*In re: Nathan Benjamin Damigo*
United States Bankruptcy Court, Eastern District of California
Case No. 19-90003-E-7
DC No. RLE-1

**Index of Exhibits to Declaration of Alan Levine in Support of Plaintiffs' Motion to (I) Modify the Automatic Stay to Allow Continuation of the Charlottesville Action Against Damigo, and (II) Hold Non-Dischargeability Action in Abeyance**

| Exhibit No. | Document | Page No. |
|---|---|---|
| A. | Motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by various defendants as Dkt. No. 136 in the United States District Court for the Western District of Virginia, Case No. 3:17-cv-00072-NKM (the "*Charlottesville Action*") on December 7, 2017 | 2 |
| B. | First Amended Complaint (the "*Amended Complaint*") filed by Plaintiffs as Dkt. No. 175 in the Charlottesville Action on January 5, 2018 | 5 |
| C. | Motion to dismiss the Amended Complaint filed by counsel on behalf of defendant Damigo as Dkt. No. 205 in the Charlottesville Action on January 26, 2018 | 118 |
| D. | Court's order and accompanying 62-page memorandum opinion, largely denying the various motions to dismiss the Amended Complaint, filed as Dkt. No. 335 in the Charlottesville Action on July 9, 2018 | 122 |
| E. | Answer to Amended Complaint filed by counsel on behalf of Damigo as Dkt. No. 343 in the Charlottesville Action on July 23, 2018 | 185 |

198192427

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA


ELIZABETH SINES  ET AL.                    :          Case No.  3:17-CV-72

     **Plaintiff**                                    :          Judge MOON


                                    :

   -v-

JASON KESSLER ET AL.                        :

                                      :

     **Defendants**

_____

### MOTION TO DISMISS THE PLAINTIFF'S COMPLAINT
_____


     Now come defendants Identity Europa, Nathan Damigo, and Elliott Kline aka Eli

Mosley, and move the Court to dismiss the Plaintiff's claims against them pursuant to

FRCP 12.


                     Respectfully Submitted,


                     s/ Elmer Woodard_____
                     ELMER WOODARD (VSB 27734)
                     5661 US Hwy 29
                     Blairs, Va. 24527
                     (434) 878-3422
                     isuecrooks@comcast.net
                     *Trial Attorney for Defendant*


1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify this Notice and all accompanying documents were served via electronic mail on December 7, 2017 upon:

All parties of record. One party is entitled to or has requested service by other means and said party has been served by regular US mail as follows:
Mr. Michael Enoch Peinovich
PO Box 1069
Hopewell Junction, NY 12533         .

s/ Elmer Woodard

_____
E. Woodard (VSB 27734)

2

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| ELIZABETH SINES, SETH WISPELWEY, MARISSA BLAIR, TYLER MAGILL, APRIL MUNIZ, HANNAH PEARCE, MARCUS MARTIN, NATALIE ROMERO, CHELSEA ALVARADO, and JOHN DOE,<br><br>                         Plaintiffs,<br><br>v.<br><br>JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT "AZZMADOR" RAY, NATHAN DAMIGO, ELLIOT KLINE a/k/a/ ELI MOSLEY, IDENTITY EVROPA, MATTHEW HEIMBACH, MATTHEW PARROTT a/k/a DAVID MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL "ENOCH" PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, and EAST COAST KNIGHTS OF THE KU KLUX KLAN a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,<br><br>                         Defendants. | Civil Action No. 3:17-cv-00072-NKM<br><br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Plaintiffs, by their undersigned attorneys, allege upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Over the weekend of August 11 and 12, 2017, hundreds of neo-Nazis and white supremacists traveled from near and far to descend upon the college town of Charlottesville, Virginia, in order to terrorize its residents, commit acts of violence, and use the town as a backdrop to showcase for the media and the nation a neo-nationalist agenda.

2.      Plaintiffs in this action are University of Virginia undergraduates, law students and staff, persons of faith, ministers, parents, doctors, and businesspersons—white, brown, and black; Christian and Jewish; young and old.  While Plaintiffs come from different backgrounds, they share a deep love of this country, their city, and our values.  They also share a fierce determination to defend those values.  Each Plaintiff in this action was injured as a result of the events in Charlottesville on August 11 and 12.  One Plaintiff suffered a stroke.  Three plaintiffs were struck in a car attack.  Others suffered and continue to suffer deep and debilitating psychological and emotional distress that prevents them from resuming their former lives or from enjoying the basic sense of peace, safety, and tranquility that most in this country can take for granted.

3.      Defendants are the individuals and organizations that conspired to plan, promote, and carry out the violent events in Charlottesville.  They are neo-Nazis, Klansmen, white supremacists, and white nationalists.  They embrace and espouse racist, anti-Semitic, sexist, homophobic, and xenophobic ideologies.  Defendants brought with them to Charlottesville the imagery of the Holocaust, of slavery, of Jim Crow, and of fascism.  They also brought with them semi-automatic weapons, pistols, mace, rods, armor, shields, and torches.  They chanted "Jews will not replace us," "blood and soil," and "this is our town now."  Starting at least as early as the beginning of 2017 and continuing through today, they have joined together for the purpose of

2

inciting violence and instilling fear within the community of Charlottesville and beyond,
wherever their messages are received.

4.      There is one thing about this case that should be made crystal-clear at the outset—
*the violence in Charlottesville was no accident.*  Under the pretext of a "rally," which they
termed "Unite the Right," Defendants spent months carefully coordinating their efforts, on the
internet and in person.  They exhorted each other:  "If you want to defend the South and Western
civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August," and,
"Next stop:  Charlottesville, VA.  Final stop:  Auschwitz."  In countless posts on their own
websites and on social media, Defendants and their co-conspirators promised that there would be
violence in Charlottesville, and violence there was.  As Defendant Eli Mosley, one of the lead
organizers for the rally, declared:  "We are [] going to Charlottesville.  Our birthright will be
ashes & they'll have to pry it from our cold hands if they want it.  They will not replace us
without a fight."

5.      The violence, suffering, and emotional distress that occurred in Charlottesville
was a direct, intended, and foreseeable result of Defendants' unlawful conspiracy.  It was all
according to plan—a plan they spent months working out and whose implementation they
actively oversaw as events unfolded on the ground.

6.      The events of August 11 and 12—now commonly referred to simply as
"Charlottesville"—were part of Defendants' coordinated campaign to intimidate, harass, incite,
and cause violence to people based on their race, religion, ethnicity, and sexual orientation in
violation not only of the values that thousands of American soldiers have died for, but also
numerous state and federal laws.  As the Utah Senator Orrin Hatch said:  "We should call evil by

its name.  My brother didn't give his life fighting Hitler for Nazi ideas to go unchallenged here at home."

7.     By this lawsuit, Plaintiffs seek to challenge Defendants' actions under the laws of the United States of America and the Commonwealth of Virginia.  Plaintiffs seek compensatory and injunctive relief.  The aim of this lawsuit is to ensure that nothing like this will happen again at the hands of Defendants—not on the streets of Charlottesville, Virginia, and not anywhere else in the United States of America.

## JURISDICTION AND VENUE

8.     The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.     Venue is properly in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b) because Plaintiffs' claims arose in Charlottesville, Virginia, which is located in the Western District of Virginia.

## THE PARTIES

**A.     Plaintiffs**

10.     Plaintiff Tyler Magill is a resident of the Commonwealth of Virginia and an employee at the library of the University of Virginia ("UVA").  He lives in Charlottesville with his wife and child.  On August 11 and 12, Magill participated in non-violent protests of Defendants' planned events.  Following the events of the weekend, Magill collapsed at his place of work and suffered a trauma-induced stroke.  Magill spent two days in the hospital and may never fully recover from the resulting brain injuries.  Magill has not been able to return to his job at the UVA library.

11.     Plaintiff Reverend Seth Wispelwey was born and raised in Charlottesville and attended UVA.  He moved back to Charlottesville four years ago with his wife and daughter.

4

Wispelwey has worked at numerous non-profit organizations that advocate for human rights, including as the head of an organization protecting victims of human trafficking. Wispelwey is an ordained Minister with the United Church of Christ and the Directing Minister of Restoration Village Arts. He is also the co-founder of a membership organization for clergy of different faiths from across the country, called Congregate, which organized numerous trainings in non-violent protest for residents of Charlottesville leading up to the events of August 11 and 12. As a result of Defendants' intentional and coordinated plans to commit violence against those who stood up for minority residents in Charlottesville, Wispelwey was harassed, intimidated, and assaulted by Defendants and their co-conspirators. Since the events of the weekend, Wispelwey has suffered extreme emotional distress that has manifested in physical symptoms including constricted chest pain, difficulty sleeping (including nightmares concerning the events of August 11 and 12), and the inability to return full-time to work.

12.     Plaintiff April Muñiz is a Mexican-American resident of the Commonwealth of Virginia. Before the events of August 12, she was the Director of Clinical Operations at a company that helps develop new treatments for patients suffering from incurable diseases. On August 12, Muñiz peacefully protested Defendants' planned event. As a result of Defendants' intentional and coordinated plans to commit violence against minority residents, Muñiz was intimidated and harassed on multiple occasions on August 12. Among other things, Muñiz was close to being hit by the car that Defendant Fields intentionally drove into a crowd of protestors in an act of domestic terrorism. Muñiz has suffered severe emotional injury, has been diagnosed with acute stress disorder and trauma, and was unable to return to work for months. She has suffered economic loss as a result of her injuries.

5

13.     Plaintiff John Doe is an African-American resident of the Commonwealth of Virginia and a student at UVA.  On August 11, John Doe peacefully protested Defendants' planned event.  On the basis of his race, John Doe was intimidated, harassed, assaulted, and sprayed with caustic substances.

14.     Plaintiff Hannah Pearce is a dermatologist who lives in Charlottesville with her husband and four children.  Pearce and her family are active members of Congregation Beth Israel.  On August 12, Pearce and her son peacefully protested Defendants' planned event.  On the basis of her religion, Pearce was threatened, harassed, intimidated, and physically assaulted.  Subsequently, a few days after the Unite the Right "rally," Defendants Andrew Anglin and Moonbase Holdings, LLC's website, Daily Stormer, intending to intimidate Pearce and her son, posted their picture online.

15.     Plaintiff Elizabeth Sines, a resident of the Commonwealth of Virginia, is a second-year law student at UVA Law School, and a graduate of Cornell University.  On August 11 and 12, Sines peacefully protested Defendants' planned events.  As a result of witnessing the events of the weekend, including the domestic terrorist attack on August 12 where Defendant Fields drove a car into a crowd, Sines has suffered from severe emotional distress and shock.

16.     Plaintiff Marissa Blair is a multi-racial resident of the Commonwealth of Virginia.  She works as a paralegal.  On August 12, Blair was peacefully protesting when Defendant Fields drove his car into a crowd of protestors, killing Blair's co-worker and friend, Heather Heyer.  Fields's car narrowly missed Blair only because her fiancé, Plaintiff Marcus Martin, pushed her out of the way before being hit himself.  Blair suffered physical injuries and continues to suffer from severe emotional distress as a result of Defendants' actions.

6

17.     Plaintiff Marcus Martin is an African-American resident of the Commonwealth of Virginia.  He works as a landscaper.  On August 12, Martin was peacefully protesting the Unite the Right "rally."  He was struck by Defendant Fields, who drove his car into a crowd of protestors in an act of domestic terrorism.  Martin pushed his fiancée out of the way of the speeding car, but he was severely injured by the attack, including sustaining a broken leg and ankle that required surgery.  He continues to suffer severe emotional distress as a result of Defendants' actions.

18.     Plaintiff Natalie Romero is a Colombian-American undergraduate at UVA.  On August 11, Romero was one of a group of community members and students who were surrounded by torch-bearing neo-Nazis and white supremacists at the Rotunda.  On August 12, Romero peacefully protested Defendants' planned event.  Romero was on Fourth Street when Defendant Fields intentionally drove a car into the crowd of protestors in an act of domestic terrorism.  Romero was struck by the vehicle driven by Fields and sustained many injuries.  The car knocked her unconscious, fracturing her skull and leaving her with a concussion.  The car also fractured the root of one tooth and left severe contusions across her body.  Romero continues to suffer vertigo and debilitating headaches.  It is unclear when Romero's symptoms will subside.  In addition to her physical injuries, Romero also suffered severe emotional distress as a result of the planned event and terrorist attack on August 12, and has feared returning to the UVA campus.  As a result of her physical and emotional trauma, Romero has already missed a semester of school.

19.     Plaintiff Chelsea Alvarado is a resident of Richmond, Virginia.  She works as a crisis counselor for the homeless and mentally ill.  On August 12, Alvarado peacefully protested Defendants' planned event.  She was struck by Defendant Fields when he drove his car down

7

Fourth Street into a crowd of protestors.  She narrowly missed being hit again by Fields when he drove his car backwards up the street.  The car knocked Alvarado to the ground, causing her to suffer serious injuries, including a concussion and severe contusions on her legs.  Alvarado continues to experience side-effects of the concussion including confusion, forgetfulness, and difficulty processing normal conversations.  Alvarado has also suffered severe emotional distress as a result of the August 12 events.

**B.**    **Defendants**

20.    Defendant Jason Kessler is a white nationalist and a member of the Proud Boys. A resident of Charlottesville, Virginia, Kessler uses the handle "MadDimension" on Discord and @The_MadDimension on Twitter.  Together with Defendant Mosley, Kessler led the organizing efforts for the Unite the Right "rally" in Charlottesville.  Kessler is also the president and founder of Unity and Security for America, a grassroots organization that claims it is dedicated to "defending Western civilization" and is a contributor to websites like VDare.com, a xenophobic, nativist publication, and the Daily Caller, a conservative news outlet.  Kessler was the lead organizer for the Unite the Right "rally" and was one of the names featured on a promotional poster for the "rally."  In January 2017, Kessler attacked a man in downtown Charlottesville while collecting signatures for his petition to remove the African-American vice mayor, Wes Bellamy, from the Charlottesville City Council.  In April, Kessler pleaded guilty to a misdemeanor charge for the assault and was then charged with felony perjury for lying to the police in connection with the assault.

21.    Defendant Richard Spencer, a resident of the Commonwealth of Virginia who attended UVA, is the head of the white nationalist "think tank," National Policy Institute.  In 2010, Spencer created an online publication called altright.com.  Spencer organizes his followers

8

to act in furtherance of his ideology, calling for an "ethnic cleansing."  Spencer planned and led

the violent torchlight rally at his alma mater on Friday evening.  Spencer actively promoted the

Unite the Right "rally" on Saturday to his numerous followers on social media and encouraged

and incited intimidation and violence based on racial, religious, and ethnic animosity.

22.     Defendant Christopher Cantwell is a resident of New Hampshire and is a white

nationalist and a self-proclaimed fascist.  He hosts "Radical Agenda," a podcast and YouTube

show streamed live multiple times a week, and runs the website christophercantwell.com.

Cantwell has stated that once he "realized that [Jewish people] were responsible for the

communism," he decided, "let's fucking gas the kikes and have a race war." He has written:  "I

think chemical and biological weapons can do a great deal of good for mankind.  Releasing

nerve gas or some kind of lethal virus into a left wing protest could prepare the bodies for

physical removal without making a big scene for the cameras or destroying anything of value."

In connection with the Unite the Right "rally" in Charlottesville on August 11 and 12, Cantwell

was charged with two felony counts of illegal use of tear gas and one felony count of malicious

body injury by means of a caustic substance.  He was indicted on December 4 on a felony charge

of illegal use of tear gas.

23.     Defendant James Alex Fields, Jr., a resident of Ohio, is a member of Defendant

Vanguard America.  Motivated by racial, religious, and ethnic animosity, and in furtherance of

Defendants' conspiracy, on August 12, Fields committed an act of domestic terrorism by driving

a Dodge Challenger into a crowd of protesters, injuring dozens and killing a 32-year old woman,

Heather Heyer.  On December 18, he was indicted on one count of first degree murder, three

counts of malicious wounding, three counts of aggravated malicious wounding, two counts of

felonious assault, and one count of hit and run (leaving the scene of an accident).

9

24.     Defendant Vanguard America is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of Vanguard America voluntarily join for the common purpose of promoting white nationalism and believe that people with "white blood" have a special bond with "American soil."  It was formed in California in 2015 and is comprised of twelve chapters across the country.  The group's website states that to join the group, a person must be "of at least 80% white/European heritage."  Defendant Fields is a member of Defendant Vanguard America; he wore their uniform and carried a Vanguard America shield at the Unite the Right event on August 12.

25.     Defendant Andrew Anglin is a resident of Ohio, a neo-Nazi, and the founder of Daily Stormer—an organization that operates through a website that Anglin publishes.  Daily Stormer has called its website the "world's most genocidal" website.  Daily Stormer was named after Der Stürmer, a Nazi propaganda tabloid known for virulently anti-Semitic caricatures and published by Julius Streicher, who was later convicted of crimes against humanity at Nuremberg. Until recently, Daily Stormer had a website at www.dailystormer.com.  Anglin and his associates at Daily Stormer, including Defendant Robert "Azzmador" Ray, use Daily Stormer "as a hardcore front for the conversion of masses into a pro-white, Anti-Semitic ideology," to "sell [] global white supremacy," and to "make a racist army."  The website, which became the most visited hate site on the Internet in 2016, includes sections entitled "Jewish Problem" and "Race War."  The Chief Technical Officer of Daily Stormer has posited that Daily Stormer "has been effective at what [it is] doing" by "the manifestation of our people on the ground in the real world."  Followers of Anglin and Daily Stormer, who call themselves "Stormers," communicate on the website's forum, which is moderated by Anglin and accessible only with a special "dark web" tor browser.  On Anglin's orders and under his continuing supervision, Stormers have

10

formed local chapters, called "Stormer Book Clubs," as part of Anglin's plan to "build an invisible empire." Anglin uses the Daily Stormer forum to actively monitor the Book Clubs and uses the website to issue orders on how to organize. "Official Operations" of Stormer Book Clubs include firearms training, organizing for protests, and being ready to respond to "challenges" issued by Anglin. Daily Stormer established "meet ups" and chat rooms that co-conspirators and attendees used throughout the August 11 and 12 weekend to coordinate their violence. The Daily Stormer released its own poster promoting the "rally" that read, "UNITE THE RIGHT/ Join Azzmador and the Daily Stormer to end Jewish influence in America," accompanied by a Nazi-like figure wielding a hammer, ready to smash a Jewish star. For months before the Unite the Right events on August 11 and 12, Anglin organized his followers to attend and prepared them to commit racially motivated violent acts in Charlottesville. Although Anglin did not attend the rally himself because he is currently in hiding to evade service in connection with a separate lawsuit relating to events in Whitefish, Montana, Anglin orchestrated the movements of Daily Stormer followers and incited them to violence on a live feed that streamed contemporaneously with the events as they occurred on August 11 and 12 in Charlottesville. Moreover, Anglin uses the Daily Stormer to entice his followers to harass and intimidate "Jew/feminist/etc." individuals by mandating in its "style guide" that the authors always include the targeted individuals' social media accounts because "[w]e've gotten press attention before when I didn't even call for someone to be trolled but just linked them and people went and did it."

26.      Defendant Moonbase Holdings, LLC is an Ohio, for-profit, limited-liability corporation registered by Defendant Anglin that operates the Daily Stormer's website. Defendant Anglin has encouraged readers to financially support the Daily Stormer by sending

donations using bitcoin, checks, and credit cards, noting that "it won't say 'Daily Stormer' on your credit card bill, but will instead say 'Moonbase Holdings,' which either sounds like a hobby shop or a multi-level marketing scheme run by reptoids.  Anyway, it looks innocuous on your statement."

27.    Defendant Robert "Azzmador" Ray, a resident of Texas, is a neo-Nazi and a writer for Daily Stormer's website.  He has held himself out as a representative of Daily Stormer, and served as an agent of Daily Stormer in organizing the Unite the Right events.  He is the leader of the "Dallas Fort Worth Stormer Book Club," which is one of many local Daily Stormer groups across the country.  In his articles published on Daily Stormer's website, Ray encouraged extremists to attend the events in Charlottesville on August 11 and 12 and incited them to violence.  Ray attended the "rally" himself and had a planning meeting with certain other Defendants in Charlottesville on August 11.

28.    Defendant Nathan Damigo, a resident of California, is a white nationalist and the founder of a white supremacist organization, Defendant Identity Evropa.  Defendant Damigo was arrested on April 15, 2017 for assaulting a woman at the "Battle for Berkeley" rally, which Damigo described as a test run for the "rallies" in Charlottesville.  Defendant Spencer has stated that Damigo and his group, Identity Evropa, took the lead in organizing white supremacist participation among people from outside Charlottesville in connection with the events on August 11 and 12.

29.    Defendant Eli Mosley, who is a resident of Pennsylvania, is a white supremacist and was the leader of Identity Evropa from August to November 2017.  He is also a co-founder with Defendant Richard Spencer of Operation Homeland, a new organization that aims to take white nationalist activism "to the next level."  He has described himself as the "command soldier

major of the 'alt-right'" and as the organizer of the Unite the Right "rally." On certain social media networks, Mosley has used the handles @NotEliMosley and @ThatEliMosley. Mosley was one of the key figures who planned and led the events of August 11 and 12.

30.     Defendant Identity Evropa is an unincorporated association pursuant to Virginia Code § 8.01-15. Members of Identity Evropa voluntarily joined for the common purpose of promoting a "white American identity." It was founded in March 2016 by Defendant Damigo, and on August 27, 2017, Defendant Mosley succeeded him as "chief executive officer." The group is currently led by Patrick Casey, Identity Evropa's former Chief of Staff. The group adopted and popularized the white supremacist slogan, "You will not replace us" that Defendants and co-conspirators chanted as they marched on August 11 and 12.

31.     Defendant Matthew Heimbach, a resident of Indiana, is the chairman of Defendant Traditionalist Worker Party ("TWP"). In 2013, Heimbach and Defendant Matthew Parrott founded the neo-Nazi Traditionalist Youth Network, a white nationalist group that promotes a racist interpretation of Christianity. Alongside Defendant Jeff Schoep, the leader of National Socialist Movement ("NSM"), Heimbach co-chairs the Nationalist Front, an umbrella organization of approximately twenty white supremacist organizations, including racist skinhead crews, Klan groups, and neo-Nazi groups. He has said, "Of course we look up to men like Adolf Hitler . . . as inspirations for what we can achieve." Heimbach organized and led marchers from TWP on August 12.

32.     Defendant Matthew Parrott, a resident of Indiana, is the co-founder of the Traditionalist Youth Network along with his stepson-in-law, Defendant Heimbach. He is currently the Chief Information Officer and Director of Defendant TWP. On August 12, Parrott refused to leave Emancipation Park after a state of emergency was declared and was arrested by

13

the police for failing to disperse. Parrott wrote an account of his experiences at the Unite the Right "rally," in "Catcher in the Reich: My Account of my Experiences in Charlottesville." In it, he wrote that Defendants TWP, League of the South, NSM, and other Nationalist Front groups joined together to "help create two shield walls" for "the fight."

33.       Defendant Traditionalist Worker Party ("TWP") is an unincorporated association pursuant to Virginia Code § 8.01-15, and a national political party committee registered with the Federal Election Commission since 2015. Members of TWP voluntarily joined for the common purpose of promoting anti-Semitism. According to Defendant Heimbach, the TWP has three dozen active chapters and an estimated 500 members across the country. The TWP was created by Defendants Heimbach and Parrott. The TWP has said: "Trust nobody who fails to name the Jew, who fails to explicitly and consistently oppose the Jew, and who preaches cleverness or nuance on the JQ [Jewish Question]." Members of the TWP prompted, attended, and fully participated in the events in Charlottesville on August 11 and 12, including by engaging in violence.

34.       Defendant Michael Hill, a resident of Alabama, is the co-founder and President of Defendant League of the South, a white nationalist organization. In 2014, Hill and the League of the South announced the formation of an armed, paramilitary unit dubbed "the Indomitables," tasked with advancing southern secession by any means necessary. In May 2015, Hill published an article in which he asserted: "We Southern nationalists do not want a race war (or any sort of war). But if one is forced on us, we'll participate. . . . Southern whites are geared up and armed to the teeth. . . . So if negroes think a "race war" in modern America would be to their advantage, they had better prepare themselves for a very rude awakening." Hill, whose name was featured on a promotional poster for the "rally," encouraged League of the South followers

to attend by urging them not to "miss out on the fun" in dealing with counter-protestors—their purported enemies.  On August 12, League of the South, led by Hill, marched through Charlottesville after Vanguard America.  Like Vanguard America, they marched with coordinated shields and flags and carried rods and other weapons.

35.     Defendant Michael Tubbs, a resident of Florida, is the "Chief of Staff" of Defendant League of the South.  Tubbs is captured on a video from August 12 ordering League of the South to attack by yelling "charge!"  After receiving this command, the group streamed past him to attack counter-protestors.  Defendant Hill later boasted that "Mr. Tubbs was everywhere the chaos was."  Tubbs previously served a four-year prison sentence for planning to bomb Jewish- and black-owned businesses in Florida.

36.     Defendant League of the South, a privately held company located in Alabama, is a white supremacist group that advocates Southern secession.  Prior to the events on August 11 and 12, Defendant Hill posted in the League's Facebook group that he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." Numerous members of the League of the South participated in Saturday's violent events together with co-defendants.

37.     Defendant Jeff Schoep, a resident of Michigan, is the leader of Defendant National Socialist Movement, the largest neo-Nazi coalition in the United States.  On April 22, 2016, Schoep formed the Aryan Nationalist Alliance, later renamed the Nationalist Front, which is the umbrella organization for hate groups such as the TWP, the Aryan Terror Brigade, and many regional factions of the Ku Klux Klan.  Schoep has said that if he could meet Adolf Hitler today, he would say, "Thank you for your sacrifice, and I hope we have honored you in some small way by carrying on the fight."  Schoep participated actively in the events of August 11 and

15

12 and tweeted afterwards that, "It was an Honor to stand with U all in C'Ville this weekend. NSM, NF, TWP, LOS, VA, ECK, CHS, and the rest, true warriors!"[1]

38.     Defendant National Socialist Movement ("NSM") is an unincorporated association pursuant to Virginia Code § 8.01-15.  Members of NSM voluntarily joined for the common purpose of promoting a "greater America" that would deny citizenship to Jews, non-whites, and LGBT persons.  Located in Michigan, NSM is paramilitary in structure; its members claim to be lieutenants, sergeants, or other military ranks.  Defendant Schoep, the head of NSM, has served as its "Commander" since 1994.  Chapters of the groups are termed "units."  NSM maintains a business through NSM88 Records LLC selling neo-Nazi flags, swastikas, gear, etc. Members of NSM participated in the violence that took place in Charlottesville on August 11 and 12.

39.     Defendant Nationalist Front is an unincorporated association pursuant to Virginia Code § 8.01-15, whose members voluntarily joined for the common purpose of promoting white nationalism and white supremacy.  Formerly known as the Aryan National Alliance, Nationalist Front is an umbrella organization consisting of white supremacist and white nationalist groups, including neo-Nazi and Klan groups.  The Nationalist Front is led by Defendants Schoep, Heimbach, Hopper, and Hill.  The Nationalist Front was conceived to be "the thread that would unite white supremacist and white nationalist circles."  Various members of the Nationalist Front engaged in acts of violence and intimidated residents of Charlottesville on August 11 and 12.

40.     Defendant Augustus Sol Invictus, formerly Austin Mitchell Gillespie, a resident of Florida, is a white nationalist, a white supremacist, and a member of Defendant Fraternal

---

[1] This tweet refers to Defendants Nationalist Front, TWP, League of the South, Vanguard America, and East Coast Knights.

16

Order of Alt-Knights ("FOAK"), the "military wing" of the Proud Boys, a group described as a

"'pro-Western fraternal organization' for men who 'refuse to apologize for creating the modern

world.'" He has said that a violent, second Civil War is necessary in order to preserve "Western

civilization." On August 14, 2017, Invictus announced his candidacy as a Republican for the

2018 Senate election in Florida. Invictus, whose name was featured on a promotional poster for

the "rally," drafted the "Charlottesville statement" along with Spencer and others, and

participated in the torchlit rally on August 11 with co-Defendants.

41.    Defendant Fraternal Order of the Alt-Knights ("FOAK") is an unincorporated

association pursuant to Virginia Code § 8.01-15 and is self-described as the "tactical defensive

arm" of Proud Boys, formed to focus on "street activism, preparation, defense, and

confrontation." Defendant Invictus is second in command at FOAK and FOAK attended the

"rally" in part to provide security to him.

42.    Defendant Michael "Enoch" Peinovich, a resident of New York, is the founder of

the blog and website The Right Stuff and a co-host of the Daily Shoah podcast. On social media,

Peinovich has at various times used the handles @NotMikeEnoch and @mikeenochsback.

Peinovich frequently appears at events alongside Defendant Spencer. Peinovich was featured on

a promotional poster for the "rally." On August 12, in the immediate aftermath of the car attack,

Spencer and Peinovich spoke to their followers at McIntire Park.

43.    Defendant Loyal White Knights of the Ku Klux Klan ("Loyal White Knights") is

an unincorporated association pursuant to Virginia Code § 8.01-15. Members of Loyal White

Knights voluntarily joined for the common purpose of promoting white nationalism and white

supremacy. Based in Pelham, North Carolina, the association only accepts "native-born white

American Citizen[s]" as members. Following the events in Charlottesville on August 11 and 12,

17

the Loyal White Knights changed their outgoing voicemail message to say: "Nothing makes us more proud at the KKK than when we see white patriots such as James Fields, Jr., age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer. James Fields hail victory. It's men like you that have made the great white race strong and will be strong again."

44.　　Defendant East Coast Knights of the Ku Klux Klan a/k/a East Coast Knights of the True Invisible Empire ("East Coast Knights") is an unincorporated association pursuant to Virginia Code § 8.01-15. Members of East Coast Knights voluntarily join for the common purpose of promoting white nationalism and white supremacy. It is active in several states, and has a subdivision or "klavern" in the state of Maryland. Tom Larson is the imperial wizard of the East Coast Knights of the True Invisible Empire. The East Coast Knights, using the handles @tightrope33_6 and @Tightrope336, frequently tweets racist images and comments; on September 19, 2017, it tweeted pictures of burning crosses, labeled an image of lynched black men as "Alabama wind chimes," and tweeted a cartoon of a Klansman using two black men hung from trees as a hammock in which to read the newspaper and drink an iced tea. The East Coast Knights was a key participant in the July 8 Klan rally, and conspired with the Nationalist Front and other Defendants to organize and participate in the violent events of August 12.

## FACTS

45.　　Defendants are white supremacist, white nationalist, and neo-Nazi organizations and individuals, who have as part of their mission to engage in racial, religious, and ethnically motivated violence, threats, intimidation, and harassment. The events in Charlottesville are part of Defendants' recent concerted efforts to move from the shadows of anonymous, disassociated,

18

online chatrooms and into a more open, organized, physical presence in our parks and on our streets.  Defendants are co-conspirators with each other and others unnamed.

**I.  Defendants And Unnamed Co-Conspirators Conspired To Commit Acts Of Violence, Intimidation, And Harassment Against The Citizens Of Charlottesville, Virginia**

**A.  <u>Defendants Targeted Charlottesville in the Months Prior to August 11 and 12 ("the Summer of Hate")</u>**

> When the Jews took over our society and turned it into a kiked-out living hell, they marked their achievement by declaring a "Summer of Love." . . . They took everything away from us.  That age is ending now.  We are taking back our birthright.  This summer, a Black Sun will pass over America. . . .  I am declaring the summer of 2017 the Summer of Hate.

> *Defendant Andrew Anglin*

46.     In furtherance of their above-stated goal, Defendants plotted to target Charlottesville, Virginia as part of what they called the "Summer of Hate."

47.     Defendants selected Charlottesville because, among other things, the city was engulfed at the time in a debate over the statue of General Robert E. Lee in a small city park.  In February 2017, the Charlottesville City Council voted to remove the Lee statue and, in June 2017, it voted to rename the park in which it stood from Lee Park to Emancipation Park.

48.     Defendants used the planned removal of the Lee statue as a rallying cry for their followers, seeking to preserve its place in the park, and use the debate about the statue as a means to stir up violence and harass, threaten, and intimidate the residents of Charlottesville.

49.     For example, Defendants Kessler and Spencer invited white supremacist groups to visit and hold events around the statue with the intent of intimidating nonwhite and Jewish individuals and their allies.

50.     On May 13, 2017, hundreds of neo-Nazis and white supremacists carried lit torches and surrounded the statue of Robert E. Lee, in an event organized and planned by, among

19

others, Defendants Kessler, Spencer, Damigo, Peinovich, Heimbach, Identity Evropa, Vanguard America, TWP, and League of the South.  Defendants and participants carried altright.com-branded signs[2] reading "we will not be replaced."  They chanted "you will not replace us" and "blood and soil."  "Blood and soil" is a translation of "Blut und Boden," a German nationalist philosophy that lay at the heart of Nazi policies.  The slogan expresses the idealization of a racially defined national body ("blood") unified with a settlement area ("soil").  It is inextricably linked with the contemporary German idea of *Lebensraum*—the belief that the German people needed to reclaim historically German areas of Eastern Europe into which they could expand—which was the driving ideology behind Hitler's invasion of neighboring countries and the mass murder of their citizens.

51.     The May 13 event was planned and intended to intimidate, threaten, and harass Charlottesville residents on the basis of race, religion, and ethnicity.  Defendant Kessler said he hoped that the May event would be a "fantastic first event" in a "cultural 'civil war.'"  Defendants' avowed goal was to promote and create an atmosphere of religious and racial subordination on the streets of Charlottesville, ideally through the infliction of violence or emotional distress.

52.     At a lunch before the event, Defendant Spencer—sharing a podium with Defendants Damigo, Peinovich, and Kessler, as well as co-conspirator Sam Dickson—explained: "What brings us together is that we are white, we are a people.  We will not be replaced."

53.     Defendants later acknowledged the success of their careful, deliberate, and months-long planning.  The Daily Stormer's website reported that "[t]he 200+ honorable whites

---

[2] Altright.com is Defendant Spencer's website.

marched to the base of the statue as they carried torches reminiscent of the 3rd Reich."  In an essay about the May 13 event, entitled "Why We Fight," Vanguard America explained:

> "The purpose of the gathering was not simply over some metal sculpture atop a pedestal in a small Southern City.  It was about defending the images of white history, white heroes, and white America. . . .

> [T]he greatest spectacle of the event came as we lit our torches for the night march.  As we approached Lee Park for the last time, our footsteps shook the whole city. . . . This movement must begin as a spiritual movement. . . . To quote a wise /pol/lak, "If you want to gas the Jews, you must first gas the Jew within yourself."

> After a few words from Spencer and Dickson, we blew out our torches, our spiritual cups filled for perhaps the first time in all of our lives and once again shouted our deafening chants, shaking the entire city with our might.

> There will be many more of these events.  This march on Charlottesville was just the beginning of the inevitable Revolution of our people.

> Hail Victory!

54.    This May event would later be referred to by conspirators as "Charlottesville 1.0."

55.    Capitalizing on the perceived success of the May event, and motivated by the same desire to achieve racial and religious subordination of city residents, Defendants began planning for additional events in Charlottesville.  On May 30, Kessler submitted an application for a permit to hold the Unite the Right "rally" on the weekend of August 11 and 12.

56.    In June, Defendant Kessler invited Defendants and others to come to Charlottesville for a "Proud Boys" event, which was designed to promote violence and

intimidate minority residents in advance of the Unite the Right "rally."[3]  As one of the Proud Boys in attendance noted, the group wanted to bait protestors because "a lot of us kinda like to see them bleed."  Another Proud Boy reminded others:  "This of course is just the beginning. There are also bigger [ ] events planned for . . . Charlottesville on August 12."

57.     On July 8, 2017, a third white supremacist event was held in Charlottesville, this time by Defendant Loyal White Knights. Nearly fifty Klansmen marched through the streets shouting "white power," and carrying signs that read:  "Jews are Satan's children."  Some wore white Klan robes, and many carried guns.

58.     Plaintiff Romero peacefully protested at the July 8, 2017 Klan march.  Following July 8, Romero received the first of four harassing phone calls from a member of the Klan.  In the first call, the man explained that as a member of the Klan, he loved going to Charlottesville to demonstrate the organization's power, and asked Romero if she understood that white people are the superior race.  As described in paragraphs 274 and 275 below, the later calls, which occurred after Romero was seriously injured by Fields's act of domestic terror on August 12, were more threatening.

59.     Kessler attended and live-streamed the Klan march on Twitter.  He shared a tweet with his followers:  "#UniteTheRight against these shitlibs in Charlottesville on August 12th is going to be so much fun.  You've got a month to be there."

---

[3] As part of the weekend, Kessler was beaten in an alley in Charlottesville by Proud Boys members until he could name five breakfast cereals. This "cereal beat-in" is the "second degree" of initiation into the Proud Boys. The first degree is a declaration of allegiance to the Proud Boys. The second degree is the cereal beat-in and a renouncement of masturbation (although Proud Boys "Pope" Dante Nero has framed the rule as requiring that a man should only ejaculate within a yard of a woman).  The third degree involves getting a tattoo and the fourth degree requires a "major fight for the cause," meaning you "kick the crap out of antifa" and possibly get arrested.

**B.**     <u>Defendants Planned and Coordinated a Scheme to Incite Violence, Threaten,</u>
        <u>Intimidate, and Harass Charlottesville Residents on August 11 and 12</u>

> The age of ultraviolence is coming. I don't know when, but I do
> know that most of you will live to see it.
>
> There is rapidly approaching a time when in every white Western
> city, corpses will be stacked in the streets as high as men can stack
> them.
>
> And you are either going to be stacking or getting stacked . . .
>
> There will be leaders. You need to be prepared to recognize them
> for who they are, and you need to be prepared to do whatever they
> tell you to do, exactly as they tell you to do it . . .
>
> *Defendant Andrew Anglin*

60.    Defendants and their co-conspirators conspired to incite violence and to threaten, intimidate, and harass the civilian population of Charlottesville, and in particular, racial, ethnic or religious minorities, and to commit other unlawful acts as described herein. For weeks, Defendants acted on the basis of racial, religious, and/or ethnic animus, and with the intention to deny Jewish people and people of color, as well as people advocating for the rights of Jewish people and people of color, equal protection and other rights that they are guaranteed under state and federal law. Defendants' conspiracy ultimately achieved its stated goals and did in fact repeatedly, systematically, and unmistakably violate the rights of religious and racial minorities in Charlottesville.

61.    The application for the Unite the Right permit submitted by Defendant Kessler claimed that the event would be a protest of the removal of the Lee monument, but Defendants also intended that the rally would instill fear in Charlottesville's minority population and cause violence. They wanted to use the events of the weekend to intimidate the broader civilian population and recruit more followers to Defendants' groups.

23

62.     An article by Defendants Anglin and Ray published on the Daily Stormer's website on August 8 explained that the purpose of the "rally" had shifted from being "in support of the Lee Monument, which the Jew Mayor and his Negroid Deputy have marked for destruction" to "something much bigger than that . . . .  It is now an historic rally, which will serve as a rallying point and battle cry for the rising Alt-Right movement."

63.     Defendants Kessler, Spencer, Anglin, Ray, Cantwell, Mosley, Damigo, Invictus, Peinovich, Heimbach, Parrott, Hill, Tubbs, Fields, and Schoep, on behalf of themselves and the groups to which they belong, and Defendants Identity Evropa, FOAK, Vanguard America, TWP, League of the South, NSM, Nationalist Front, Loyal White Knights, and East Coast Knights, along with Daily Stormer (Defendant Moonbase Holdings), through their leadership and members, all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville.  They also coordinated with numerous named and unnamed co-conspirators.

64.     Defendant Spencer and co-conspirator Evan McLaren, a member of Defendant Identity Evropa, met in person at the Trump Hotel in Washington, D.C. to organize and direct the "rally" in Charlottesville, with the purpose and result of committing acts of violence, intimidation, and harassment against the citizens of Charlottesville.

65.     Defendants Cantwell and Kessler met in Charlottesville on August 9 to plan and direct the unlawful acts of violence, intimidation, and denial of equal protection of law.

66.     Defendants Ray, Cantwell, and Mosley and co-conspirator David Duke attended another in-person meeting on August 11 to plan and direct the unlawful acts of violence, intimidation, and the denial of equal protection of law.

24

67.     Defendants Nationalist Front, NSM, TWP, League of the South, Vanguard America, East Coast Knights, and "other allies," coordinated their attendance as a "joint operation" in advance of August 12 to plan, direct, and prepare for unlawful acts of violence, intimidation, harassment, and denial of equal protection to Charlottesville citizens.

68.     Defendants also frequently coordinated the illegal acts planned for the Unite the Right event online. They made use of websites, social media (including Twitter, Facebook, 4chan, and 8chan), chat rooms, radio, videos, and podcasts to communicate with each other and with their co-conspirators, followers and other attendees and did so to plan the intended acts of violence, intimidation, and the denial to citizens of the equal protection of laws.

69.     For years, Defendants and others unnamed have used the Internet to, in Defendant Anglin's terms, "solidify a stable and self-sustaining counter-culture." Use of the Internet is part of the ways, manner, and means of how Defendants' conspiracy operated and operates.

70.     Defendants and co-conspirators coordinated by posting articles on their own websites, and by using social media to send and share messages for the "rally" and to encourage attendance and the commission of illegal acts. They interviewed one another about the plans for the "rally," and shared those messages on podcasts or other video-streaming services. They agreed to mobilize their respective members and followers to attend and be violent and suppress the equal rights of Charlottesville citizens. According to Spencer, for example: "Damigo and his group [Identity Evropa] took the lead to organize white supremacist participation among people from outside Charlottesville."

71.     One Internet tool Defendants used extensively to plan and direct illegal acts was the chat platform Discord. Originally developed as a messaging platform for group "game play," Discord is set up as a series of private, invite-only servers, each providing a space for real-time

group discussion.  Each server is organized into "channels," indicated by a "#" before the name.  Participants in the chat use "handles" or nicknames to identify themselves.  Participants can request to be "tagged" as a member of a group.   Once tagged, the participants can read and participate in that group's chats.

72.    A "Charlottesville 2.0" server was established on Discord in June 2017.  This server was used to direct and plan unlawful acts of violence, intimidation, and denial of equal protection of law at the Unite the Right "rally."  One user explained that Discord was "for closed, top super secret communications intended for the elite inner circle of the alt-right."[4]  Defendants used Discord as a tool to promote, coordinate, and organize the Unite the Right "rally," and as a means to communicate and coordinate violent and illegal activities "in secret" during the actual events of that weekend.

73.    Discord was moderated, reviewed, directed, and managed by Defendants Kessler and Mosley, along with their co-conspirators.  As moderators of the group, they were able to view all of the posts, invite or reject participants, and delete messages they did not condone.  The group was "invite only" and not open to the public.

74.    Individual Defendants, including Heimbach, Parrott, Cantwell, and Ray, were all participants on Discord, and participated in the direction, planning, and inciting of unlawful and violent acts through Discord.

75.    These Defendants and their co-conspirators used Discord for regular "leadership" meetings through which they shared information and plans.  Defendants also used Discord to distribute what they called "Orders" to co-conspirators and attendees.  One document posted by

---

[4] Another user explained, "unless Jason or Eli made this server public without telling me. . .  this isn't a public server. It's invite only through our trusted, pre-vetted alt-right servers. Not sure who told you it's public."

Defendant Mosley was entitled "General Orders" for "Operation Unite the Right Charlottesville

2.0."

76.     There were at least 43 channels set up on Discord as a means of sharing specific

information.  Those channels included:

| | | |
|---|---|---|
| #announcements | #news | #ma_ct_ri |
| #dixie-lyrics | #safety_planning | #vt_nh_me |
| #mod_help | #alex_jones_chat | #great_lakes_region |
| #confirmed_participants | #pictures_and_video | #midwest_region |
| #shuttle_service_information | #beltway_bigots | #ky_tn |
| #code_of_conduct | #voice_chat | #tx_ok |
| #self_promotion | #friday-night | #florida |
| #flags_banners_signs | #sunday-night | #georgia |
| #promotion_and_cyberstrike | #chants- | #carolinas |
| #gear_and_attire | #virginia_laws | #california_pacific_nw |
| #antifa_watch | #lodging | #carpool_available |
| #demonstration_tactics | #lodging_wanted | #ny_nj |
| #sponsors_only | #lodging_available | #pennsylvania |
| #i_need_a_sponsor | #carpool_wanted | #dc_va_md |

77.     They also had a channel called #questions_for_coordinators, where participants

could ask questions of the organizers, and a channel for the "leadership," reserved for

conversations among the main organizers of the event about "planning" and "infrastructure," as a

leader of Defendant Vanguard America later described it.  With the permission of a moderator,

individuals could be "tagged" as members of certain organizations.  Defendants Vanguard

America, Identity Evropa, TWP, and League of the South, as well as Daily Stormer (Moonbase

Holdings) and its "book club" chapters, all had "private organization channel[s]" on the

Charlottesville 2.0 Discord server that allowed their tagged members to participate in private

group communications in advance of the "rally."

78.     Defendants enlisted other co-conspirators to coordinate and organize the "rally,"

through Discord and other means.  For example, one individual, using the Discord handle

"Tyrone" (hereinafter Tyrone), agreed with Defendant Kessler that he would coordinate

27

transportation for attendees on August 12. Others were tasked with helping Defendants Kessler and Mosley moderate the Discord server. Another individual, using the Discord handle "Caerulus Rex," was the coordinator between various "security details" that were established by Defendants and their co-conspirators. "Caerulus Rex" has also been identified as a frequent bodyguard of Defendant Spencer.

79. Promotional materials, often promoting and inciting violence, were added to Discord in order to be shared and utilized more broadly.

80. Defendants also used Discord to coordinate how they would communicate on other social media. For example, they told followers to use #UniteTheRight and #Charlottesville on Twitter, so that they and their followers could closely communicate during the weekend of the "rally." They shared that hashtag through Discord.

81. Additional Discord servers were used by Defendants and co-conspirators to spread the word about the events in Charlottesville and to encourage followers to show up and be prepared for violence.[5] For example, Defendant Vanguard America has at least one Discord server, called Southern Front, which was established for members of the group living in southern states. Vanguard America leaders, who were active on the Charlottesville 2.0 Discord server, used the Southern Front server to coordinate attendance of additional Vanguard members and to provide channels of communication between Vanguard members and the main organizers of the Charlottesville event.

82. Certain co-conspirators in a self-styled "anti-Antifa" group, called "Anticom," which purports to provide defensive violence at white supremacist events like the

---

[5] In this First Amended Complaint, references to "Discord" are to the Charlottesville 2.0 Discord server, except where otherwise indicated.

28

"Battle for Berkeley," organized in their own Discord server.  The leader of Anticom was active on the Charlottesville 2.0 server, and then used the Anticom server to tell followers to attend the event and bring weapons, pursuant to the directives of the "rally" organizers.

83.      Although certain posts on the Charlottesville 2.0, Southern Front, and Anticom Discord servers have been made public, numerous other Discord servers and channels were used along with the aforementioned servers to plan and coordinate attendance and violent acts at the events of August 11 and 12.  These additional servers and channels have not yet been made public.  Likewise, the #leadership channel on the Charlottesville 2.0 server remains undisclosed.[6]

84.      Defendants Anglin and Ray likewise established "meet ups" and chat rooms through the Daily Stormer's website that co-conspirators and attendees were told to use throughout the weekend to coordinate their actions.

85.      A "Charlottesville Statement" was distributed by Defendant Spencer, setting out the philosophy and ideology underlying the "rally."  He was aided in drafting his manifesto by Defendant Invictus, co-conspirator McLaren, and others.  Among other things, the Charlottesville Statement holds that "'Judeo-Christian values' might be a quaint political slogan, but it is a distortion of the historical and metaphysical reality of both Jews and Europeans" and that "Nations must secure their existence and uniqueness and promote their own development and flourishing. . . . Racially or ethnically defined states are legitimate and necessary."

**C.      Defendants Promoted Attendance, Violence, and Imagery Designed to Threaten, Intimidate and Harass**

[T]his will clearly be an earth-shaking day that will go down in the history books . . . our time has come.

_____

[6] One co-conspirator, an organizer of the Unite the Right event and leader of Defendant Vanguard America, who was active on the Southern Front and Charlottesville 2.0 Discord servers, posted in the Southern Front server in response to reports that certain Discord conversations had been made public:  "We have been aware of that. The chat logs were released to unicorn riot. They have months of conversations. It was the general chat not the leadership though so they got very little in the way of planning or infrastructure."

29

August 12, 2017 is going to be a shot heard around the world . . . . There will be before Charlottesville 2.0, and there will be after Charlottesville 2.0. there is no way to exaggerate the significance of this. We can make all the noise on the internet that we want, and this is great, but our real power will come only from numbers in the streets. . . .

[T]hanks to the magnitude of this event, I truly believe—more than I ever did before—that we will eventually win this struggle and secure the existence of our people and future for white children. It is our destiny. **Next stop: Charlottesville, VA. Final stop: Auschwitz**. See ya there, faggots.

*Daily Stormer*

86.    Defendant Anglin, through Daily Stormer, told followers: "We are angry . . . There is a [sic] atavistic rage in us, deep in us, that is ready to boil over. *There is a craving to return to an age of violence. We want a war*." He advised followers that "the hardcore message is what sells" and told them to "[b]e ready to die for [the fight]."

87.    On Defendant Spencer's website, altright.com, one article on the upcoming August "rally" explained: "Our ideas dominate the internet . . . Now it's time to dominate the streets. . . . You might think it's just a rally, but really, it's so much more . . . . We are telling the anti-White establishment and it's [sic] attack dogs that we are not going to give another inch . . . And now we have come to the tipping point."

88.    Defendant Ray declared: "We are stepping off the Internet in a big way. . . . We have been organizing on the Internet. And so now they are coming out. We have greatly outnumbered the anti-white, anti-American filth. At some point we will have enough power that we will clear them from the streets forever . . . you ain't seen nothing yet."[7] In an interview

---

[7] Vice released a 22-minute documentary following Defendants throughout the day. The video can be found at https://news.vice.com/story/vice-news-tonight-full-episode-charlottesville-race-and-terror.

during the torchlight rally, Defendant Ray also stated that Defendants' goal was to "stop" the "usurp[ation]" of "our country" "by a foreign tribe called the Jews."

89.　　Defendant Mosley tweeted:  "We are [] going to Charlottesville.  This is our country and it is our right that me and thousands fought for already . . .  Our birthright will be ashes & they'll have to pry it from our cold dead hands if they want it.  They will not replace us without a fight."

90.　　One promotional image created by Defendant TWP and distributed on Discord stated:  "This is not an attack on your heritage this is an attack on your racial existence.  FIGHT BACK OR DIE."

91.　　The Daily Stormer released its own poster, which was later shared by Defendant Vanguard America:



92.     Using Daily Stormer's website, Defendants Anglin and Ray commanded the

Daily Stormer community to attend ("You must make it there!").  They told their members:

"[w]e need to do everything we can to get as many people to attend this rally as possible. . . .

There is a rising nationalist movement in America and it is not going away.  Having thousands of

nationalists come out for this rally will put the fear of god into the hearts and minds of our

enemies."  A writer on Spencer's website, altright.com, enthused that Daily Stormer was "going

to bring a lot of young new cadres to the rally," including Identity Evropa.

93.     Anglin also urged his followers:  "We are now taking these [Stormer Book Clubs]

to the next level . . . We are going to have challenges (which will include getting you in fit and

32

fighting shape and learning useful masculine skills) . . . .  We are going to build an invisible empire.  This has all been worked out in my mind a long time ago, and this summer, the Summer of the Black Sun, is when we are going to bring it all together."  On Defendant Vanguard America's Southern Front Discord server, Defendant Ray told Vanguard members in July 2017, "You don't think the [Daily Stormer Book Clubs] have anything to do with books do you? . . . Think boots, not books."

94.     Defendant Hill encouraged followers of Defendant League of the South to attend by urging them not to "miss out of the fun" in dealing with their purported enemies.  Defendant East Coast Knights exhorted individuals to attend:  "We will be there!  Join us!"

95.     Another co-conspirator on Discord posted an image of a raised fist holding a dagger by its blade, dripping blood, over the words "FIGHT UNTIL THE LAST DROP."



96.     Defendants' intent to engage in violence, to ensure that others engaged in violence, and to orchestrate and direct that violence against racial and religious minorities was open and explicit.  For example, on a podcast run by Defendant Peinovich, the Daily Shoah, a co-conspirator, discussing the "rally," asked: "Now come on, beating up the wrong negro . . . is that even a possibility?  Beat up the wrong nigger . . . ."  A member of Defendant Vanguard

America blithely asked on Discord, "When can we gas the reprobates. . . ."  Tyrone, a co-

conspirator, wrote:  "Most efficient is how you get six million Jews in a Cadillac.  3 in the front 3

in the rear 5,999,994 in the ash tray."

97.    On Discord, moderated and controlled by Defendants Kessler and Mosley, there

were countless exhortations to violence, including:

- "I'm ready to crack skulls."

-  "If you don't have a flame thrower you're wrong,"

- "It's going to get wild.  Bring your boots."

-  "Studies show 999/1000 niggers and feminists fuck right off when faced
  with pepper spray."

- "Bringing women to a protest/rally where we expect violence is fucking
  retarded . . . even if you aren't expecting violence you should prepare for
  it."

- "Let there be no mistake – these two side have irreconciable [sic]
  differences that will never reach compromise – the only question is the
  level of conflict to decide the victor."

- "You have a week, bros.  Best spend it having four or five of your friends
  simulate jumping you.  Go light, don't get injured before the event, and
  focus on blocking and pushing back in ways that don't look like assault."

- "Let's make this channel great again. The Carolinas (kind of) started the
  Revolutionary War and the Civil War, so why not add the Race War /
  Second Civil War to the list?"

98.    Defendants took no steps to prevent any violence.  To the contrary, consistent

with their conspiracy to encourage and enable violence, Defendants and co-conspirators

reinforced a false narrative of a larger—necessarily violent—racial and religious war in which

Unite the Right events were a critical moment.  This strategy was intended to—and foreseeably

resulted in—violence directed at the racial and religious minorities.

34

99.    For example, Defendant Hill tweeted on July 24:  "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August."

100.    Defendant Mosley published "General Orders" for the "rally" which divided attendees into "Friendlies" and "Enemies/Counter Protesters."  Individuals opposed to the ideas advanced by the Unite the Right "rally" were described as "hostile."

101.    The General Orders further instructed co-conspirators and attendees that if they ended up losing their permit to gather in the park then they may "have to initiate plan red or have to take the ground by force with plan yellow."  Plan Red was described as "incredibly dangerous" and called for meeting early at a rally point and marching to the park.  The General Orders also promised that there would be "security forces . . . to reduce the threat" presented by "hostiles."

102.    Co-conspirators on Discord incited attendees to bring weapons and engage in violence.  This incitement was known to and promoted by Defendants.

103.    Tyrone posted a quote from Hitler's close associate and "Reich Plenipotentiary for Total War," Paul Joseph Goebbels, on Discord: "Whoever can conquer the street will one day conquer the state, for every form of power politics and any dictatorship-run state has its roots in the street."

104.    Defendants expressly acknowledged that their false narrative of "self-defense" was merely a pretext for violence.  Tyrone, for example, had the following exchange on Discord:

> Tyrone:  "What if we are sociopathic and want [antifa] to show up, for . . . self defense purposes?"
>
> Americana – MD:  If you're concerned about antifa showing up and being violent I present you 2 valid options.  1.  Don't attend [emoji of a woman] or 2.  Be better

35

at violence than they are.

Tyrone:  It's not just about you (collective you not personal) violence like this is a team game.

Tyrone then told others:  "The best defense is a good offense, my grandpappy taught me."

105.    One Discord participant told people to "purchase self defense insurance," while another quipped that the ability to make out a self-defense claim "[d]epends how much of a jew your lawyer is."

106.    Using Discord and other mediums, Defendants gave orders to each other, co-conspirators, and followers in advance of the Unite the Right weekend, including what weapons to bring, what protective armor to wear, and instructions for uniforms.  In particular, they advised other participants to bring firearms or improvised weapons.  They engaged in these acts with the intention that they and their co-conspirators would in fact engage in violence and harassment against racial and religious minorities and threaten the broader Charlottesville population.

107.    Defendant Cantwell expressly "encourage[d]" Radical Agenda followers "to carry a concealed firearm."

108.    One co-conspirator, who was active on the Charlottesville 2.0 Discord server as the "Head Representative" of Anticom on the server, told his followers in the Anticom server on August 7:  "@everyone Bring as much gear and weaponry as you can within the confines of the law. I'm serious. . . .  You still have a few days to get some protection from Home Depot and bring any guns you have . . .  This isn't just Anticom.  Spencer, organizers, everyone are behind this."  He added: "This is the time to get off Discord and take action."  On August 8, he simultaneously posted on the Charlottesville 2.0 and Anticom servers the a photograph of himself in tactical gear carrying a rifle (see images below from the Charlottesville 2.0 server,

36

left, and Anticom server, right).  He told his followers:  "I wasn't kidding when I made an

announcement to bring as much weaponry as legally feasible. . .  This was discussed with the

organizers."  An Anticom follower responded: "Yeah I also recommended crowdfunding a 50

dollar campaign to hand out pepper spray to fellow goers."



109.    Defendants and co-conspirators posted photos of themselves posing with

automatic weapons and tactical gear, and boasted about the weapons they were bringing.

Tyrone, for example, bragged on the Charlottesville 2.0 server that he would be bringing

"Mosin-Nagants with bayonets attached," referring to military rifles used by Russian and Soviet

armed forces, which "will shoot clean through a crowd at least four deep."  Tim "Baked Alaska"

Gionet, a co-conspirator and attendee of the events of August 11 and 12, posted the following on

Twitter:



110.    Defendant Ray wrote on Discord: "Well I also come barehanded and barefisted, bc officers don't duck lol.  But my guys will be ready with lots of nifty equipment."

111.    One co-conspirator on Discord posted a fake advertisement for a product that looked like pepper spray called "Nig-Away"—"a no-fuss, no-muss 'nigger-killer,'" promised to "kill[] on contact . . . dissolv[ing] all tissue, leav[ing] only bone matter" in order to "rid the area of niggers."  He commented beneath the photo, "stock up now."

38



Discord was rife with discussions by co-conspirators of weapons and the use of everyday objects to inflict harm:

- "I'm conceal carrying."

- "[A] real man knows how to make a shield a deadly weapon."

- "[K]nives and guns are more legal than blunt weapons or batons, but its [sic] better to only carry what would only be perceived as a defensive tool. I figure knives would cause the police more alarm over a can of pepper spray or a rugged and abrasive shield."

- "[G]et standard OC spray. I personally use Fox Labs."

- "[R]emember that newspapers can be your greatest ally / toss a few pennies in there, roll it up and fold it and bam."

- "[A]void batons . . . just get hardwood dowel (that fits in your hand) from a store and cut it to size."

- "If you get PVC get schedule 80 for thicker thumping."

- "Don't carry anything that's explicitly a weapon. Flag poles and signs work, but openly carrying obvious weaponry is probably not a good idea."

- "A wrench with a wrist lanyard gets the same job [as a blackjack/billyclub] accomplished."

39

- "Just carry a pocket full of rocks.  They can be in a sock or something."



112.    On June 7, 2017, Kessler posted in the #announcement channel of the
Charlottesville 2.0 Discord server, "@everyone . . . I recommend you bring picket sign post,
shields and other self-defense implements which can be turned from a free speech tool to a self-
defense weapon should things turn ugly."

113.    One co-conspirator on Discord posted a link to his store, Resistance Tools, along
with a coupon code (UNITETHERIGHT2017), and wrote "FOR PEOPLE NOT CONCEALED
CARRYING IN C'VILLE:  I sell stun guns, tasers, pepper spray, batons, and other self-defense
stuff."

114.    Defendant Vanguard America, through its leaders and members, encouraged its
members to attend the rally on its own Discord server, Southern Front.  An individual with the
username "Thomas Ryan," on information and belief Thomas Ryan Rousseau, a leader of
Vanguard America, repeatedly urged members to contact him directly if they planned to attend
the "Unite the Right" event and if they wanted to travel together in a "hate bus," saying:  "This
event is a **BIG DEAL** and offers a chance to link up Vanguard Guys from across the
nation."  He also issued orders on the proper Vanguard uniform for the event.

40

115.    Defendant Vanguard America members were instructed to arrive at the rally in matching khaki pants and white polos, about which one member on the server commented: "I like the polos. it's a good fighting uniform."  Rousseau also told his Vanguard America co-conspirators, "Self defense items are not listed on the gear list, some individuals will have concealed carry, some will not."  On August 7, one co-conspirator asked: "Serious question, why are they saying not to bring fire arms?"  Another replied, "Sounds like they are scared lol . . . I always carry a collapsible baton now it's my new favorite."  "Thomas Ryan" replied:  "It's concealed carry only . . . Concealed knives have dozens of laws around them. Open knives do not, but it looks really dumb to carry an open large knife so we're not doing that . . . Not sure about batons."

116.    Defendant Ray, a "good friend" of Defendant Vanguard America, according to their leader Rousseau, also used the Southern Front server to encourage Vanguard America members to attend the rally, posting a link to the Daily Stormer article "Charlottesville:  Why You Must Attend and What to Bring and Not to Bring!"  A Vanguard America member responded to Ray's post with a violent drawing of Defendant Heimbach wearing a shirt bearing Nazi and Defendant TWP symbols and the words "nigger killer" above a tally of "communists killed," smiling in front of decapitated black men wearing logos associated with anti-fascist movements:

41



117.　　One member of Defendant Vanguard America explained on the Southern Front server after the event that Vanguard America had coordinated with Defendant National Socialist Movement because the Charlottesville event was about violence: "In cville we needed numbers, NSM fought so hard regardless of their optics. Do we need them at normie events? No. We need them in a fight? Yes."

118.　　In addition to directives being circulated on Discord, Defendants Ray and Anglin issued directives using Daily Stormer's website in advance of the Unite the Right weekend. In articles titled "Operational Security for Right Wing Rallies" and "Charlottesville: Why You

42

Must Attend and What to Bring and Not to Bring!," "Stormers" were told that they were required to bring tiki torches and should also bring pepper spray, flag poles, flags, and shields.

119.    Indeed, the evidence that Defendants were planning to arm themselves in advance of the "rallies" was so pervasive that the Charlottesville Police Department received private threat assessments from the Federal Bureau of Investigation indicating that "Unite The Right supporters would bring bats, batons, flag sticks, knives, and firearms to confront their political opponents."

120.    Defendants and co-conspirators provided guidance and instructions to co-conspirators and participants about how to try to avoid the legal ramifications of their violence. For example, they set up a channel on Discord devoted to understanding Virginia law, where one co-conspirator suggested that rallygoers buy self-defense insurance.  Defendants also assured co-conspirators that they would be protected when they engaged in violent acts intended, incited, strategized, and encouraged by Defendants.  The "General Orders" told attendees that if they found themselves arrested, there would be "money and a legal team set aside for you after." Defendant Spencer put out a call for attorneys on his website, altright.com.  Daily Stormer advised attendees:

> [I]f you end up in some heavy stuff and are not yet charged with anything, use your moments of freedom to get really difficult to find. Do not wait around for bad processes to begin against you. Exit from any risky situation as quickly as you can. If you make yourself easy to serve with legal process, legal process will be likely be served to you.

121.    Defendants and co-conspirators told each other to bring shields, uniforms, flags, and signs decorated with iconography that would instill fear along racial and religious lines, while also identifying rallygoers with the hate groups to which they belong.  The Texas and

43

Louisiana chapters of Defendant Vanguard America, for example, planned to have shields with their logos painted on.

122. Defendants also discussed and intended for followers to come with paraphernalia bearing racist and anti-Semitic imagery. Defendant Kessler, for example, explained: "The Confederate flag is THE BEST optics because it's beloved by legions of Southerners who are on the doorstep of becoming just like us if we can move them beyond 'heritage not hate.'"

123. The "official" poster for the event contained Nazi and confederate iconography, including imperial eagles reminiscent of Nazi Germany's national emblem, confederate flags and monuments, and confederate soldiers in formation.



**D.**    <u>**Defendants Coordinated Funding, Logistics, Transportation, and Legal Support For Co-Conspirators and Attendees**</u>

124. Defendants furthered their conspiracy and its illegal, injurious objectives by coordinating attendance at the rally through Discord, the Daily Stormer website, and other media.

125. On Discord, Defendants established the #sponsors_only and #i_need_a_sponsor channels to provide financial support to others who wanted to travel to Charlottesville.

44

Defendants also used channels like #carpool_wanted and #carpool_available to organize

carpools in "Hate Van[s]" and "full blown hate convoy[s]."[8]

126.    On the Daily Stormer website, attendees were advised:  "If you want to come but

can't find a way, get on the BBS [a Daily Stormer forum] and ask for help.  Go to the Book Club

section and find the nearest book club to you and post in that thread that you want to go but need

assistance.  If you happen to have hit a dead thread, start a thread in General Discussion asking

for help.  If you are going and have an extra seat or seats, start a thread to offer a ride."

127.    Cantwell asked listeners of his Radical Agenda podcast and readers of his website

to send money to him if they "want[ed] to help," but could not attend the "rally."

128.    RootBocks, and WeSearchr—sites that were set up to raise money for hate-based

causes—facilitated the attendance of co-conspirators.  On July 28, for example, RootBocks

tweeted "@BakedAlaska was banned from @GoFundMe so go help him out here."  Baked

Alaska a/k/a Tim Gionet has advocated racial and religious based violence, including by

circulating an image of a Jewish woman in a gas chamber.  David Duke also tweeted, "Help my

friend Baked Alaska get to the #UniteTheRight rally. Please donate to make this happen.

rootbocks.com/projects/get-b . . ."

---

[8] The "Hate Van" and "hate convoy" suggested by conspirators in this case has historical precedent. During the Civil Rights Era, George Lincoln Rockwell, the founder of the American Nazi Party, and his supporters drove a two-vehicle caravan that included a blue and white van dubbed the "Hate Bus" through the South.  The exterior of the van was plastered with the words "LINCOLN ROCKWELL'S HATE BUS" and the phrases, "WE DO HATE RACE MIXING" and "WE HATE JEW-COMMUNISM."  Rockwell pledged solidarity with the Klansmen who attacked the Freedom Riders (black and white civil rights activists who rode interstate busses in a campaign of desegregation) and hoped to confront the "Communist, nigger-loving" Riders when they arrived in New Orleans. In New Orleans, they demonstrated with signs that read "America for Whites, Africa for Blacks" and "Gas Chamber for Traitors."  After Rockwell's assassination in 1967, the American Nazi Party broke into two factions, one of which became the Defendant NSM, run by Defendant Schoep.  See RAYMOND ARSENAULT, FREEDOM RIDERS: 1961 AND THE STRUGGLE FOR RACIAL JUSTICE 195 (1961).

129.    On the August 8 "Charlottesville Unite the Right Announcement Special" podcast with Defendant Peinovich, Defendant Mosley told listeners that they'd be setting up a general legal fund using Rootbocks.  On that same program, Mosley told listeners how to get help with transportation.

130.    Defendants and co-conspirators also coordinated travel for the day of the "rally" on Saturday.  After consulting with Defendant Kessler, Tyrone took responsibility for helping organize shuttles.  One co-conspirator instructed Discord participants:  "Nobody is going to the park on their own.  We will be arriving as a group."

**E.    When Plaintiffs and Others Sought to Prepare for the Events of August 12, They Were Targeted for Additional Threats and Harassment**

131.    Plaintiffs and community members understood that August 12 could be (and ultimately was) the largest public gathering of hate groups in decades.

132.    Anticipating a need for a designated, separate space for peaceful protesters, a UVA professor received permits for McGuffey Park and Justice Park for the periods during which the Unite the Right "rally" was to take place.

133.    A broad group of concerned citizens, including Plaintiff Wispelwey, recognized the need to organize community members in advance of the rally weekend in order to provide a sense of solidarity for Charlottesville and give guidance on non-violent protest.

134.    Wispelwey, an ordained minister, co-created a membership-organization, "Congregate," to join interfaith clergy from around the country to "stand against white supremacy and bear witness to love and justice."  Congregate's goal was to bring 1000 clergy-members to Charlottesville to stand up for equality and against hate.  Working with other religious leaders and community organizers and organizations, Congregate planned an interfaith service for August 11 at St. Paul's Memorial Church on University Avenue ("St. Paul's"), the

46

night before Defendants' permit to gather in Emancipation Park. Congregate also helped plan an interfaith "sunrise service" for August 12 at the African-American First Baptist Church on West Main Street so that community members could gather, feel supported, and pray.

135.    As a result of its work in support of the Charlottesville community, Congregate was targeted. Defendant Kessler advised his followers of Congregate's work in a video released prior to the Unite the Right weekend. In doing so, Kessler intended to have others threaten, and potentially cause violence to, the organization—a practice that is not uncommon among Defendants and co-conspirators. For example, after a photograph was published of a young woman giving the middle finger to a man in a confederate army uniform, a prominent member of the East Coast Knights tweeted out the young woman's home address and wrote: "We will be having a rally at this address next week. Bring your own torch."

136.    On August 2, one co-conspirator posted on Discord screenshots from a Facebook event for an upcoming community "Back to School Block Party" in Charlottesville. He commented: "Negro block party about 1 mile SW of Lee park." Following that post, one Discord participant suggested that a white supremacist group "go to the bloc party after and beat them at kick ball." Another replied, asking, "What happens if we lose? I hear niggers are pretty good at sports ball." A third replied, "We shank them."

137.    Defendant Kessler along with other co-conspirators posted various photographs on Discord and provided names and identifying information of individuals planning to protest in Charlottesville, as well as the community groups organizing the protest. On August 10, Kessler, Defendant Mosley, and others hosted a voice chat on Discord, during which an unidentified voice offered a "solid gold medal" to any person who would shave the "Bearded Lady," referring to a photograph of an expected protestor.

47

138.　　Congregation Beth Israel, the synagogue to which Plaintiff Pearce belongs, also learned of Defendants' online, public threats to Charlottesville's Jewish population.  In reasonable fear and apprehension of Defendants and their co-conspirators, the Temple made the painful decision to move and hide its sacred Torah scrolls off site in advance of the weekend.  Among the Torahs at the Synagogue was one salvaged from a neighborhood of Eastern European Jews who were massacred during the Holocaust that is displayed in a glass cabinet.  Unfortunately, that Holocaust Torah could not be moved because of its fragile condition.  Plaintiff Pearce thought at the time of how ironic it was that a Torah that managed to survive the Holocaust was again being threatened by Nazis.

139.　　The Temple also decided it needed to move its Saturday Shabbat services up an hour, so that it could close in the afternoon when Defendants and other neo-Nazis and white supremacists were expected to be in Charlottesville.  The Temple took further safety precautions, including hiring a security guard, to keep the congregation safe while they were there for services, re-directing substantial resources.

140.　　Stores, restaurants, and bars around town created signs that they posted in their windows showing the businesses' support for equality and diversity.  Those stores and restaurants were also targeted by Defendants.

141.　　In June, for example, Defendant Kessler encouraged Discord participants to obtain the names of local businesses whose owners signed a petition to ask the government to cancel Kessler's permit.  In August, co-conspirator Griffin tweeted about targeting a local restaurant, Brazos Tacos.  Defendant Mosley also tweeted about targeting several restaurants, namely Brazos Tacos, Cinema Taco, Commonwealth Restaurant and Skybar, Mudhouse, and the Whiskey Jar.  Defendant Spencer tweeted a picture of Commonwealth Restaurant, which had a

48

sign in the window reading: "If equality & diversity aren't for you then neither are we." On August 10, Defendant Peinovich tweeted, "Do these white business owners and shitlibs in CVille think that their virtue signaling mean they will be spared somehow? Lol."

142. By identifying these businesses, Defendants intended that their co-conspirators and followers would threaten these businesses. A number of these businesses thereafter received in person and mailed threats:



49

II.   **On August 11 and 12, Defendants Successfully Implemented the Violence and Intimidation They Had Planned**

A.   <u>Friday, August 11, 2017</u>

1)   <u>The "Secret" Torch Parade</u>

143.   Defendants, including Mosley, Spencer, Kessler, Ray, Anglin, Cantwell, and Invictus, along with their co-conspirators, organized a torchlight march through campus culminating at the statue of Thomas Jefferson near the Rotunda on August 11 at the Grounds at UVA.

144.   The permit Defendant Kessler applied for and received was for the following day, August 12, in Emancipation Park.  Defendants did not publicly disclose the time or location for the August 11 torch parade "because it was a secret arrangement."

145.   The torch parade was the result of weeks of planning by Defendants and co-conspirators.  They had established a #friday_night channel on Discord to coordinate attendance, dress code, and plans.  They advised co-conspirators that the event was intended to be a secret and that they should bring torches.

146.   For example, the Daily Stormer website stated:

> Tiki Torches: Yes – required.  Pick up tiki torches before you leave your hometown.  There will be a torchlight ceremony and the tiki torches will all be gone from the shelves of the local stores.  Dollar stores are your best bet.  Wal-Mart has them cheap as well.  Make sure and get some tiki torch fuel/oil too.  Otherwise they won't burn.

147.   On a planning call conducted through Discord, Defendant Mosley instructed Defendants and co-conspirators:  "We are doing a torch light event on Friday. . . . Anyone who doesn't have tiki stuff now should go out and get it tonight or tomorrow morning and if you could get extras that would be great."  Defendant Kessler ordered attendees to buy torches for

50

Friday, but to do so outside of Charlottesville, so that they would not "tip our enemy off." He instructed that people "buy extras for those who are flying in or unprepared."

148.   Defendant Mosley ordered individuals to arrive at Nameless Field, a large area behind UVA's Memorial Gymnasium, at 9:30 p.m., so that they could march once darkness fell at 9:47 p.m. He told them not to arrive earlier to avoid tipping off counter-protestors, and stressed that "it's extremely important that nobody mention this outside our circle."

149.   While planning their torchlight march, Defendants were aware of the fact that open fires are illegal on UVA's campus without authorization. Nearly one month before the planned torchlight march, a Discord participant posted a link to UVA's guidelines against open fires. A co-conspirator, and moderator on Discord, "pinned" the regulation to the chat, meaning that it was highlighted for participants.

150.   The choice to use lit torches was a deliberate decision to harass and intimidate the people of Charlottesville and counter protesters, especially people of color and Jewish people. Defendants and co-conspirators intentionally drew on the history of torch-bearing mobs, and in particular, the Ku Klux Klan's use of torches in the late 1800s and in the twentieth century, and the Nazi's use of torches in their rallies in the 1930s. In both historical cases, just as with cross-burning, the use of torches was connected with racial violence; torches were chosen by Defendants and co-conspirators as part of a deliberate plan to evoke fear of the same kind of violence. As one co-conspirator on Discord explained: "Tiki torches are the last stand of implicit whiteness." Defendant Ray explained the purpose of the torch parade as follows: "Our country is being usurped by a foreign tribe, called the Jews. We are going to stop it." Defendant Invictus explained to a reporter, "Somebody forgot the pitchforks at home, so all we got is torches."

51

151.    On the morning of August 11, Defendant Cantwell and other co-conspirators gathered at a Walmart outside of Charlottesville.  Cantwell then travelled to McIntire Park to prepare for the evening.  In an interview with a reporter from *Vice*, Cantwell said:  "I'm trying to make myself more capable of violence. . . .  I'm here to spread ideas, talk, in the hopes that somebody more capable will come along and do that."

152.    On Friday evening, using Discord, Defendant Mosley alerted co-conspirators that they should go to UVA:  "Everyone can start assembling at nameless field right now with your torches to start staging.  We will step off from the field at 10 pm."

153.    Starting around 7:30 p.m., approximately 300 neo-Nazis and white supremacists—Defendants and their co-conspirators—began arriving at Nameless Field.  They carried unlit tiki torches, and many wore khaki pants and white polo shirts (the uniform of Defendant Vanguard America) and pins marking their affiliations with different hate groups.  A little after 8:00 p.m., Defendant Spencer texted a reporter:  "I'd be near campus tonight, if I were you.  After 9:00 p.m., Nameless field."

154.    By early evening, Plaintiff Wispelwey was inside St. Paul's Church, along with an overflow crowd of an estimated 1,000 people.  Dozens of local and national clergy members visiting Charlottesville for the weekend participated and spoke at the service.

155.    Plaintiff John Doe, along with other UVA students, peacefully walked to the Rotunda where Defendants were believed to be holding their event.

156.    Plaintiff Natalie Romero had spent the afternoon of August 11 painting banners and posters for use during the planned peaceful protest of the August 12 "rally."  Romero then learned that Defendants would be holding a rally on the UVA campus at the Rotunda.  With a group of other UVA students, Romero peacefully made her way to the Rotunda.

52

157.     At the same time, at Nameless Field, Plaintiff Magill observed Defendants and their co-conspirators barking and grunting loudly, making sounds that resonated for blocks. Defendants Cantwell, Kessler, Ray, and other co-conspirators were issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as "security."

158.     Defendants and their co-conspirators filled their tiki torches with fuel, formed a long column, and lit the flames.  They then started marching two-by-two from Nameless Field to the Rotunda, and down to the Jefferson Statue.  Defendants and co-conspirators deliberately took a circuitous route that included marching through student housing on the Lawn, which Plaintiff Sines observed, and which was intended to threaten, intimidate, and harass as many bystanders as possible.

159.     Defendants marched in an organized, coordinated fashion.  Organizers, including Defendant Cantwell, wore earpieces, carried radios, and shouted specific orders at the marchers. They shouted to keep pace, avoid gaps, stay in line "two-by-two," and march alongside a "security guard."  Defendant Invictus said it was a "tight operation" and, in his live video feed, frequently enthused "high T!," meaning high testosterone.

160.     Defendant Cantwell marched on the outside of the column, along with other "guards" who were selected for their willingness to "get physical" with counter-protestors.

161.     Plaintiffs Sines and Romero heard the marchers chanting slogans chosen for their intimidating and racially harassing effect.  These slogans included, "You will not replace us!" "Jews will not replace us!" "Blood and soil!" "White lives matter!" and "This is our town now!" Romero also heard the marchers chant "go back to where you came from," an apparent reference to Romero's Hispanic heritage.

162.    The marchers also barked like dogs and performed Nazi salutes.  Again, these actions were intentionally chosen for their racially threatening, intimidating, and harassing effect.

163.    Defendants intended to send a clear message through the torch parade:  Jewish people, black people, and their allies should be afraid for their safety, livelihoods, and lives.

2)    The Attack at the Rotunda

164.    The torch march eventually reached the steps on the far side of the Rotunda. Hundreds of neo-Nazis and white supremacists, including Defendants Kessler and Spencer, charged toward a small group of fewer than 30 people, mostly students and community members, including Plaintiffs John Doe and Romero, who had locked arms around the statue of Thomas Jefferson.

165.    As Defendants and their co-conspirators rushed down the steps that surround the Rotunda and streamed toward the Jefferson statue, they continued to shout "Blood and soil," "Jews will not replace us," and "You will not replace us," and to bark like dogs.  They also made monkey noises at the black protesters.  Plaintiff John Doe, one of the few African-American men present, was terrified and feared for his life.  Plaintiff Romero, one of the few Hispanic-Americans present, had never been more afraid in her entire life.

166.    As they reached the statue, Defendants and co-conspirators stood shoulder to shoulder and encircled the students to trap them.  Seeing the mob surround the students, Plaintiff Magill, who had followed the white supremacists and was warning others to steer clear, ran through the crowd and locked arms with the small group, which included Plaintiffs John Doe and Romero.  One co-conspirator yelled, "we need some more people to fill in this way to block these people off."  After the fact, one protestor tweeted:  "They surrounded us at the statue / They wouldn't let us out"; Defendant Spencer retweeted this, adding "Fact check:  true."

54

167.　　One co-conspirator on Defendant Vanguard America's Southern Front Discord server posted a tweet from Hatewatch, saying "Anti fascists are surrounded by hundreds of fascists at Jefferson statue. No police." Another replied: "DO IT . . . TIME TO PHYSICALLY REMOVE THEM"

168.　　Defendants and co-conspirators began to kick and punch the protesters around the statue, using their torches as weapons, and to beat individuals onto the ground. Defendant Ray claimed that the group of white supremacists "went through [the protestors] like shit through a goose!"

169.　　From the crowd, Defendants, co-conspirators, and others threw an unidentified fluid at the peaceful protesters around the statue, including on Plaintiffs Magill, John Doe, and Romero. Looking down at the fluid on their clothing, which they feared was fuel or other flammable liquid, and the hundreds of lit torches around them, Magill and John Doe believed that they might be killed. Co-Conspirators and others then threw their lit torches through the air, aimed and directed at many of the protesters around the statue. At one point, Defendant Ray shouted, "The heat here is nothing compared to what you're going to get in the ovens!"

170.　　Plaintiff Sines witnessed co-conspirators throwing fuel and tiki torches at the peaceful protestors around the statute.

171.　　Plaintiff Romero witnessed co-conspirators removing their helmets and swinging them at peaceful protestors. Romero was also spit on by co-conspirators.

172.　　Defendants and co-conspirators, including Defendant Cantwell, attacked the protestors with mace. The Daily Stormer included the below photo of Cantwell spraying a protestor in the eyes in its live feed with the caption ". . . might be the greatest photo I've ever

55

seen." The same photo was retweeted by Defendant Mosley under a caption: "He protect / He

atack / But most importantly he got your back."



173. Due to Defendants' conduct, and consistent with their intention to terrorize,

Plaintiff John Doe feared that he was in imminent danger. Encircled by Defendants and co-

conspirators, John Doe felt trapped and did not believe that he could escape safely. He knew that

as an African-American man, if he had tried to escape before the group dispersed, he would have

been attacked. For approximately ten minutes, he remained in place, and while confined within

the circle of Defendants and co-conspirators, was sprayed with mace.

174. Fearing for their lives, Plaintiffs John Doe, Romero, and the other protesters

struggled to escape the mob. Once away from the mob, Romero attempted to wash off the mace

that had been sprayed in her eyes and all over her shoulders by Defendants and co-conspirators.

After the trauma of the torchlight rally, Romero had trouble sleeping that night.

175. Defendants and their co-conspirators climbed to the top of the Thomas Jefferson statue and waved their torches high in the air, yelling, "Hail Spencer! Hail victory!" Defendant Spencer spoke briefly to the crowd, saying, "We own these streets! We occupy this ground!" He told the crowd that they were "risking their lives" for their future. This was consistent with the unlawful plan developed by Defendants through their conspiratorial acts in the weeks and months preceding these events, and as operationalized and modified by Defendants in response to developments on the ground.

176. These acts of violence were not isolated or unplanned incidents. The torch rally was planned with the specific intent of engaging in racially-motivated violence, threats, intimidation, and harassment. The attacks upon the students were coordinated both in advance and on the day that they occurred. Defendants and co-conspirators intentionally formed a circle trapping the students and either directly participated in the ensuing violence or continued to incite it—including through the chants described above—as the violence was occurring.

3) St. Paul's Memorial Church

177. During the attack at the Rotunda, hundreds of people were across the street at St. Paul's Church, listening to civil rights and religious leaders speak of peace and equality. At least one white supremacist, Defendants' co-conspirator, was within the church, live-streaming the interfaith service to his followers.

178. Some of the individuals within the church, including Plaintiff Wispelwey, along with people who had volunteered to serve in a security role outside the church, could see and hear the mob charging through the Rotunda, chanting and wielding torches.

179. After seeing the mob surround and attack the peaceful protestors at the Rotunda, Plaintiff Wispelwey and others were reasonably afraid that the mob would come

57

towards the church to cause violence to the building and the individuals inside, particularly given the racial and religious make-up of the assembled group and the fact that Defendant Kessler had specifically targeted Congregate, in advance, for harassment and intimidation.

180.    At around 10:00 p.m., when the service at St. Paul's ended, the organizers asked everyone in attendance to leave in groups through the back doors to avoid the neo-Nazis and white supremacists.  However, after learning more details of the violence occurring at the Rotunda, Plaintiff Wispelwey reasonably apprehended that force would be used against those still within the church if they went outside.  The church was filled with children and elderly individuals who were particularly vulnerable to any violence that could occur.  Accordingly, a few minutes later, everyone at St. Paul's was asked to return to their seats.  They remained in the church for nearly an hour after the service was supposed to end.

181.    After the church re-opened its doors, Plaintiff Wispelwey drove some of his fellow clergy back to their hotels to make sure they were safe.  From his car, Wispelwey saw co-conspirators carrying baseball bats and torches—carried for the purpose of threatening, intimidating, and harassing residents.

182.    Directly outside of the Graduate Hotel, Plaintiff Wispelwey saw Defendant August Invictus harass and intimidate a friend.  Invictus then walked towards Wispelwey, who was wearing a collar, until they were mere inches apart.  Invictus kept moving forward even as Wispelwey pulled back.  Once he was directly face-to-face with Wispelwey, Invictus began demanding, in a challenging and highly aggressive tone, that Wispelwey reveal what church he belongs to.  Defendant Augustus Invictus then asked "What the hell are you doing," and continued hounding Wispelwey to state his church denomination.

58

4)     <u>Defendants Celebrated the Torch Parade as an</u> <u>Advertisement for the "Unite the Right" Rally the Following Day</u>

183.    David Duke, the former Grand Wizard of the Ku Klux Klan, and co-conspirator, posted the following:



184.    Co-conspirator McLaren posted a photo of the march and tweeted: "White peoples never agreed to become minorities in their own lands, in numbers and spirit." Defendant Kessler tweeted a picture of the torchlight marchers surrounding the protestors at the statue and wrote: "Incredible moment for white people who've had it up to here & aren't going to take it anymore. Tomorrow we #UniteTheRight #Charlottesville." Spencer retweeted that tweet.

59



185.    Co-conspirator Thomas Ryan Rousseau, a leader of Defendant Vanguard America, kept his co-conspirators informed on the Southern Front Discord server, posting "All VA members safe and accounted for," while another co-conspirator wrote "I had a lot of fun tonight.  Can't wait for the big event tomorrow."

186.    Defendant Invictus told watchers of his livestream to come on Saturday to the most important "rally" of the year.  Anticipating and strategizing violence, Defendant Anglin wrote on his Daily Stormer website that people should "be at Lee Park by noon, preferably by 11:00."  Although he wouldn't be there, Anglin said that he had given Defendant Ray words to relay to the crowd.  He told readers:  "Make sure you're with a crew.  Don't park alone, don't walk to your car alone . . .  If you wanna stay up all night with Stormers, or arrange to travel to the park together tomorrow, get in this thread and start sending people PMs."  He signed off for the evening saying "[w]e are on the verge of breaking through into a whole other realm."

60

B.    **Saturday, August 12, 2017**

1)    Defendants Intentionally Planned A Violent Confrontation With Counter-Protesters

187.    On August 12, Defendants, their co-conspirators, and others acting at their direction executed their plan to carry out racial, religious, and ethnic violence, intimidation, and harassment.  Defendants Kessler, Cantwell, Mosley, Heimbach, Hill, Invictus, Ray, Spencer, Damigo, Peinovich, Fields, Parrott, Tubbs, the Nationalist Front, League of the South, NSM, TWP, Vanguard, the East Coast Knights, the Loyal White Knights, FOAK, and hundreds of Stormers (many of them from Stormer Book Clubs) all participated in the violent events of the day together with co-conspirators, including Duke and the Proud Boys.

188.    Defendants and co-conspirators planned to arrive early and anticipated and encouraged the use of violence to assist the rally.  As one co-conspirator explained:  "Me, the rest of TWP and LS [League of the South] have been to more than one rodeo. / And shit NSM will be there early too / Those guys are nuts / In a good way."  Defendant Kessler promised that there would be hundreds of members of TWP and League of the South at the park as early as 8:00 a.m.

189.    Defendants Mosley, Kessler, and co-conspirators exhorted rallygoers to arrive before the park opened to form "a white bloc barrier or square around the entire statue + podium . . . . given that they know we're coming, we'll all need as many people as possible to be there right when the park opens."

190.    Defendant Kessler told Discord participants:  "EVERYONE needs to get to the park as early as possible and defend our territory."  He suggested that camping out at the monument the night before would give them "[t]he most extremely prepared position."  In these

61

remarks, Kessler referred to (and actively encouraged) preparation for violence against racial and religious minorities and anyone who supported their cause.

191.      A co-conspirator asked the Discord group: "So are we going to occupy very early? Or try and force this commie scum out after the fact? I'm good with either." Another participant responded, "We will be fine as long as we have bodies there and willing to remove whoever is in our way. Vanguard is fabricating 20 additional shields. We should have a good amount between organizations. We just need to make sure we have bodies there ready to rock."

192.      Consistent with the conspiracy's effort to organize and maximize violent acts, a co-conspirator and moderator on Discord told participants "we'll be putting out a video for basic formation, roles, and commands to all of the group leaders shortly," and posted a "Shields & Shield Tactics Primer" made by the "Detroit Right Wings," as well as a video illustrating shield fighting techniques, to be studied by participants. Defendant Mosley said: "I run this [the Unite the Right "rally"] as a military operation . . . I was in the army."

193.      Defendants took no steps to prevent, or aid in preventing, the intimidating, threatening, and otherwise illegal conduct they knew was being planned and coordinated.

     2)      <u>The Events On August 12 Were Intentionally Violent In Accordance with Defendants' Planning</u>

194.      According to former Charlottesville Police Chief Al S. Thomas, Jr., Defendants refused to follow a plan that had been worked out to keep them separated from the counter-protesters. For example, instead of entering the park from one entrance, they came in from all sides.

195.      Most of the Defendant groups arrived in military formations, armed like paramilitary forces—carrying, among other things, guns, shields, protective gear, flags, and rods. They shouted commands at their groups to "move forward" or "retreat." Governor Terry

McAuliffe stated that "80 percent of the people here had semiautomatic weapons . . . you saw the militia walking down the street, you would have thought they were an army."

196.　　Four members of Defendants Nationalist Front, League of the South, NSM, TWP, and Vanguard America met at a pre-set location in order to march to Emancipation Park in formation.

197.　　Defendant Vanguard America marched to the Park first, chanting "Blood and soil!"  Members of the group were in uniforms, as instructed, dressed in helmets, white or black polos, and khakis, and wielded matching shields and flags.  Defendant Fields (who was wearing the uniform white polo, khakis and carrying a black shield with the Vanguard logo) marched with Vanguard America.

198.　　Defendant League of the South, led by defendant Michael Hill, followed.  Like Defendant Vanguard America, they marched with coordinated shields and flags and carried rods and other weapons.

63

 **Michael Hill**
@MichaelHill51

 Follow

The truth. The League of the South.



6:59 PM - 24 Aug 2017

199.    One member of Defendant League of the South explained that he attended the Unite the Right "rally" because:  "I intend to stand for the South and die for it if need be.  They will not replace us."

200.    Defendant TWP marched behind Defendant League of the South, and Defendant Parrott marched with TWP.  Defendant Heimbach guided the group, wearing a black combat helmet with a bodyguard close on his heels.

201.    As the Nationalist Front groups and other Defendants and co-conspirators marched towards Emancipation Park, they shouted threatening, harassing, and intimidating language at Charlottesville residents and protesters on the basis of their race, religion, and ethnicity or their support for people of different races, religions, and ethnicities.  These included

64

statements like, "Get the fuck out of our country, bitches! Yeah, come up to me! Come up to me, bitch!"

202. Marching down Jefferson Street, Defendants and co-conspirators passed the synagogue where Plaintiff Pearce is a member. During the Shabbat services, three co-conspirators in uniforms and semi-automatic rifles stood across from the temple. As others paraded past, they shouted, "There's the synagogue!" followed by chants of "Sieg Heil" and other anti-Semitic language. Some carried flags with swastikas and other Nazi symbols. Defendant Ray, intending to threaten, intimidate, and harass Charlottesville's Jewish population, carried a banner (later posted on Daily Stormer's website) that read "Gas the kikes, race war now!"[9] Defendant Ray also told a woman to "put on a fucking burka" and called her a "sharia whore." He ended by proclaiming: "Hitler did nothing wrong." These acts were fully consistent with the broader campaign of racial and religious suppression at the heart of Defendants' conspiracy.

203. Later that day, in a thread with Daily Stormer, co-conspirators suggested meeting at 3:00 p.m. to "torch those Jewish monsters." After seeing their exchange, the Charlottesville mayor made a frantic appeal to the Secretary of Public Safety asking for police protection at the Temple.

---

[9] As made clear in the Daily Stormer "style guide," references like this are only meant to seem hyperbolic to the uninitiated. The Daily Stormer is aware that "[m]ost people are not comfortable with material that comes across as vitriolic, raging, non-ironic hatred," and so "[t]he undoctrinated should not be able to tell if we are joking or not. There should also be a conscious awareness of mocking stereotypes of hateful racists." But according to Defendant Andrew Anglin, who drafted the style guide, "[t]his is obviously a ploy and I actually do want to gas kikes."

65



204.    By contrast, Plaintiff Wispelwey had organized a 6:00 a.m. interfaith prayer "sunrise" service that was held at the historical African-American First Baptist Church on West Main Street.

205.    After the service, a number of community members left the church to hold a peaceful march from the nearby Jefferson School African American Heritage Center to McGuffey Park.  Others, including Plaintiff Wispelwey, silently marched with other clergy members directly from the sunrise service to Emancipation Park.

66



206.   When Plaintiff Wispelwey and his fellow clergy arrived at Emancipation Park, around 8:00 a.m., they were confronted by heavily armed militiamen and extremists, many in full military attire with semiautomatic rifles and pistols.  Plaintiff Wispelwey and other clergy members locked arms and knelt before them.

207.   As they had planned, Defendants and their co-conspirators approached Emancipation Park in coordinated waves of passenger vans.  Defendant Peinovich, flanked by his "security team," approached Emancipation Park in the "third or the fourth wave."

208.   Consistent with their elaborate planning and lessons in battlefield tactics, Defendants and their co-conspirators charged through the peaceful clergy when they arrived at the park.  Many of the clergy were pushed to the ground, and Plaintiff Wispelwey was knocked into a bush.  A co-conspirator stood staring Plaintiff Wispelwey directly in the eyes and repeatedly shouting "fuck you, faggot" at him.

67

209.    The violence by the Defendants at the entrance to Emancipation Park followed a consistent pattern according to their pre-set plan.  The Defendants would "use shields, flags, or fists" to break through the blockade of counter-protestors, would succeed in entering the park, and then another wave would arrive.  In between each wave, counter-protestors would attempt to reassemble before the next arrived.  This played out at least half a dozen times.

210.    After the being assaulted, Plaintiff Wispelwey and other clergy were afraid that they could get seriously injured or would suffer another, more serious attack.  As a result of Defendants' and their co-conspirators' actions, and as the violence escalated, Plaintiff Wispelwey was forced to end his peaceful protest and leave the park where he and others were lawfully standing.

211.    Plaintiff Romero experienced a similar attack by Defendants and their co-conspirators.  Having linked arms with a group of women facing Defendants and co-conspirators, who were clad in shields and helmets outside Emancipation Park, Romero was pushed against a police car as the Defendants and co-conspirators sought to move through Romero's group.  During this assault, Romero was also spit on.

212.    Defendants bragged about their violence after the fact.  Defendant Parrott, for example, wrote an account of the Unite the Right "rally" in "Catcher in the Reich:  My Account of my Experience in Charlottesville."  He wrote that Defendants TWP, League of the South, NSM, and other Nationalist Front groups joined together "to help create two shield walls" for "the fight."  He explained, "While most of the Identity Evropa men were occupied on other fronts, they sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers.  They offered more fighters, but we had our positions amply covered."  He further said, in an interview with the *Los Angeles Times*:

68

With a full-throated rebel yell, the League broke through the wall of degenerates and TradWorker managed to enter the Lee Park venue itself while they were largely still reeling. Michael Tubbs, an especially imposing League organizer towered over and pushed through the antifa like a Tyrannosaurus among raptors as league fighters with shields put their training to work.

213. Defendant Hill later exclaimed that: "Mr. Tubbs was everywhere the chaos was."



214. By around 10:00 a.m., having charged through protesters, pushing and shoving them with their shields and rods, Defendants TWP, NSM, and League of the South lined up inside Emancipation Park, led by, among others, Defendants Schoep, Hill, Heimbach, and Parrott. Defendant Parrott explained that they had "stuck with the original plan to define and secure the event perimeter."

215. Once inside the Park, Defendants' racial, religious, and ethnically motivated violence did not stop. It escalated.

216. As they had planned, Defendants used their shields and rods to plow through people and knock them over. They used rods and flags to assault protesters.

217.    Defendants also encouraged violence by others.  Over the course of the morning, Daily Stormer, through a livefeed maintained by Defendants Anglin and Ray and other Daily Stormer staff on the ground, encouraged followers to organize in groups and deliberately incited them to engage in violent acts.  Among other exhortations, they told followers: "WHITE SHARIA NOW!" and "WE HAVE AN ARMY! THIS IS THE BEGINNING OF A WAR!"

218.    Members of Defendant Vanguard America also communicated over the Southern Front server, sharing live feed streams and encouraging co-conspirators on the ground in Charlottesville to "Just incite a riot already."  One co-conspirator on the Anticom Discord server, reported to the group: "Vanguard shields are holding the line."

219.    Having witnessed the events of Friday and the anti-Semitic chants of defendants and their co-conspirators, Plaintiff Pearce struggled with whether she should attend the peaceful protest and whether she should identify herself as Jewish.  On the one hand, she believed that it was important to peacefully protest, but she also feared for her safety.  As she left her house, she made a Star of David out of duct tape and attached it to her shirt which bore a Hebrew letter in rainbow colors to show her support for the LGBT community.  She went to Emancipation Park to peacefully protest the neo-Nazis and white supremacist presence in Charlottesville.

220.    One of the rallygoers, a co-conspirator, saw Plaintiff Pearce on the street, pointed at her, and, shouted: "Oh good, they are marking themselves for us, so it is easy to find them."  At the Park, Pearce was joined by her son, who also wore a Star of David and carried a rainbow flag.

221.    While Plaintiff Pearce was standing, peacefully, outside of the Park, expressing her solidarity with other Jewish and non-white members of her community, another white-supremacist and co-conspirator threw an open bottle filled with a foul liquid at her—a common

70

tactic of Defendants and their co-conspirators.  Indeed, in advance of the rally, co-conspirators had encouraged others to "[p]ee in balloons and throw them at communists / In self defense," and to "[f]eel free to urinate and defacate on your nearest antifa terrorist faggot pussy."  The bottle struck Pearce on her leg and she could smell the foul liquid on her body.

222.     In short order, peaceful protesters, including Plaintiffs Wispelwey and Pearce, were forced to leave the area of Emancipation Park as Defendants and co-conspirators attacked people with clubs, smoke bombs, and pepper spray, in fulfillment of their premeditated strategy of inflicting injury.

3)     <u>The Authorities Declared the Rally an Unlawful Assembly and Defendants and Co-Conspirators Intentionally Spread the Violence Outside Emancipation Park</u>

223.     By 11:22 a.m., before the permit for the "rally" even began, Charlottesville officials declared the gathering in Emancipation Park an unlawful assembly, defined under Virginia law as "whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order."

224.     At 11:28 a.m., Governor McAuliffe declared a state of emergency, stating: "It is now clear that public safety cannot be safeguarded without additional powers, and that the mostly out-of-state protestors have come to Virginia to endanger our citizens and property.  I am disgusted by the hatred, bigotry and violence these protestors have brought to our state over the past 24 hours."

225.     Daily Stormer wrote shortly thereafter: "Someone is getting gassed! . . .  LET'S HOPE IT'S JEWS!"

226.     Jason Kessler and other Defendants directed the mob to move to McIntire Park. Some Defendants and co-conspirators, loaded into white vans, and Defendants Cantwell and Ray

71

shared one van.  In his interview with *Vice* that day, Ray explained:  "We're showing to this

parasitic class of anti-white vermin that this is our country.  This country was built by our

forefathers.  It was sustained by us.  It's going to remain our country."

227.    Daily Stormer encouraged its followers to go to McIntire Park and assemble

"behind" Defendants Ray and Cantwell, and incited the crowd to violence:

> **12:42 PM:**
>
> STREETS BELONG TO US!
>
> COPS WON'T INTERVENE!
>
> > Clash between protesters and counter protesters. Police says "We'll not
> > intervene until given command to do so." #Charlottesville
> > pic.twitter.com/UkRDINn2mv
> >
> > — ACLU of Virginia (@ACLUVA) August 12, 2017
>
> **GET TO MCINTIRE PARK NOW AND FIND AZZMADOR, CANTWELL OR SACCO
> VANDAL! STAY IN THE GROUP! DO NOT SEPARATE ONCE YOU ARE BEHIND
> ONE OF THESE THREE MEN!**
> **12:33 PM:**
>
> # EVERYONE GO TO MCINTIRE
> # PARK!
>
> GOOGLE MAP COORDINATES HERE!
>
> **12:31 PM:**
>
> FUCK YOU FAGGOTS!

228.    Among those who followed their direction was Defendant Vanguard America.

Defendant Schoep also marched to McIntire Park, attacking protestors along the way.  He

explained, "I was offered a ride to safety and declined to leave until the women and others were

safe, so we just marched back through antifa . . . We went right through [antifa] like warriors."

Defendant Parrott refused to leave Emancipation Park and was arrested by the police for failing

to disperse.  Parrott described his detention as being "a political prisoner for about 20 minutes."

72

229.    By 1:00 p.m., Defendants Spencer and Peinovich, and their followers, had mostly

reassembled in McIntire Park. Violence again broke out. One woman protesting Defendants'

message was choked by co-conspirator Steven Balcaitis, who was wearing a t-shirt advertising a

white nationalist and anti-Semitic website, Red Ice. As he grabbed her neck, he looked at a

bystander and said, "Don't save her."

230.    Defendants Spencer and Peinovich spoke to their followers at McIntire Park.

Peinovich called the counter-protestors "savages."

231.    Defendants at McIntire Park discussed returning to Emancipation Park in defiance

of police orders. Defendant Mosley sought people with guns: "I need shooters," he said. "We're

gonna send 200 people with long rifles back to that statue." According to a Defendant NSM

twitter account, Defendant Schoep "led a group of 40 back the 1.3 miles from the 2nd park back

to Lee Park, through Antifa and police interference!" They jeered: "So much respect for my

Commander Jeff Schoep. I will go into battle with you anytime Sir 83/88!"

232.    A few minutes after 1:00 p.m., Daily Stormer posted:

**1:08 PM:**

Apparently everyone is getting kicked out of McIntire park.

Everyone is getting kicked out of everywhere.

My advice is this:

## HOLD YOUR FUCKING GROUND
## WHEREVER YOU ARE.

**12:56 PM:**

> Daily Stormer reccomendation: HOLD YOUR FUCKING GROUND.
> DON'T RETREAT. DON'T GIVE AN INCH. https://t.co/rYlXmSBidS
>
> — Daily Stormer Status (@rudhum) August 12, 2017

233.     Defendants took no steps to prevent, or aid in preventing, the violent actions that they knew was being planned.

234.     Some Defendants and co-conspirators stayed in the parks while others dispersed and began to terrorize residents in the downtown area of Charlottesville, near the pedestrian mall. Muñiz, wearing a t-shirt with a representation of women of color, witnessed the marchers walk back to town from McIntire Park and then followed herself to join a group of peaceful counter-demonstrators.

235.     On the mall, Defendants and co-conspirators again brought violence.  One co-conspirator, for example, was caught on video punching two peaceful counter-protestors directly in the face.

4)     <u>The Car Attack</u>

236.     "Run Them Over" is a popular anti-Black Lives Matter and anti-racial justice protest catchphrase and shows up in memes and comments across the Internet.[10]  In late January 2017, Fox Nation, the opinion website operated by Fox News, tweeted out a "Reel Of Cars Plowing Through Protestors Trying To Block The Road."  The author of the video piece, which originally appeared on the Daily Caller, wrote: "Here's a compilation of liberal protesters getting pushed out of the way by cars and trucks" and "Study the technique; it may prove useful in the next four years."  On Facebook, the author bragged about the popularity of the piece, boasting that he "[m]ade a profit for the company today. Went from 400,000 to 2 million views in a 24 hour timespace #winning."

---

[10] Over the past two years, the imagery of running protestors over with a car has gained currency among Defendants and others.  Defendant Heimbach encouraged a police car to mow down peaceful protestors.  An article reports that Heimbach was walking near the parade route when he encountered a group of demonstrators holding signs about water preservation.  A black SUV with police plates drove up and stopped in front of the demonstrators.  An officer leaned out the window and asked them to step aside so that they could pass. "Don't stop, officer," shouted Heimbach as the SUV made its way through the group, "Fucking step on the gas!"

74

237.    The same trope was used as part of planning for the Unite the Right "rally."  On Discord, for example, in response to a post from Tyrone that if "something happens . . . adjustments will have to be made to remove people from the scene," co-conspirator "AltCelt(IL)" responded with an image from a famous scene in the movie *Dawn of the Dead*, in which the protagonists retrofit buses with chainsaws and barbed wire to escape a mall by running over thousands of swarming zombies.  AltCelt(IL) added a "crying laughing" emoji and wrote "This will be us."



238.    Tyrone replied with picture of a John Deere tractor captioned "Introducing John Deere's new multi-lane protestor digestor" and commented, "I know NC law is on the books that driving over protesters blocking roadway isn't an offense… Sure would be nice."

75



239.    On the same day (July 17, 2017), Tyrone asked the #virginia_laws channel, "*Is it legal to run over protestors blocking roadways? I'm NOT just shitposting. I would like clarification. I know it's legal in NC and a few other states. I'm legitimately curious for the answer.*"  Two participants reacted to this post with red heart emojis.

240.    Another co-conspirator on Discord, using the #virginia_laws channel, posted a photo of an armored military tank and wrote:  "Is this legal in VA?"  Eleven participants responded with emojis expressing approval.

241.    Similarly, when Defendant Kessler asked the #demonstration_tactics channel for advice on planning a march, one co-conspirator, "PrimitveXaoc," encouraged the use of sidewalks because "straight through the streets like they did a few weeks ago for the 'community defense' March was awful (Antifa)."  He posted several photos from that march and wrote: "These fools had babies and children in the streets dragging banners over cars blocking their

view and such.  Too bad the civilians didn't just make new speed bumps for some of these scum."

242.    At approximately 1:40 p.m., in furtherance of the conspiracy, Defendant Fields drove his Dodge Challenger onto Fourth Street, idled for a moment while his vehicle faced the peaceful protesters, and then deliberately accelerated into the crowd.

243.    Plaintiffs Martin, Blair, Sines, Muñiz, Alvarado, and Romero were marching up Fourth Street when Fields attacked.  Plaintiff Muñiz had walked to the front of the crowd when it was at the intersection of Fourth Street and Water Street to take a picture of the gathering.  When the crowd turned left onto Fourth Street, Muñiz was still towards the front of the crowd.

244.    Plaintiffs Martin and Blair were approaching the same intersection, walking up Fourth Street towards the downtown mall, with their friend, Heather Heyer.  As he saw the car speeding down the road, Martin pushed Blair out of the path of the moving car.  She fell to the ground and sustained injuries, including a hematoma on her left side and a gash on her right arm. Martin was hit directly by the car, sustaining serious injuries, including a broken leg, fractured ankle, and multiple bruises.

245.    He is pictured below, flying through the air after the car slammed into his body.



246.    Looking for Martin on the street, Blair saw people lying on the ground and bleeding.  She stepped over them looking for Martin.

247.    Blair found Martin on the ground, where people were trying to help him.  Fifteen minutes after the attack, Martin was taken to the hospital and Blair rode in the ambulance with him.  Blair did not receive immediate treatment for her injuries because she was looking after Martin.

248.    While waiting in the hospital, Blair learned that a woman had died in the car attack.  She feared that she knew who it was, and began asking everyone around her if they knew who it was.  Eventually she learned that it was her friend, Heather Heyer, who had been struck and killed.

78

249.　　Plaintiff Romero was hit directly by Defendant Fields's car.  The impact threw

her against a parked car, which she hit before falling to the ground.  Plaintiff Romero recalls

wanting to lie down and close her eyes, but she thought that if she closed her eyes and gave up,

she would die.  She attempted to get up, but struggled and was told by a bystander to sit back

down.

250.　　Romero is pictured below receiving initial care from bystanders:



251.　　Covered in blood from a skull fracture sustained during the attack, Romero was

carried to an ambulance, where a medic informed her that she had been unconscious as they

helped her down Fourth Street.  Before falling unconscious, Romero had begged bystanders to

call her mother, as she had lost her phone when struck by Fields's car.

252.　　Plaintiff Alvarado, who attended the events with Plaintiff Romero, was also hit by

Defendant Fields's car.  The impact of the car knocked her to the ground.  Initially filled with

79

adrenaline, she immediately picked herself up and looked for her friend Romero, who had been hit. Alvarado then watched as Defendant Fields drove his car in reverse into the crowd she was standing in. Fields narrowly missed hitting Alvarado again because she was able to press closer to the adjoining wall. Alvarado continued to fear that the car would come back down the street.

253. Plaintiff Alvarado then went to assist Plaintiff Romero. She supported Romero as they walked up the street until Romero was put into the ambulance. Alvarado was subsequently directed to the medical tent, where she was treated for her injuries.

254. Plaintiffs Muñiz and Sines narrowly escaped being struck by the car. They witnessed belongings and bodies flying in the air. When they saw Defendant Fields speed his car in reverse—backing over many of the bodies he already hit—they were sure that he was going to come charging back into the crowd. Plaintiff Muñiz feared that the cars would be coming from all directions.

255. Plaintiff Muñiz ran away and collapsed on the side of the road. She suffered an acute stress reaction. Plaintiff Sines ran into an alleyway and was so shocked that she had difficulty forming any words. Fearing other attacks, she ran to her closest friend's house downtown.

256. Plaintiff Muñiz saw volunteer medics arriving. Muñiz was shaken and terrified and could not stand up. Muñiz feared that the incident was no longer over. Finally, when Muñiz felt that no other attack was forthcoming, the medic got Muñiz to her feet and walked her to the trauma center.

257. Plaintiff Wispelwey was not at Market Street when the car attack occurred. When he learned of what happened, he sprinted to the site with other clergy to provide assistance, to support victims, and to help control the crowds so that medical vehicles could reach victims.

258.    Plaintiff Pearce also rushed to the scene to provide care and, with the help of her son, tried to suppress the crowds so that medical vehicles could reach those injured.

259.    But as Plaintiffs mourned and tried to care for one another, Defendants and co-conspirators celebrated and encouraged others to leave town immediately, before they found themselves in trouble.

260.    Defendant Spencer tweeted "My recommendation:  Disperse.  Get out of Charlottesville city limits."  Defendant Kessler retweeted him.  At 2:25 pm, Defendant Hill tweeted "The League of the South had a good day in Charlottesville, Virginia.  Our warriors acquitted themselves as men.  God be praised!"

261.    Concluding its live feed for the day, Daily Stormer posted: "THE STREET WAR HAS ENDED.  WE WON.  WE SHOWED THAT OUR IDEAS HAVE TO BE SHUT DOWN WITH VIOLENCE."

5)    After the Fact, Defendants Celebrated Their Successful Plan to Incite Violence

262.    As news about the car attack spread, Defendants celebrated what they believed was their "victory" and mocked the death of Heather Heyer.

263.    Only one hour after the car attack, Defendant East Coast Knights's prominent member "Kneuss" tweeted:  "At least nobody important got hurt. #Charlottesville," followed by another tweet stating, "Dirty apes playing in the street gotta learn the hard way #Charlottesville."[11]  Both tweets were liked by the East Coast Knights Twitter account.

---

[11] Kneuss, who uses the handle "@realDRKNEUSS" on Twitter, interacts frequently with the East Coast Knights on Twitter and they retweet each other frequently; often they are each other's only retweet.  On August 12, at 3:43 p.m., Kneuss tweeted "Big shout out to League of the South, TWP, and NSM the East Coast Knights greatly appreciate you and everything you do. #Charlottesville."  The East Coast Knights' Twitter account retweeted this tweet.  On September 19, Kneuss tweeted a stylized image saying ECK 33/6, which is a reference to the East Coast Knights.

81

264. Later that evening, Defendant Anglin posted a message: "Roadkill Nights Powered by Dodge. It's going down Saturday Aug. 12th from 11am to 10 pm."

265. The following day, Discord participants posted memified photos of Defendant Fields driving his car into the crowd, one labeling the car "RESPECT" and the crowd "WOMEN." Another meme circulated online labeled the image "BACK TO THE FHURER."



82



266.    In Southern Front, the Discord server set up for southern members of Vanguard America, and the organization to which Defendant Fields belonged, members posted similar memes, such as a picture of Plaintiff Martin flying through the air with the caption "Can't Dodge This" and another labeling Fields a "USA Patriot."  One co-conspirator wrote: "I don't think we should hand out shields anymore @everyone . . . We should hand out dodge challengers instead."



267.    Daily Stormer encouraged followers to find out the details of Heather Heyer's

funeral and to attend.  A tweet from Defendant Kessler's account referred to Heather Heyer as a

communist and said:  "Communists have killed 94 million.  Looks like it was payback time."

Kessler claimed he was on a mixture of prescription drugs and alcohol when he wrote that

message and did not remember it; an agent of Daily Stormer claimed credit for hacking Kessler's

account and posting the tweet.

268.    Defendant Heimbach said of the rally:  "We achieved all of our objectives.  We

showed that our movement is not just online, but growing physically.  We asserted ourselves as

the voice of white America.  We had zero vehicles damaged, all our people accounted for, and

84

moved a large amount of men and materials in and out of the area.  I think we did an incredibly impressive job."

269.    White supremacists debriefed on Discord, celebrating that protesters "got btfo [blown the fuck out] by all objective measures / only people who moved us a single inch were the zog-cops." "Kneuss" of the Defendant East Coast Knights celebrated:  "3 fatalities in #Charlottesville.  How many WN's [white nationalists]?  NOT 1.  Fuck the left, Fuck commies, and all kayaks belong in ovens.  Amen."  This tweet was liked by the East Coast Knights' official Twitter account.

270.    A Vanguard America co-conspirator posted a Daily Stormer article on the Southern Front Discord server and wrote: "This was the biggest victory for our movement history.  It was glorious. https://www.dailystormer.com/charlottesville-complete-victory-event-debriefing/" they celebrated, "We fucked up many commies . . .  We hospitalized dozens . . .  We got our guys out, without police help.  We won. . . .  Now you make the next rally and fight for your people."  After the Saturday events, Thomas Ryan Rousseau, a leader of Vanguard America, reassured co-conspirators on the Southern Front Discord server:  "I'm safe, with a dozen or so guys hanging out at a hotel sharing stories of the day."

271.    Defendant Schoep tweeted:  "It was an Honor to stand with U all in C'Ville this weeknd.  NSM, NF, TWP, LOS, VA, ECK, CHS, and the rest, true warriors!"  "Kneuss" and other co-conspirators retweeted and liked this.  A co-conspirator posted on Facebook: "Don't feel ashamed of Cville.  This is your future.  This is the enemy."

272.    Speaking of Charlottesville in an interview, the Grand Dragon for Defendant Loyal White Knights, said:  "I'm sorta glad that them people got hit and I'm glad that girl died.  They were a bunch of Communists out there protesting against somebody's freedom of speech,

85

so it doesn't bother me that they got hurt at all." Defendant Loyal White Knights also changed their outgoing voicemail message to say: "Nothing makes us more proud at the KKK than we see white patriots such as James Fields, Jr, age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer. James Fields hail victory. It's men like you that have made the great white race strong and will be strong again."

273.    Likewise, Defendant Spencer told the *New York Times* that August 12 was "a huge moral victory." Defendant Cantwell told a *Vice* reporter: "I'd say it was worth it. Nobody on our side died . . . none of our people killed anybody unjustly . . . our rivals are just a bunch of stupid animals who don't pay attention that couldn't just get out of the way of the car." Speaking of counter-protesters like Plaintiffs, he said: "These people want violence and the right is just meeting market demand."

274.    In addition to celebrating the August 12 "rally" as a success, Plaintiff Romero continued to be harassed and intimidated. Following her release from the hospital, Romero received three more phone calls from the same Klansman who had harassed her in July. On these phone calls, the man explained that he was trying to sell silver Dodge Challengers—the color, make, and model used by Defendants Fields in his car attack—in Charlottesville. Five minutes after Romero hung up, he called again with the same foreboding pitch.

275.    Later, Romero received a fourth call, again from the same individual, in which the caller said, "Don't you hate it when there are random pedestrians blocking the road, and shit like that? There was one girl named Natalie Romero, she got caught in the accident? She should have died in the hospital." These calls terrified Romero and she continues to worry about her safety.

86

276.     Plaintiff Romero, and several other of the Plaintiffs, also appeared on a list purporting to identify "members of Antifa" who had attended the August 12 "rally." The list identified who had been injured, and who among those "members of Antifa" were "known to be violent."[12] None of the Plaintiffs were identified on the list as among those "known to be violent." The list was created by a former member of Defendant Identity Evropa, who then joined Vanguard America in July 2017 and became an active participant on its Southern Front Discord server, bragging "I really can help track most Antifa" and "[m]y info is good and I will do everything I can to help VA [Vanguard America]."

277.     The list he created was circulated on Gab, a Twitter-like social media site where neo-Nazis and white supremacists, many of who mhave been kicked off of traditional social media platforms, share and post information. On Gab, at least one distribution of the purported "Antifa" list was directed to Defendant Cantwell, among others.

**III.     Defendants' Actions Have Caused and Will Continue to Cause Damage to Plaintiffs**

**A.     <u>The Unlawful Acts By Defendants, Co-Conspirators, and Others Acting at Their Direction Caused Serious Injury, Including To Plaintiffs</u>**

    1)     <u>Defendants' Actions Caused Serious Bodily Injury and Damage to Property</u>

278.     The planned violence brought about by Defendants in Charlottesville on August 11 and 12 left an indelible mark on Plaintiffs, Charlottesville, and the rest of the country. Three innocent people lost their lives: a peaceful protestor, Heather Heyer, and two state law enforcement officers, Lieutenant H. Jay Cullen and Trooper Pilot Berke M.M. Bates. At least 34 individuals, including Plaintiffs, were injured and countless others were victims of assault. Hundreds, if not thousands, were subjected to verbal abuse, threats, harassment, and intimidation

---

[12] Defendants considered any individual opposing their "rally" as being "Antifa," regardless of whether they were violent or intended to be violent.

when Defendants, co-conspirators, and their followers chanted and shouted overtly anti-Semitic, racist, xenophobic, and homophobic messages.

279.   Countless public officials, including Virginia's governor Terry McAuliffe, Attorney General Jeff Sessions, and Senators Cory Gardner, Ted Cruz, and Ron Wyden, have recognized that the Unite the Right "rallygoers" were motivated by racism, xenophobia, and anti-Semitism, that the "rallygoers" engaged in hate-based violence, and that the events that unfolded were properly characterized as domestic terrorism.

280.   On September 12, 2017, Congress passed a unanimous and bipartisan joint resolution "rejecting white nationalists, white supremacists, the Ku Klux Klan, neo-Nazis, and other hate groups," recognizing that they engaged in a "horrific and violent display of bigotry" in Charlottesville, and condemning "the violence and domestic terrorist attack that took place during events between August 11 and August 12, 2017."

281.   The joint resolution also documented that the hate-based groups are "organizing similar events" around the country, and urged the President to "speak out against hate groups that espouse racism, extremism, xenophobia, anti-Semitism, and white supremacy," and address "the threats posed by those groups," which are currently growing within the United States.

282.   President Trump signed the resolution, and issued a signing statement "oppos[ing] hatred, bigotry, and racism in all forms."

2)   <u>Plaintiffs Suffered And Continue To Suffer Serious Injuries</u>

283.   <u>Plaintiff Magill</u>:  Magill suffered permanent physical injury from a stroke that was caused by the trauma of the events of August 11 and 12.  Four days after the "rally," on Tuesday, August 15, Magill collapsed at UVA library.  He began losing his vision and speech and could

barely speak words to tell someone to call an ambulance. Thankfully, he was able to motion to someone in the library to call for help, and he was rushed to the hospital.

284. Magill was admitted to the emergency room at 10:00 a.m. on Tuesday where doctors found that his carotid artery had torn and two blood clots were released to his brain, causing a stroke. Medical professionals maintain that Magill's stroke was a result of trauma to his neck as a result of the events during the weekend.

285. Magill spent two days in the hospital and according to medical professionals, will never fully recover from the resulting brain injuries. He has lost aspects of his vision and speech and has difficulty writing and reading for long periods of time. He has incurred significant medical expenses, and will continue to do so. He will need continued medical care. Magill has not yet been able to return to work.

286. <u>Plaintiff Martin</u>: As a result of the car attack, Martin was diagnosed with a shattered tibia in his left leg, a fractured ankle, and significant ligament damage. He underwent surgery and had two screws placed in his ankle. He experienced swelling in both ankles, and he could not walk for 3 or 4 days. He has been told to expect swelling in his left ankle for at least a year. Due to the nature of his job, he will not be able to work for at least 8-9 months. He has suffered severe emotional distress that includes having mental flashbacks to the events of the "rally." Martin is going to mental counseling twice a week to seek support for his emotional trauma.

287. <u>Plaintiff Blair</u>: For days after the attack, Blair found herself short of breath, shaking, and crying uncontrollably at times. To this day she has trouble focusing, including at work, and finds herself often uncharacteristically angry. She is scared of Dodge challengers and loud noises. She is also experiencing flashbacks. She is withdrawn and reticent in ways she

never was before.  She has lost about ten pounds since the attack due to lack of appetite.  She cannot walk by the location of the attack.

288.    <u>Plaintiff Romero</u>:  As a result of her assault and false imprisonment at the torchlight rally, Romero experienced burning in her eyes and on her shoulders, and the fear and anxiety she felt that night prevented her from sleeping.  The car attack the following day left Romero with severe physical injuries and emotional trauma.  Romero suffered a skull fracture, concussion, severe contusions, a fractured tooth, and scratches all over her body.  She suffers from severe vertigo and experiences debilitating headaches that prevent her from leaving the house.  She also cannot be exposed to bright light or look at white paper without experiencing pain.  Her doctors are unsure of when these symptoms will subside.  In addition to her physical injuries, Romero suffered severe emotional trauma as a result of the torchlight rally and car attack.  Romero did not return to campus for classes this fall because of anxiety and fear associated with her assaults on August 11 and 12.

289.    <u>Plaintiff Alvarado</u>:  The car attack on August 12 caused Alvarado serious physical injuries and emotional trauma.  Alvarado suffered a concussion and severe contusions to her legs.  As a result of her concussion, she continues to experience confusion, forgetfulness, and difficulty processing conversations.  In addition to her physical injuries, the car attack also left her with severe emotional trauma.  Alvarado suffers from depression, which has led to weight gain, isolation from her family and friends, and an inability to do daily tasks.

290.    <u>Plaintiff Wispelwey</u>:  Wispelwey continues to suffer from emotional distress.  Wispelwey's emotional distress has manifested in physical symptoms including constricted chest pain, difficulty breathing, and chronic sleep issues.  He regularly wakes up with night terrors recalling the events of August 11 and 12 and has had to take time off from his work in order to

90

cope with the trauma of the weekend.  He has seen a trauma-informed therapist, has been proscribed with sleep medication, and diagnosed with acute stress disorder.  Wispelwey has also become hyper-vigilant, especially in crowds.

291.  <u>Plaintiff Muñiz</u>:  After experiencing the car attack, and being verbally harassed on August 12, Muñiz has suffered severe emotional injury.  For the first week following the attack, Muñiz could not drive a car.  She was afraid even to be a passenger without covering her left eye, because the sight of oncoming traffic was terrifying.  Muñiz has since experienced triggers—moments where she relives the fear of that day and she shakes and trembles.  She has suffered a few episodes, in which she has fallen to the ground in a catatonic state and can do nothing but cry and drool for long periods.  She has been sleeping erratically, has suffered short term memory issues, and has become socially withdrawn.  She has been unable to obtain medical care for other conditions due to her stress, so she continues to suffer from other ailments.  She is seeing a therapist multiple times per week and has started therapy for post-traumatic stress.  At work, Muñiz used to manage a department of around twenty people, with two managers beneath her.

292.  Unable to return to work, Muñiz was on leave for disability during which time she was paid 70% of her pay, and has lost other financial benefits, such as tuition reimbursement. She returned to work on a reduced schedule on November 1, but her company made a decision that she is not capable of doing that job anymore so she was placed in a new role with less responsibility.  Medical professionals have diagnosed Muñiz with acute stress disorder.  Muñiz returned to work full-time on January 2, although in her new role with less responsibility.  She is undergoing weekly therapy for her symptoms.

293.    <u>Plaintiff John Doe:</u>  As a result of being barked at, yelled at, and physically assaulted, John Doe has suffered numerous emotional injuries.  He has had difficulty focusing in school and is constantly recalling the trauma of Friday evening.  When he walks past the Thomas Jefferson statue on his campus, he is immediately triggered by the recollection of the events on August 11.  Since the "rally," John Doe has had difficulty sleeping and has developed a heightened, anxious, sense of awareness in public spaces.  John Doe also had to miss two weeks of work.

294.    <u>Plaintiff Sines:</u>  Upon witnessing the car attack and nearly being hit, Sines suffered extreme emotional distress and shock.  She often wakes up with nightmares of the car attack and her academic performance has suffered in law school as a result.  Sines is unable to focus, and has missed classes due to her emotional distress.  Sines is also now hyper-vigilant, and afraid in her own home.

295.    <u>Plaintiff Pearce:</u>  In addition to the physical and verbal, religious-based assault Pearce experienced on August 12, she continues to suffer serious emotional distress.  In his Hebrew school class, Pearce's son was asked to answer several writing prompts.  In response to the question, "what makes me uncomfortable about being Jewish," he wrote "neo Nazis."



Since August 12, and in response to threats made against it by Defendants and co-conspirators, Pearce's synagogue Beth Israel has adopted a new, elaborate security protocol that limits parents' ability to pick up their children from Hebrew school. Whereas prior to August 11, student pick up was a relaxed, joyful process during which parents would chat and children would play, parents must now enter a code to a locked, secure door, after which they are permitted to wait quietly inside the door for their child to be retrieved. Moreover, Plaintiff Pearce is now afraid for her safety and for the safety of her family at the Synagogue. And since

93

the attack, she has had to explain to her son why there are always police officers standing guard outside the synagogue.

**B.**     **Defendants Will Continue to Cause Violence and Intimidation Unless Restrained: "We Will Be Back"**

296.     In the weeks after the "rally" and the mass of injuries in Charlottesville, Defendants not only claimed "victory," but swore that they would return. Already, they have followed through on their promise.

297.     Defendant Spencer said: "To Mayor Mike Signer and Wes Bellamy and all these little creeps of this little town who don't understand who they're dealing with—the local little losers—we are never backing down. We are going to be back."

298.     Defendant Anglin wrote on August 14: "As for media rumors that the [Daily Stormer] site will be shut down . . . . You should know better. It's going to take bullets to stop us."

299.     Co-conspirator McLaren tweeted: "Brothers & sisters across the Alt Right—this is a taste of how it feels to be the tip of the spear entering our civilizational crisis." A few days later, he tweeted: "If you were there in #Charlottesville, you're amused at the pronouncements of the Alt Right's death. We are only just beginning."

300.     "There's no way in hell I'm not going back to Charlottesville," Defendant Spencer declared at a press conference with Defendant Damigo. Defendant Mosley told the Huffington Post: "Our people are feeling real good right now…This day was a milestone pushing us into our next stage. We had a large turnout. We're coming back to Charlottesville."

301.     The Daily Stormer also vowed that it would hold similar events "soon." A post on the website read: "We are going to start doing this nonstop. Across the country . . . We are

going to go bigger than Charlottesville.  We are going to go huge."  Furthermore, it told readers

that "[w]e are now at war," and promised to "take over the country."

302.    Defendant Kessler promised:  "We're going to have bigger and bigger events in

Charlottesville."

303.    Defendants plan for these other events to be violent.  After the Unite the Right

"rally," Defendant Cantwell explained, "I came pretty well prepared for this thing today," while

pulling out three pistols, two semi-automatic machine guns, and a knife.  Of the next "alt-right

protest," he said, "it's going to be tough to top but we're up to the challenge . . . I think a lot

more people are going to die before we're done here, frankly."

304.    Following his release on bond for the offenses committed on August 12,

Defendant Cantwell remarked that after his stint in prison, he wants to "turn it up to 11."

305.    One week after the Unite the Right "rally," Richard Spencer's website, Vincent

Law, published "The Alt-Right is Finished Debating:  No More Words, Only Preparation Now":

> Now, what happens next?  Our side certainly isn't ready for
> mass action . . . yet.  And there are no street actions planned for the
> near future.  Still, the lines have been drawn.  Think about those
> brave young men at Charlottesville.  There is no going back for
> them. . . .
>
> The public will see very soon that debate is pointless.
> There are no principles at play anymore.  Only our tribe and theirs.
> And only one group out there has drawn a line in the clay and
> decided to make a stand for what is theirs by birth, by blood and
> by the will of God.  The Alt-Right is finished debating, negotiating,
> surrendering.  We're ready to close ranks and fight for what is ours.
> Post-Charlottesville our fleet lies at the bottom of a deep and
> troubled sea and we can only march on forward like Cortez once
> did.  And like him, we stand poised to conquer the continent.

306.    On Saturday, October 7, Defendant Spencer and other co-conspirators returned to

Charlottesville.  The called the event "Charlottesville 3.0."  Again, they carried tiki torches, and

again they chanted "You will not replace us."  But this time, they added: "We will be back, we will be back."

307.    On November 27, 2017, Defendant Kessler filed an application for a permit to hold another "rally" in Charlottesville.  Although that application was denied, Kessler has indicated that it will proceed nonetheless.  It is scheduled to occur on August 11 and 12, 2018.

### C.  <u>Defendants Continue Their Efforts of Mutual Support and Coordination</u>

308.    Using many of the same platforms the Defendants used to fund their pre-"rally" coordination and planning, Defendants have since provided mutual support to defray the costs associated with their unlawful conduct.

309.    Defendant Cantwell posted bail in connection with his felony indictment by crowdfunding on white-supremacist supportive sites Hatreon and GoyFundMe.  Cantwell's GoyFundMe page solicited donations for the "1433 Justice Fund," a personalized version of the popular white supremacist numeric symbol "1488."  The "14" stands for the 14 Words slogan, which is the heart of Cantwell and his co-conspirators' ideology:  "We must secure the existence of our people and a future for white children."  In place of the usual "88," which is shorthand for "Heil Hitler" (H being the 8th letter of the alphabet), "33" is a stand-in for "CC" or "Chris Cantwell."

310.    While in prison, Defendant Cantwell continued to broadcast his podcast Radical Agenda with the assistance of Defendant Peinovich.  Moreover, Peinovich assisted Cantwell in his fundraising by distributing recordings of phone calls from jail in which Cantwell makes pleas for donations.

311.    Similarly, Defendant Damigo, founder of co-Defendant Identity Evropa, established a purported "Identity Evropa Defense Fund," and solicited donations for himself,

96

Defendant Mosley, and Defendant Identity Evropa. Mosley and Damigo also appeared together with Defendant Spencer on "Red Ice TV" to solicit donations.

## CONSPIRACY ACTS

312. As detailed above, all Defendants had an agreement and understanding to engage in, promote, and incite racial, religious, and ethnicity-based harassment and violence. They did so through, among other things, using and encouraging the use of weapons and caustic substances, military-style marches, burning torches, intimidating iconography, and threats of violence. They did so in order to (a) injure black and Jewish residents of Virginia by denying them the equal privileges and immunities of citizenship, and the use, benefits and privileges of property and/or contractual relationships, (b) further Defendants' cause of recruiting new followers to engage in racial, religious, and ethnically-motivated violence referenced above both at the Unite the Right "rally" and in the future, and (c) compel the city of Charlottesville to maintain the statue of Robert E Lee in Emancipation Park as a means of furthering their aforementioned goals.

313. All Defendants, with the exception of Defendant Fields, on behalf of themselves or the organizations for which they are agents, planned and coordinated the Unite the Right "rally," encouraged attendance, actively organized followers to attend, coordinated logistical support to attendees, promoted the "rally" as violent, and encouraged attendees to prepare for and commit violent acts.

314. Among other things, they used online and media platforms to encourage attendance at the Unite the Right "rally," to discuss and promote causing harm to Jewish people and people of color, and to promote violence.

315. Defendant Spencer and co-conspirator McLaren met in person to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events.

316. Defendants Cantwell and Kessler met in person in Charlottesville to plan unlawful acts of violence, intimidation, and denial of equal protection for the Unite the Right events.

317. Defendants Ray, Cantwell, and Mosley and co-conspirator David Duke attended an in-person planning meeting on August 11 to plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

318. Defendants Anglin and Ray (using, among other things, Daily Stormer's website), Hill, and East Coast Knights organized and caused others to attend the Unite the Right events and commit acts of violence, intimidation, and denial of equal protection.

319. Defendants Nationalist Front, NSM, TWP, League of the South, Vanguard America, East Coast Knights, and "other allies," coordinated their attendance as a "joint operation" in advance of August 12, in order to plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

320. Defendant Damigo and his group Identity Evropa took a lead role in organizing white supremacist participation among people from outside Charlottesville to engage in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

321. Defendants Kessler and Mosley organized the "rally" and coordinated logistics, along with co-conspirator Tyrone, for attendees on August 12 in Charlottesville so that they would engage in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

322.    Defendant Kessler and Mosley moderated, reviewed, and managed the Charlottesville discussion forum on the application named Discord to direct and plan unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events. Along with Kessler and Mosley, Defendants Heimbach, Parrott, Cantwell, Ray, an agent of Daily Stormer (and, hence, Defendants Anglin and Moonbase Holdings), and co-conspirator Tyrone were all participants in Discord and in the direction, planning, and inciting of such unlawful acts through Discord, including the use of weapons and objects to inflict harm and intimidate. Defendants Vanguard America, Identity Evropa, TWP, League of the South, and Moonbase Holdings (through Daily Stormer) all had members on the Discord channel.

323.    Defendants Cantwell, Ray, and Anglin, among others, advised rallygoers on bringing weapons.

324.    Using Discord, Defendants Kessler and Mosley set up a channel for co-conspirators to coordinate unlawful acts at the Unite the Right events, including acts of violence, intimidation, and denial of equal protection.

325.    Defendants Anglin, Ray, and, through Daily Stormer, Moonbase Holdings, set up a channel for co-conspirators to coordinate unlawful acts, including acts of violence, intimidation, and denial of equal protection, at the Unite the Right events.

326.    Defendants Cantwell, Kessler, Mosley, Anglin, Ray, and Peinovich, and others, raised funds, planned for legal support, and arranged travel for the participants who engaged in unlawful acts of violence, intimidation, and denial of equal protection at the Unite the Right events.

327.    Defendants Peinovich, Invictus, Kessler, Spencer, Cantwell, Heimbach, and Hill were featured in the promotional poster for the Unite the Right "rally."

99

328. Defendants Cantwell, Mosley, Spencer, Kessler, Ray, Anglin, and co-conspirators planned and organized a "secret" torch parade at UVA for August 11, with a plan and intent to intimidate, threaten and harass Charlottesville residents, particularly Jews, blacks, and other minority residents.

329. Defendants Cantwell, Mosley, Spencer, Kessler, Ray and Invictus attended and participated in the violent August 11 torch parade, and directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens.

330. Defendant Cantwell assaulted peaceful protestors with mace, a caustic substance, during the August 11 march.

331. Co-conspirators attended the torchlight march on August 11 and engaged in acts of intimidation, harassment, and violence.

332. All Defendants, with the exception of Anglin, attended and participated in the Unite the Right "rally" on August 12, during which they threatened, intimidated, and harassed protestors and minority residents, and incited and engaged in violence. Defendant Fields attended with Vanguard America, wearing the uniform white polo and khakis, and carrying a black shield with the Vanguard logo.

333. All Defendants, with the exception of Defendant Fields, directed and incited acts of violence and intimidation at the Unite the Right "rally" on August 12.

334. Co-Conspirators attended the Unite the Right "rally" on August 12 and engaged in acts of intimidation, harassment, and violence.

100

335.     Defendant Fields deliberately drove his Dodge Challenger into a crowd of peaceful protestors on August 12, intending to instill fear in the community and to cause injuries on a mass scale.

### CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1985(3)

### (By All Plaintiffs Against All Defendants)

336.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

337.     Defendants plotted, coordinated, and executed a common plan to engage in violence and intimidation in the streets of Charlottesville.

338.     In furtherance of a conspiracy to violate the rights of Plaintiffs and other black and Jewish people and their supporters, Defendants repeatedly engaged in campaigns of violence, threats, and intimidation at Lee Park and throughout the city of Charlottesville.

339.     Defendants have committed numerous overt acts in furtherance of the conspiracy to violate Plaintiffs' rights, which are set forth in the paragraphs above.  Defendants have sought to create an atmosphere of violence against Plaintiffs, and to violate Plaintiffs' equal rights, including those under U.S.C. § 1982.

340.     Co-conspirators whose identities are not known committed numerous additional acts in furtherance of the conspiracy to violate Plaintiffs' rights, including those alleged herein.

341.     The illegal activities described were undertaken by Defendants, their agents, and co-conspirators as express overt acts pursuant to an unlawful conspiracy, the purpose of which was and is to discriminatorily deprive black, Jewish, nonwhite individuals, and their white supporters, of their rights to the equal protection of the laws and their rights to the equal

101

enjoyment of the privileges and immunities of citizens of the United States guaranteed by the Constitution and laws, because of their race, religion, and open and obvious advocacy for the rights of nonwhite individuals.

342.    As a result of the acts set out in the above paragraphs committed in furtherance of this conspiracy, Plaintiffs suffered injuries to their person or property and/or suffered the discriminatory deprivation of one or more of their rights or privileges guaranteed by the Constitution or laws because of one or more of the illegal overt acts of Defendants and their agents.  These rights include but are not limited to their rights to be free of the badges and incidents of slavery pursuant to the Thirteenth Amendment, as well as their rights protected by 42 U.S.C. § 1982.

343.    Because of Defendants' violation of Plaintiffs' rights, Plaintiffs have suffered numerous and various injuries, including bodily injury, injuries to property, lost income, and severe emotional distress.

## COUNT II: 42 U.S.C. § 1986

### (By All Plaintiffs Against All Defendants)

344.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

345.    Defendants all possessed actual knowledge of the Section 1985(3) anti-civil rights conspiracy described in this complaint that was planned and then undertaken against the class of American citizens described—including a number of the Plaintiffs named herein.

346.    Defendants, as organizers, planners, promoters, and leaders of the conspiracy, were each in a position and had the power to have stopped the anti-civil rights conspiracy or to aid in stopping it.

347.    Each of the Defendants failed and refused to take any steps to attempt to stop this conspiracy or any of the overt acts committed in furtherance of the conspiracy so as to stop the injuries which occurred to Plaintiffs or to other members of the class of citizens targeted by the anti-civil rights conspiracy described.

348.    The failure of Defendants to take any steps to aid in preventing the actions described herein, by informing the lawful authorities or otherwise, violated the command of 42 U.S.C. § 1986.

349.    Plaintiffs suffered their injuries as a result of the individual Defendants' failure to stop the described conspiracy.

## COUNT III: CIVIL CONSPIRACY

### (By All Plaintiffs Against All Defendants)

350.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

351.    Each Defendant conspired together and combined with one or more other persons to accomplish, through the concerted action described above, unlawful and tortious acts, including:

    a.   Subjecting persons to acts of intimidation or harassment, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

    b.   Directing violence at another person, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

    c.   Directing vandalism at a person's real or personal property, motivated by racial, religious, or ethnic animosity, in violation of Virginia Code § 8.01-42.1.

    d.   Causing or producing a riot, in violation of Virginia Code § 18.2-408.

103

e. Directing, inciting, or soliciting other persons participating in a riot to acts of force or violence in violation of Virginia Code § 18.2-408.

f. Causing public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof in violation of Virginia Code § 18.2-415.

g. Assembling a collection of people for the purpose and with the intention of committing, and actually committing, an assault or battery on another person, in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1.

h. Assembling a collection of people for the purpose and with the intention of committing, and actually committing, an act of violence (as defined in Virginia Code § 19.2-297.1), in violation of Virginia Code §§ 18.2-38, 18.2-42, and 18.2-42.1.

i. Maliciously causing another person bodily injury by use of any explosive or fire, in violation of Virginia Code § 18.2-52.

j. Burning an object with the intent to intimidate on a highway or other public place in a manner having a direct tendency to place another person in reasonable fear of apprehension of death or bodily injury, in violation of Virginia Code § 18.2-423.01.

k. Burning an object with the intent to intimidate on the private property of another without permission, in violation of Virginia Code § 18.2-423.01.

l. Committing an act of violence with the intent to intimidate a civilian population at large, or influence the conduct or activities of a government through intimidation, in violation of § 18.2-46.5.

m. Possessing, using, selling, giving, distributing, or manufacturing a weapon or imitation weapon that could cause serious bodily harm in connection with an act of terrorism in violation of Virginia Code § 18.2-46.5.

n. Inviting, soliciting, recruiting, encouraging, or otherwise causing another to participate in an act of terrorism in violation of Virginia Code § 18.2-46.5.

o. Knowingly providing material support to an individual or organization whose primary objective is to commit an act of terrorism, with the intent to further the individual or organization's objectives, in violation of Virginia Code § 18.2-46.5.

p. Engaging in an overt act intended to inflict bodily harm, or intended to place the victim in fear or apprehension of bodily harm (assault).

q. Committing an unwanted touching that was neither consented to, excused, or justified (battery).

r. Causing reasonable apprehension that force will be used unless a person willingly submits and causing him to submit to the extent that he is denied freedom of action (false imprisonment).

352. Each of the Plaintiffs suffered damages resulting from acts committed in furtherance of the conspiracy.

353. As co-conspirators, Defendants are civilly liable to Plaintiffs for the actions of all individuals who acted in pursuit of the common conspiratorial scheme.

## COUNT IV: NEGLIGENCE PER SE

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero Against Defendant Fields)

354. Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

105

355.	Pursuant to Virginia Code 18.2-46.5, any person who commits or conspires to commit or aids and abets the commission of an act of terrorism is guilty of a felony.

356.	Virginia Code 18.2-46.4 defines an "act of terrorism" as, among other things, an act of violence committed with the intent to intimidate the civilian population at large.

357.	Virginia Code 18.2-46.5 was enacted to protect the civilian population from acts of terrorism and violence.

358.	Fields intentionally drove his vehicle into a group of civilians and counter-protestors with the intent to murder, injure, and intimidate the civilian population at large, in violation of Virginia Code § 18.2-46.5.

359.	Plaintiffs, as members of the civilian population, belong to the class of persons for whose benefit Virginia Code § 18.2-46.5 was enacted and the violation of the Statute constitutes negligence per se.

360.	The injuries suffered by Plaintiffs were the type of harm against which Virginia Code 18.2-46.5 was designed to protect.

361.	Defendant's violation of Virginia Code § 18.2-46.5 directly and proximately caused the Plaintiffs harm.

**COUNT V: VIOLATION OF VIRGINIA CODE § 8.01-42.1**
**CIVIL ACTION FOR RACIAL, RELIGIOUS, OR ETHNIC HARASSMENT**

**(By Plaintiffs Wispelwey, Magill, Muñiz, John Doe, Sines, Blair, Martin, Alvarado, and Romero Against Defendants Fields, Mosley, Spencer, Kessler, Ray, Cantwell, and Invictus)**

362.	Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

363.	Virginia Code 8.01-42.1 creates a civil cause of action for any person who is subjected to the following if motivated by racial, religious, or ethnic animosity: (1) acts of

106

intimidation or harassment; (2) violence directed at his or her person; or (3) vandalism directed against his or her real or personal property.

364.     Plaintiffs Wispelwey, Magill, Muñiz, John Doe, Sines, Blair, Martin, Alvarado, and Romero were subjected to acts of intimidation and/or harassment, violence directed at their persons, and/or vandalism directed against their real and/or personal property.

365.     These acts were motivated by Defendants' racial, religious, or ethnic animosity.

## COUNT VI: ASSAULT AND BATTERY

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero Against Defendant Fields)

366.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

367.     As a result of the intentional and unlawful acts of Defendants as described herein, Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero were placed in apprehension of harmful and/or offensive bodily contact, and suffered harmful, offensive bodily touching which was neither consented to, excused, or justified.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiffs Muñiz, Sines, Blair, Martin, Alvarado, and Romero Against Defendant Fields)

368.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

369.     Defendant Fields intentionally and/or recklessly drove his car into a crowd of counter-protestors with the intent to murder, severely injure, and intimidate a civilian population.

107

370.　　As a result of Defendant Fields's outrageous and extreme actions, Plaintiffs Muñiz, Blair, Martin, Alvarado, and Romero suffered severe emotional distress that no reasonable person could be expected to endure.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request an award of the following relief:

371.　　A declaratory judgment that the actions described herein deprived Plaintiffs of their rights under federal and state law.

372.　　Injunctive relief enjoining Defendants from future violations of rights guaranteed by state and federal law.

373.　　Compensatory and statutory damages in an amount to be determined at trial.

374.　　Punitive damages in an amount to be determined at trial.

375.　　Such other relief as the Court deems necessary and just.

108

Respectfully submitted,

*s/ Robert T. Cahill*
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

*Of Counsel for all Plaintiffs:*

Roberta A. Kaplan (*pro hac vice*)
Julie E. Fink (*pro hac vice*)
Christopher B. Greene (*pro hac vice*)
Seguin L. Strohmeier (*pro hac vice*)
KAPLAN & COMPANY, LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
Email: rkaplan@kaplanandcompany.com
Email: jfink@kaplanandcompany.com
Email: cgreene@kaplanandcompany.com
Email: sstrohmeier@kaplanandcompany.com

Karen L. Dunn (*pro hac vice*)
William A. Isaacson (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131
Email: kdunn@bsfllp.com
Email: wisaacson@bsfllp.com

Philip M. Bowman (*pro hac vice*)
Joshua J. Libling (*pro hac vice*)
Yotam Barkai (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
575 Lexington Ave.
New York, NY 10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: pbowman@bsfllp.com
Email: jlibling@bsfllp.com
Email: ybarkai@bsfllp.com
109

Alan Levine (*pro hac vice*)
COOLEY LLP
1114 Avenue of the Americas, 46th Floor
New York, NY 10036
Telephone: (212) 479-6260
Fax: (212) 479-6275
Email: alevine@cooley.com

David E. Mills (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Fax: (202) 842-7899
Email: dmills@cooley.com

*Of Counsel for Plaintiff Natalie Romero:*

Kenneth D. Bynum (VSB: 23177)
BYNUM & JENKINS, PLLC
1010 Cameron Street
Alexandria, Virginia 22314
(703) 549 7211 Direct Dial
(703) 549 7701 Fax
KBynum@BynumAndJenkinsLaw.com

Pleasant S. Brodnax, III (VSB: 26477)
1701 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006
Telephone: (202) 462-1100
Fax: (202) 204-5165
www.pleasantbrodnax.com

110

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2018 I filed the foregoing with the Clerk of Court

through the CM/ECF system, which will send a notice of electronic filing to:

Justin Saunders Gravatt
David L. Hauck
David L. Campbell
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
jgravatt@dhdglaw.com
dhauck@dhdglaw.com
dcampbell@dhdglaw.com

*Counsel for Defendant James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Defendants Michael Hill, Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
jek318@gmail.com

*Counsel for Defendants Jeff Schoep, Nationalist Front, National Socialist Movement, Matthew Parrott, Matthew Heimbach, Robert Ray, Traditionalist Worker Party, Elliot Kline, Jason Kessler, Vanguard America, Nathan Damigo, Identity Europa, Inc. (Identity Evropa), and Christopher Cantwell*

I further hereby certify that on January 5, 2018, I also served the following non-ECF

participants, via U.S. mail, First Class and postage prepaid, addressed as follows:

Loyal White Knights of the Ku Klux Klan
a/k/a Loyal White Knights Church of the
Invisible Empire, Inc.
c/o Chris and Amanda Barker
P.O. Box 54
Pelham, NC 27311

Richard Spencer
1001-A King Street
Alexandria, VA 22314

Michael Peinovich
a/k/a Michael "Enoch" Peinovich
PO Box 1069
Hopewell Junction, NY 12533

Moonbase Holdings, LLC
c/o Andrew Anglin
6827 N. High Street, Suite 121
Worthington, OH 43085

Andrew Anglin
6827 N. High Street, Suite 121
Worthington, OH 43085

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the True
Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Fraternal Order of the Alt-Knights (c/o
Proud Boys)
c/o LegalCorp Solutions, LLC
11 Broadway, Suite 615
New York, NY 10004

Augustus Sol Invictus
206 N. Mills Avenue
Orlando, FL 32801

*s/ Robert T. Cahill*
Robert T. Cahill (VSB 38562)
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5656
Telephone: (703) 456-8000
Fax: (703) 456-8100
Email: rcahill@cooley.com

*Counsel for Plaintiffs*

2

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA


ELIZABETH SINES  ET AL.          :          Case No.  3:17-CV-72

       **Plaintiff**          :          Judge MOON


                            :

   **-v-**

JASON KESSLER ET AL.          :

                            :

       **Defendants**

---

**MOTION TO DISMISS THE PLAINTIFF'S AMENDED COMPLAINT**

---

     Now come Defendants Jason Kessler, Christopher Cantwell, Vanguard America,

Robert Ray, Nathan Damigo, Elliott Kline, Identity Evropa, Matthew Heimbach,

Matthew Parrott, Traditionalist Worker Party, Jeff Schoep, National Socialist Movement,

and Nationalist Front (hereafter "Moving Defendants") and move the Court to

dismiss all claims against them pursuant to FRCP 12(b)(6) for failure to state a claim

upon which relief can be granted.

1

Respectfully Submitted,


s/ Elmer Woodard _____
ELMER WOODARD (VSB 27734)
5661 US Hwy 29
Blairs, Va. 24527
(434) 878-3422
isuecrooks@comcast.net
*Trial Attorney for Defendant*


S/ James E. Kolenich (PHV)
KOLENICH LAW OFFICE
9435 Waterstone Blvd. #140
Cincinnati OH 45249
Phone: 513.444.2150
Fax: 513.297.6065
e-mail: Jek318@gmail.com

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify the above was served via the Court's ECF system on January 26, 2018 upon:

All parties of record. One party is entitled to or has requested service by other means and said party has been served by regular US mail/ electronic mail as follows:
Mr. Michael Enoch Peinovich
PO Box 1069
Hopewell Junction, NY 12533
mpeinovich@gmail.com

s/ Elmer Woodard

_____
E. Woodard (VSB 27734)

3

# Exhibit D

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

07/09/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ELIZABETH SINES, *ET AL.*, | CASE NO. 3:17-CV-00072 |
| *Plaintiffs,* | |
| v. | MEMORANDUM OPINION |
| JASON KESSLER, *ET AL.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

In 1871, Congress passed a law "directed at the organized terrorism in the Reconstruction South[.]" *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 610 n.25 (1979); *see* 42 U.S.C. § 1985. Over a hundred and forty years later, on August 11th and 12th, 2017, the Defendants in this lawsuit, including the Ku Klux Klan, various neo-Nazi organizations, and associated white supremacists, held rallies in Charlottesville, Virginia. Violence erupted. Charlottesville residents who suffered injuries at the rallies, the Plaintiffs, allege that this violence was no accident. Instead, they allege the Defendants violated the 1871 Act and related state laws by conspiring to engage in violence against racial minorities and their supporters. The Defendants retort that they were simply engaged in lawful, if unpopular, political protest and so their conduct is protected by the First Amendment. While ultimate resolution of what happened at the rallies awaits another day, the Court holds the Plaintiffs have plausibly alleged the Defendants formed a conspiracy to commit the racial violence that led to the Plaintiffs' varied injuries. Accordingly, the Plaintiffs' claims largely survive, although one Defendant is dismissed and other claims are pared down.

## I.    LEGAL STANDARD

This opinion addresses one precise question: the legal sufficiency of the Plaintiffs' allegations that the Defendants conspired to engage in racial violence. This question comes

before the Court because some of the Defendants have moved the Court to dismiss the complaint.[1]   A motion to dismiss a complaint tests the legal sufficiency of the allegations to determine whether the Plaintiffs have properly stated a claim; "it does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).  And so the Court does not today choose between the parties' competing narratives of what "actually happened" at the August rallies.

Plaintiffs' complaint is required to "to provide the 'grounds' of [their] entitle[ment] to relief," but this "requires more than labels and conclusions[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  A court need not "accept the legal conclusions drawn from the facts" by Plaintiffs or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted).  But the Court takes all factual allegations in the complaint as true and draws all reasonable inferences in the Plaintiffs' favor.  *Rubenstein*, 825 F.3d at 212.  In sum, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## II.   Summary of Allegations

Before addressing the complaint, three brief points are necessary.  First, Plaintiffs' complaint is 112-pages long, pushing the limits of Rule 8(a)'s requirement of a "short, plain

---

[1]      More specifically, Defendants Michael Hill, League of the South, and Michael Tubbs jointly filed a motion to dismiss (dkt. 201); Defendants Jason Kessler, Christopher Cantwell, Vanguard America, Robert "Azzmador" Ray, Nathan Damigo, Elliot Kline, Identity Evropa, Matthew Heimbach, Matthew Parrott, Traditionalist Worker Party, Jeff Schoep, and National Socialist Movement filed another motion to dismiss (dkt. 205); Defendant Nationalist Front filed a motion to dismiss (dkt. 207); Defendant Richard Spencer filed a *pro se* motion to dismiss (dkt. 209); and Defendant Michael Peinovich filed a *pro se* motion to dismiss (dkt. 212).  Other Defendants either answered, (dkt. 196), filed a motion to dismiss that was stricken, (dkt. 202), or failed to appear.  Judge Hoppe struck Defendant Fraternal Organization of the Alt-Knights' motion to dismiss because organizational defendants cannot proceed *pro se*.  (Dkt. 210).

2

statement." Fed. R. Civ. P. 8(a). While the Court will not ask the Plaintiffs to trim their complaint, the following summary will necessarily leave out some details. To the extent those details are material to the Court's analysis, they are discussed later in the opinion. Second, the complaint frequently uses vague nouns, lumping all Defendants and all co-conspirators together. Because this style of pleading raises problems addressed below, the following summary focuses on allegations that are tied to specific Defendants. Third, it is important to remember that the following summary is a recounting of *allegations*. While the Court does not repeatedly state "Plaintiffs *allege* that Defendant *X* did *Y*," this summary should not be taken as the Court's endorsement of one version of the facts.

**A.     The Plaintiffs**

The Plaintiffs are ten Charlottesville residents who each allegedly suffered some injury related to the rallies. Their relationships to the Defendants fall into three general groups. First, there are those that attended a counter-protest on the night of Friday, August 11th, 2017. As discussed more fully below, various Defendants led a torchlight march at the University of Virginia. At the end of that march, some Plaintiffs were assaulted. One of these Plaintiffs was Tyler Magill, who was surrounded and assaulted by various marchers around a Thomas Jefferson statue. (Dkt. 175 at ¶166). The marchers hurled torches at Magill and others, sprayed them with pepper spray, and threw other liquids on them. (*Id.* at ¶¶169, 173, 174). He later suffered a "trauma-induced stroke" and related injuries. (*Id.* at ¶11). Plaintiff John Doe, an African-American UVA student, attended the march where he also was harassed and assaulted. (*Id.* at ¶13). He suffered various emotional injuries. (*Id.* at ¶293). A third Plaintiff, a UVA student named Natalie Romero, was also surrounded and assaulted at the statue. (*Id.* at ¶18).

3

Second, another group of Plaintiffs was injured when one of the Defendants, James Fields, drove his car into a crowd of counter-protestors after the "Unite the Right" rally on Saturday, August 12th. Plaintiff Romero also falls into this second group, as she was hit by Fields's car and sustained subsequent injuries. (*Id.*). Plaintiff Marcus Martin, an African-American counter-protestor, was hit by Fields's car and sustained a broken leg and ankle. (*Id.* at ¶17). He pushed his fiancé, Plaintiff Marissa Blair, out of the way of the oncoming car, but she too suffered various physical injuries. (*Id.* at ¶16). Plaintiff Chelsea Alvarado was also hit by Defendant Fields's car, and she suffered physical and emotional injuries. (*Id.* at ¶19). Plaintiff Elizabeth Sines, a second year law student, witnessed the events and suffered severe emotional distress and shock. (*Id.* at ¶15). Plaintiff April Muñiz was close to being hit by the car, and she has been diagnosed with acute stress disorder and trauma since the event. (*Id.* at ¶12).

Third, there are two other Plaintiffs who are more difficult to classify. Plaintiff Seth Wispelwey is a minister who led an ecumenical organization called "Congregate" in non-violent protest. (*Id.* at ¶¶11, 134). He was part of a church service across from the torchlight march on the 11th, was confronted by one of the Defendants after the torchlight rally, and was assaulted while counter-protesting on Saturday. (*Id.* at ¶¶178, 182, 208). The last Plaintiff is Hannah Pearce. She is a member of Congregation Beth Israel, a synagogue close to the park where the Saturday rally took place. (*Id.* at ¶14). She peacefully protested throughout the weekend and was subjected to anti-Semitic harassment. (*Id.* at ¶¶219–21).

## B.     The Defendants

Two of the primary organizers of the Friday and Saturday events were Defendants Richard Spencer and Jason Kessler. Defendant Richard Spencer planned the Friday night march and encouraged his many followers to attend the Saturday rally. (Dkt. 175 at ¶21). Defendant

4

Jason Kessler is a Charlottesville resident who applied for, and eventually received, a permit to hold the Saturday rally. (*Id.* at ¶¶20, 55).

Two other promoters were Defendants Christopher Cantwell and Michael Peinovich. Defendant Cantwell attended the events and faced criminal charges for using pepper spray at the Friday night march. (*Id.* at ¶22). Defendant Michael Peinovich hosts a podcast called The Daily Shoah and was featured on a promotional poster for the event. (*Id.* at ¶42).

Many of the individual Defendants who helped plan the events are part of organizations that are themselves Defendants. Defendants Andrew Anglin and Robert "Azzmador" Ray run a website called The Daily Stormer. (*Id.* at ¶¶25, 27). They used this platform and associated "book clubs" to promote the events, which Ray attended. (*Id.*). The website is owned by an Ohio limited liability corporation, Defendant Moonbase Holdings, LLC. (*Id.* at ¶26).

Defendant Vanguard America is a white nationalist group with twelve chapters across the country. (*Id.* at ¶24). Many of its members attended the events. (*Id.* at ¶¶153, 197). Plaintiffs alleged one of its members, Defendant James Fields, intentionally drove his car into a crowd of counter-protesters, killing one individual and injuring many others. (*Id.* at ¶23).

Another organizer was Defendant Eli Mosley. (Dkt. 175 at ¶29). He is associated with the white supremacist organization Defendant Identity Evropa. (*Id.* at ¶¶29, 30). The founder of that organization is Defendant Damigo, who helped facilitate transportation for the events. (*Id.* at ¶28). Defendant Identity Evropa popularized the "You will not replace us!" chant that became the protesters' rally cry. (*Id.* at ¶30). Both Damigo and Mosley attended the events.

Defendant Traditionalist Worker Party is a white nationalist organization, with many members who attended the rallies. (*Id.* at ¶33). It is led by Defendant Matthew Heimbach and Defendant Matthew Parrott. (*Id.* at ¶¶31, 32). Parrott wrote an account of his experiences at the

5

Saturday rally, and he described how multiple Defendants used organized formations of "shield walls" in "the fight."  (*Id.*).

Defendant League of the South and two of its leaders, Defendants Michael Hill and Michael Tubbs, were also involved in the fighting at the Saturday rally.  (*Id.* at ¶¶34–36). Defendant Tubbs, in particular, led an organized charge of League of the South members against counter-protestors.  (*Id.*).

Defendant Augustus Sol Invictus is a member of Defendant Fraternal Order of Alt-Knights, which is the "military wing" of the white nationalist group "Proud Boys."  (*Id.* at ¶¶40–41).  He attended both events.  (*Id.*).

Two different Ku Klux Klan organizations also participated in some capacity.  Defendant Loyal White Knights of the Ku Klux Klan organized a previous Charlottesville rally, and then made various statements celebrating Defendant Fields's decision to drive his car into counter-protesters.  (*Id.* at ¶36).  Defendant East Coast Knights of the Ku Klux Klan also attended the previous rally and then participated in the August 12 rally.  (*Id.* at ¶44).

Defendant National Socialist Movement is a white supremacist organization that has a "paramilitary" structure.  (*Id.* at ¶38).  Defendant Jeff Schoep, its leader, attended the rallies and afterwards tweeted that is was an "honor" to stand with the other "warriors."  (*Id.* at ¶37).

Finally, Defendants Schoep, Heimbach, and Hill lead Defendant Nationalist Front, an umbrella organization that includes many of the aforementioned organizations.  (*Id.* at ¶39).

## C.    Months preceding August 11 and 12th

Charlottesville drew Defendants' attention because of its decision to change the name of Lee Park, a small park in Downtown Charlottesville that contains a statue of General Robert E. Lee, to Emancipation Park in February 2017.  (Dkt. 175 at ¶¶47–48).  In May 2017, various

6

white supremacist groups, including some Defendants, led a torchlight march around the Lee statue. (*Id.* at ¶50). "Capitalizing on the perceived success of the May event," Defendant Kessler submitted an application for a follow-up rally on August 12th. (*Id.* at ¶55). In the intervening months, various Defendants came to Charlottesville for marches and demonstrations. (*Id.* at ¶¶56–57). Plaintiff Romero protested one of these events, a Ku Klux Klan march, and received harassing phone calls afterwards from a member of the Klan. (*Id.* at ¶58).

**D.     Planning for the August 11th and 12th rallies**

Key Defendants met together in person for planning purposes at least a few times. Defendant Spencer and Evan McLaren, a member of Defendant Identity Evropa, met at the Trump Hotel in D.C. to organize the rally on an unspecified date. (Dkt. 175 at ¶64). Closer to the rallies, Defendants Cantwell and Kessler then met on August 9th in Charlottesville to plan. (*Id.* at ¶65). Defendants Ray, Cantwell, Mosley, and purported co-conspirator David Duke had a similar meeting on August 11. (*Id.* at ¶66).

Much more significantly, the majority of the planning appears to have occurred online. Defendants Kessler and Mosley used an online program called "Discord" for planning. (*Id.* at ¶¶71–73). This "invite only" platform allowed Defendants and their chosen invitees to engage in private conversations during the lead up to the events. (*Id.* at ¶72). While Defendants Kessler and Mosley moderated and managed Discord, many other Defendants participated on the platform, including Defendants Heimbach, Parrott, Cantwell, Ray, Vanguard America, Identity Evropa, Traditionalist Worker Party, League of the South, and Moonbase Holdings. (*Id.* at ¶¶74, 77). Organizational Defendants were able to maintain private sub-forums for their own members. (*Id.* at ¶77).

7

Conversation on Discord included mundane planning details, racist "jokes," and concrete threats of violence. Defendant Mosley posted "General Orders" for "Operation Unite the Right Charlottesville 2.0." (*Id.* at ¶75). Organizers also posted information about shuttle service information, lodging, and carpools. (*Id.* at ¶76). Other corners of Discord were significantly darker. One user posted a fake advertisement for a pepper-spray-look-alike called "Nig-Away," described as a "a no-fuss, no muss 'nigger killer,'" promised to "kill[] on contact" in order to "rid the area of niggers." (*Id.* at ¶111). Another frequent Discord user asked whether it was "legal to run over protestors blocking roadways?" (*Id.* at ¶239). He clarified he was not joking, "I'm NOT just shitposting. I would like clarification. I know it's legal in [North Carolina] and a few other states. I'm legitimately curious for the answer." (*Id.*). Other Discord users made similar comments about running over counter-protestors. (*Id.* at ¶236–41). Elsewhere on Discord, users made it clear they planned to fight at the events, saying things like "I'm ready to crack skulls." (*Id.* at ¶97). Defendant Kessler told users: "I recommend you bring picket sign post, shields and other self-defense implements which can be turned from a free speech tool to a self-defense weapon should things turn ugly." (*Id.* at ¶ 112). Defendant Vanguard America instructed its members "to arrive at the rally in matching khaki pants and white polos," with one member noting that this was "a good fighting uniform." (*Id.* at ¶ 115). Defendant Hill wrote, in a Defendant League of the South Facebook group, that he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." (*Id.* at ¶36). Similar comments from other Defendants abound.

## E.      Counter-protestors prepare

While this planning was ongoing, separate counter-protesters received permits to hold events in other parks during the Defendants' rally. (Dkt. 175 at ¶132). Plaintiff Wispelwey

started an organization, "Congregate," to join with interfaith clergy in protesting against racial inequality and the rally. (*Id.* at ¶134). Defendant Kessler advised other attendees about Congregate's work, allegedly in an attempt to threaten the organization. (*Id.* at ¶135). The names of other counter-protestors were shared over Discord. (*Id.* at ¶137).

Other individuals opposed to the "Unite the Right" rally also prepared. Plaintiff Pearce's temple, Congregation Beth Israel, moved its Torah scrolls off site in advance of the rally and changed the time of its normal Shabbat services. (*Id.* at ¶¶138–39). Stores around town put signs up supporting diversity and equality. (*Id.* at ¶140). Defendants Kessler, Mosley, Spencer, and Peinovich shared the names and addresses of these businesses, allegedly in an attempt to have attendees intimidate them. (*Id.* at ¶141). Some of these businesses received various threats. (*Id.* at ¶142).

## F.    The march on August 11th

Defendants Mosley, Spencer, Kessler, Ray, Anglin, Cantwell, and Invictus organized a secret torchlight march at UVA. (Dkt. 175 at ¶143–49). These torches were supposed to invoke the Ku Klux Klan's and Nazi's similar use of torches. (*Id.* at ¶150). The marchers marched two-by-two up the Lawn, around the Rotunda, and towards a Thomas Jefferson statue on the far side of the Rotunda. (*Id.* at ¶¶159, 164). As they marched, they chanted various racist slogans and performed Nazi salutes. (*Id.* at ¶¶161–62).

Although the march was supposed to be secret, approximately thirty counter-protesters, including Plaintiffs Doe, Magill, and Romero, reached the Jefferson statue before the marchers. (*Id.* at ¶¶164, 169). The counter-protesters linked arms and surrounded the statue, facing away from it. (*Id.* at ¶164). As the marchers rounded the Rotunda, they charged towards the statue and surrounded the counter-protestors. (*Id.* at ¶¶164, 166). Fighting broke out, and the marchers

9

kicked and punched the counter-protesters. (*Id.* at ¶168). People in the crowd threw an unidentified fluid at the counter-protesters, including on Plaintiffs Doe, Magill, and Romero. (*Id.* at ¶169). These Plaintiffs were afraid it was fuel and that they would be burned. (*Id.*). Defendant Ray shouted, "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.*). A photo shows Defendant Cantwell spraying a counter-protestor with pepper spray. *Id.* at 56. (*Id.* at ¶172). Plaintiffs Doe and Romero felt trapped and did not believe they could escape safely. (*Id.* at ¶¶173–74).

During this time, Plaintiff Wispelwey and around 1,000 others were inside St. Paul's Church, which is located across the street from the Rotunda. (*Id.* at ¶154). The faith community at St. Paul's, including Plaintiff Wispelwey, witnessed the marchers. (*Id.* at ¶178). The church leaders asked everyone to remain at the church out of a fear of violence. (*Id.* at ¶180). Plaintiff Wispelwey eventually drove some attendees to their homes and hotels. (*Id.* at ¶181). At one hotel, Defendant Invictus confronted Wispelwey and aggressively asked him what he was doing at the hotel and what church he belonged to. (*Id.* at ¶182).

The night ended with Defendants Kessler and Spencer, and others, celebrating the evening's events and encouraging their followers to come to the following day's rally. (*Id.* at ¶184).

**G.      The rally on August 12th**

Almost all of the Defendants attended Saturday's "Unite the Right" rally, including Defendants Kessler, Cantwell, Mosley, Heimbach, Hill, Invictus, Ray, Spencer, Damigo, Peinovich, Fields, Parrott, Tubbs, Nationalist Front, League of the South, National Socialist Movement, Traditionalist Worker Party, Vanguard America, East Coast Knights, Loyal White

Knights, Fraternal Order of Alt-Knights, and members of The Daily Stormer's "book clubs." (Dkt. 175 at ¶187).

Defendants arrived in passenger vans, gathered at pre-arranged meet up spots, and then marched towards the park. (*Id.* at ¶¶196, 207). They entered Emancipation Park "in military formations, armed like paramilitary forces." (*Id.* at ¶195). Organizations marched with matching uniforms, coordinated shields, and regimental flags. (*Id.* at ¶¶197–98). Defendant Fields, who would later drive his car into the crowd, wore Defendant Vanguard America's uniform and marched with other Vanguard America members. (*Id.* at ¶197).

As the military formations marched into the park, they assaulted and knocked over various counter-protestors, including Plaintiffs Wispelwey and Romero. (*Id.* at ¶208). Other counter-protesters were blockaded around the park, and rally attendees used "shields, flags, or fists" to break through these counter-protesters and enter the park. (*Id.* at ¶209). Once in the park, the violence escalated. According to an account of the day written by Defendant Parrott, members of Defendants Traditionalist Worker Party, League of the South, National Socialist Movement, and other Nationalist Front groups, jointly created "two shield walls" for "the fight." (*Id.* at ¶212). Defendant Identity Evropa "were occupied on other fronts," but "sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers." (*Id.*). Defendant Tubbs ordered Defendant League of the South members to "charge," and "[a]fter receiving this command, the group streamed past him to attack counter-protesters." (*Id.* at ¶35).

Some marchers also yelled anti-Semitic and Nazi slogans while passing Plaintiff Pearce's synagogue. (*Id.* at ¶202). Defendant Ray carried a banner that stated "Gas the kikes, race war now!" (*Id.*). An anonymous individual later threatened to "torch those Jewish monsters" in a

11

comment on a YouTube video, leading Charlottesville's mayor to ask for police protection for the synagogue. (*Id.* at ¶203). Plaintiff Pearce and her son counter-protested the rally outside the park. (*Id.* at ¶220). She wore a Star of David and carried a rainbow flag. (*Id.* at ¶219). She was harassed by a rally attendee, who shouted, "Oh good, they are marking themselves for us." (*Id.* at ¶220). Another rally attendee threw an open bottle with a "foul liquid" that hit Plaintiff Pearce. (*Id.* at ¶221).

Then, at 11:22 a.m., Charlottesville declared the gathering an unlawful assembly. (*Id.* at ¶223). Defendants Kessler, Cantwell, Ray, Schoep, and Vanguard America among others, moved to McIntire Park. (*Id.* at ¶226–28). Defendant Parrott did not leave, and was arrested for failure to disperse. (*Id.* at ¶228). Violence continued in McIntire Park and on Charlottesville's downtown mall. (*Id.* at ¶¶229, 234).

## H.    The car attack on August 12th

At 1:40 p.m., Plaintiffs allege Defendant Fields deliberately drove his car into a crowd of peaceful protesters that were congregated at the intersection of Fourth Street and the Downtown mall. (*Id.* at ¶242). Plaintiffs Martin, Blair, Sines, Muñiz, Alvarado, and Romero were all on Fourth Street when Fields drove his car into the crowd. (*Id.* at ¶243). Multiple of these Plaintiffs were struck by Defendant Fields' car and incurred serious injuries. (*Id.* at ¶¶244–56). A friend of some of the Plaintiffs, Heather Heyer, was killed. (*Id.* at ¶248).

## I.  Happenings after the event

After the event, Defendants Anglin, Vanguard America, Kessler, Heimbach, East Coast Knights, and Loyal White Knights posted messages approving of the Defendant Fields's car attack. (Dkt. 175 at ¶¶264, 266–69, 272). Defendant Schoep said it was an honor "to stand" with the other co-Defendants at the rally, and referred to them as "true warriors." (*Id.* at ¶271).

12

Defendant Spencer referred to the rally a "huge moral victory." (*Id.* at ¶273). Defendant Cantwell was glad nobody on the Defendants' "side" died. (*Id.*).

Many Defendants have stated they would like to return to Charlottesville for a similar event. (*Id.* at ¶296). Defendant Spencer and others engaged in another torchlight march in Charlottesville on October 7, 2017. (*Id.* at ¶306). Defendant Kessler filed an application for another rally on August 11 and 12, 2018. (*Id.* at ¶307).

### III.  COUNT ONE: 42 U.S.C. § 1985(3)

In Count One, Plaintiffs allege all Defendants violated 42 U.S.C. § 1985(3), which states:

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . [and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The specific Defendants identified in footnote one moved to dismiss. The majority of the Section 1985(3) claims survive, although Plaintiff Pearce's claims against these Defendants will be dismissed, and all claims against Defendant Peinovich will be dismissed.

Plaintiffs must plausibly allege the following elements to state a Section 1985(3) claim:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

13

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)).[2]  Importantly, and unlike Section 1983, Section 1985(3) reaches private conspiracies (*i.e.*, there is no state action requirement).  *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

In order to frame a Defendant-by-Defendant analysis of the pleadings, the Court works through these elements slightly out of order.  The Court first addresses the requisite racial animus and purpose of the conspiracy (the second and third elements).  After laying this framework, the Court evaluates the complaint to see if it plausibly alleges that each Defendant joined such a conspiracy (the first element).  The Court then asks whether that conspiracy caused Plaintiffs' alleged injuries (the fourth and fifth elements).  Finally, while Plaintiffs' overarching First Amendment and other defenses are addressed separately at the end of this opinion, the Court does flag specific allegations that are not protected by that Amendment throughout the following discussion.

## A.     Racial animus

Plaintiffs must plead that the Defendants were "motivated by a specific class-based, invidiously discriminatory animus."  *A Soc'y Without A Name*, 655 F.3d at 346; *Francis v. Giacomelli*, 588 F.3d 186, 196–97 (4th Cir. 2009) (same).  No Defendant seriously disputes that Plaintiffs have adequately alleged Defendants possessed racial animus against black and Jewish individuals; the complaint is replete with racist statements made and affirmed by Defendants.  However, some Defendants do argue that they only possessed racial animus against non-white

---

[2]     This statute is "the surviving version of § 2 of the Civil Rights Act of 1871" which was passed to address the Ku Klux Klan's violence against minorities and is known as the Ku Klux Klan Act.  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 368, 394 (1979); Ken Gormley, *Private Conspiracies and the Constitution: A Modern Vision of 42 U.S.C. Section 1985(3)*, 64 Tex. L. Rev. 527, 530 (1985) (providing history of the Act's background).

14

individuals, and so they cannot be held liable by white Plaintiffs.  But Section 1985(3) was enacted "to combat the prevalent animus against Negroes *and their supporters.*"  *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983) (emphasis added).  And the Supreme Court has said the statute reaches "class-based animus" directed "against Negroes *and those who championed their cause*[.]"  *Id.* (emphasis added).  Here, Plaintiffs have plausibly alleged that they were attacked because of their support of non-white racial minorities, and so this element is satisfied as to all Defendants.

**B.      Intent to deprive Plaintiffs of equal protection of rights secured by law**

In addition to racial animus, the purpose of the alleged conspiracy must be to "deprive the plaintiff of the equal enjoyment of rights secured by the law to all."  But importantly, "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates."  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).  And so, "[t]he rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere."  *Scott*, 463 U.S. at 833.  The Fourth Circuit has further clarified that these underlying rights must be "rights guaranteed by federal law or the Constitution."  *Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1333 (4th Cir. 1976).

Additionally, the federal substantive right "found elsewhere" must be "guaranteed against private impairment."  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993).  For example, a plot by solely private parties to deprive individuals of their First Amendment rights is not actionable because those rights are only protected against public impairment  (*i.e.*, "Congress shall make no law . . .").  *See Scott*, 463 U.S. at 833 ("[H]ere the right claimed to have been infringed has its source in the First Amendment.  Because that Amendment restrains only official

15

conduct, to make out their § 1985(3) case, it was necessary for respondents to prove that the state was somehow involved in or affected by the conspiracy.").

In light of these limitations, the Supreme Court has noted there are "few" rights that can support a Section 1985(3) claim. *Bray*, 506 U.S. at 278. The only rights to be so recognized by the Supreme Court are "the Thirteenth Amendment right to be free from involuntary servitude, *United States v. Kozminski*, 487 U.S. 931, 942 (1988), and, in the same Thirteenth Amendment context, the right of interstate travel, *see United States v. Guest*, 383 U.S. [745,] 759, n. 17 [(1966)]." *Id.*; *see also Tilton v. Richardson*, 6 F.3d 683, 686–87 (10th Cir. 1993) (same). So the big question under this element is which of Plaintiffs' underlying rights satisfy these requirements. Plaintiffs suggest two potentially viable sources.

First, Plaintiffs claim the Thirteenth Amendment provides them with a right to be free from racial violence. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Court held that Section 1985(3) reached a private conspiracy where white Mississippians allegedly stopped African-Americans on a public highway (mistaking them for civil rights workers), pulled them out of their car, and beat them. *Id.* at 89–92. The Supreme Court later summarized *Griffin* as holding that "the conspiracy at issue was actionable because it was aimed at depriving the plaintiffs of the rights protected by the Thirteenth Amendment and the right to travel guaranteed by the Federal Constitution. Section 1985(3) constitutionally can and does protect those rights from interference by purely private conspiracies." *Scott*, 463 U.S. at 832–33. But if Section 1985(3) protects Thirteenth Amendment rights that were implicated by the facts of *Griffin*, those rights must extend beyond the core "right to be free from involuntary servitude." In *Griffin*, after all, the alleged assaults were certainly motivated by racial animus, but they could not be fairly described as seeking to literally enslave the plaintiffs.

16

Plaintiffs respond by citing cases (including *Griffin*) that discuss Congress's authority to legislate under Section Two of the Thirteenth Amendment, which "extend[s] far beyond [legislation addressing] the actual imposition of slavery or involuntary servitude." *Griffin*, 403 U.S. at 105. Because, "[b]y the Thirteenth Amendment, we committed ourselves as a Nation to the proposition that the former slaves and their descendants should be forever free," these cases teach that "'Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.'" *Griffin*, 403 U.S. at 105 (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968)); *United States v. Cannon*, 750 F.3d 492, 501 (5th Cir. 2014) ("[T]he term 'badge of slavery' . . . refers to indicators, physical or otherwise, of African–Americans' slave or subordinate status." (internal citations omitted)). But this language is not entirely helpful here. No one disputes that Congress's power under the Thirteenth Amendment allows it to address "badges and incidents" of slavery; the question here is whether the Thirteenth Amendment provides rights independent of Congressional action that go beyond a more narrow reading of the "right to be free from involuntary servitude."

The Court concludes the Thirteenth Amendment provides Plaintiffs an underlying right to be free from racial violence analogous to that present in *Griffin*. In doing so, the Court relies most heavily on *Scott*'s statement that the *Griffin* conspiracy was "aimed at depriving the plaintiffs of *the rights protected by the Thirteenth Amendment*," rights which "Section 1985(3) constitutionally can and does protect . . . ." *Scott*, 463 U.S. at 832–33 (emphasis added). Likewise, the Fourth Circuit has characterized *Griffin* as holding that Section 1985(3) protects underlying rights granted by the Thirteenth Amendment. *See Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 158 (4th Cir. 1985) ("The Court held that the statute does create a cause of

17

action for certain kinds of private action interfering with the federally protected rights to travel and *Thirteenth Amendment rights* . . . ." (emphasis added)); *Bellamy v. Mason's Stores, Inc. (Richmond)*, 508 F.2d 504, 506 (4th Cir. 1974) ("The language of [Section 1985(3)] tracks the language of the fourteenth amendment, and we now know that included within it is a wholly private conspiracy to deny Negro citizens the right of travel and *rights based upon the thirteenth amendment*." (emphasis added)).  District courts have also assumed Section 1985(3) reaches racial violence analogous to that alleged here, although most have not engaged in careful analysis of the Thirteenth Amendment's scope.  *See, e.g., Frazier v. Cooke*, No. 4:17-CV-54, 2017 WL 5560864, at *2–*3 (E.D. Va. Nov. 17, 2017).  The repeated Supreme Court and Fourth Circuit interpretations of *Griffin* provide very persuasive guidance, even if found in *dicta*, that the Thirteenth Amendment does provide an underlying right to be free from racial violence that can sustain a Section 1985(3) claim.  *See Doe v. Chao*, 435 F.3d 492, 508 (4th Cir. 2006) ("We said long ago that 'certainly dicta of the United States Supreme Court should be very persuasive.'" (citation omitted)).  Accordingly, Plaintiffs' claims can proceed on this theory.

Second, Plaintiffs alternatively suggest Section 1982 as a fountainhead of enforceable rights.  That statute provides: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  Plaintiffs claim that rally attendees interfered with the property rights of Congregation Beth Israel by marching past it and making anti-Semitic remarks outside of it. Plaintiff Pearce, a member of that synagogue, seeks to assert its alleged rights.  Assuming Pearce can assert the synagogue's rights, Plaintiffs have still failed to adequately allege Defendants conspired to violate rights guaranteed to them by Section 1982.

The Supreme Court's seminal case on Section 1982 is *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). There the Court held that Congress had authority to prevent private defendants from refusing to sell a home to black plaintiffs because of their race. *Id.* at 438–44. Those facts represent a paradigmatic Section 1982 violation. Some courts have extended the reach of that statute to something closer to Plaintiff's theory. For example, in *United States v. Greer*, 939 F.2d 1076 (5th Cir. 1991), *opinion reinstated in relevant part on reh'g*, 968 F.2d 433 (5th Cir. 1992), the Court affirmed a conviction for conspiracy to violate Section 1982 when a neo-Nazi group damaged the temple's gas lines, painted swastikas and anti-Semitic slogans on the temple, and shot out the windows with a pistol. 939 F.2d at 1083. The court agreed with the Government "that members and non-members of the temple and community center, such as guests, could claim that the acts of defendants violated their right to use this property." *Id.* at 1091. Similarly in *United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995), the court upheld another conviction for conspiracy to violate Section 1982. In that case, a skinhead and member of the Klu Klux Klan shot into a synagogue late at night. Even though no one was present, the court found this conduct violated Section 1982. *Id.* at 1164.

Here, alternatively, there are no allegations that anyone touched or harmed the synagogue. The worst of the allegations concern unidentified individuals who marched past the synagogue and shouted anti-Semitic slogans. This alleged conduct is very different from the shots fired into synagogues in the above cases or the repeated harassment found in other cases. Furthermore, the only allegation concerning an actual Defendant states Defendant Ray carried a banner with anti-Semitic language. (Dkt. 175 at ¶202). It does not allege he carried this banner past the synagogue or otherwise interacted with it. (*Id.*). Likewise, the allegation that Defendants can be held liable for a statement made by an unknown individual on a YouTube

19

video is frivolous. (*Id.* at ¶203). These allegations do not adequately plead that one of the Defendants interfered with the property rights of the synagogue.

While Plaintiffs have identified an underlying federal right guaranteed against private impairment in the Thirteenth Amendment, they must plausibly allege that Defendants entered a conspiracy to deprive them of that right. Determining whether they have done so requires the Court to return to the first element, conspiracy.

## C.     Conspiracy

In order to adequately plead a Section 1985(3) conspiracy, "the plaintiff must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights." *A Soc'y Without A Name*, 655 F.3d at 346. "[A]lthough an express agreement is not necessary, the participants in the conspiracy must share the general conspiratorial objective . . . . [I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Simmons*, 47 F.3d at 1378.

One effect of these pleadings requirements, and the overlapping First Amendment interests discussed below, is that Plaintiffs cannot plausibly plead that all rally attendees who disagreed with them were part of one overarching conspiracy. *See A Soc'y Without A Name*, 655 F.3d at 347 (holding Section 1985(3) allegations were insufficient when the plaintiff "fail[ed] to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made"). Plaintiffs at various times call anonymous individuals who shouted anti-Semitic slogans "co-conspirators." (Dkt. 175 at ¶202). Stretching credulity even further, Plaintiffs allege various statements posted on Facebook and YouTube were made by "co-conspirators." (*See id.*

at ¶203 (attributing screen shot of youtube.com with comment "it's time to torch those jewish monsters" to a co-conspirator); *id.* at ¶271 ("A co-conspirator posted on Facebook . . . .")). Plaintiffs seemingly label everyone at the rally (and for that matter on the internet) who disagreed with them as co-conspirators. The Court does not credit such conclusory labeling. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' . . . will not do.").[3]

Instead, Plaintiffs must allege each Defendant entered into an agreement with a specific co-conspirator to engage in racially motivated violence at the August 11th and 12th events. The plausibility of these factual allegations increase as Plaintiffs add specificity about the method of agreement, the time or place of the agreement, and the scope of the agreement. The Court works through Plaintiffs' allegations on a Defendant-by-Defendant basis below. While the Court does not credit the conclusory labels discussed above, the Court concludes Plaintiffs have adequately pled specific factual allegations that each moving Defendant, except for Defendant Peinovich, was part of a conspiracy to engage in racially motivated violence at the "Unite the Right" events.

### i.      Jason Kessler

Jason Kessler appears prominently throughout the complaint. (*See* dkt. 175 at ¶¶ 20, 49–52, 55, 56, 59, 61, 63, 65, 73, 78, 97, 112, 122, 130, 135, 137, 141, 143, 147, 157, 164, 179, 184, 187–89, 190, 212, 226, 241, 260, 267, 302, 307, 316, 321, 322, 324, 326–29). Kessler was perhaps *the* overarching organizer for the event. He applied for the permit for the August 12th

---

[3]      The complaint also contains some other conclusory allegations that the Court does not credit. (*See, e.g.,* dkt. 175 at ¶63 ("[A list of all Defendants] all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville."); *id.* at ¶187 ("On August 12, Defendants, their co-conspirators, and others acting at their direction executed their plan to carry out racial, religious, and ethnic violence, intimidation, and harassment."). These more general allegations lack the requisite factual specificity and would not be able to sustain Plaintiffs' claims without the more specific allegations detailed below.

rally and then worked with Defendant Spencer to invite a plethora of white supremacist groups. (*Id.* at ¶¶49, 55, 61, 326). He hoped this rally would help to move white Americans across the South "beyond 'heritage not hate.'" (*Id.* at ¶122). He allegedly "moderated, reviewed, directed, and managed" Discord. (*Id.* at ¶¶ 73, 322, 324). Despite this moderation, he allowed statements like "I'm ready to crack skulls" and "Studies show 999/1000 niggers and feminists fuck right off when faced with pepper spray" to proliferate across the platform. (*Id.* at ¶97). Kessler himself told others on Discord to "bring picket sign post, shields and other self-defense implements which can be turned from a free speech tool to a self-defense weapon should things turn ugly." (*Id.* at ¶112). And, in the days leading up to the event, he met in person with Defendant Cantwell to plan "unlawful acts of violence [and] intimidation." (*Id.* at ¶¶65, 316).

At the Friday night torchlight march, Defendant Kessler once again functioned as an organizer, telling the marchers to get in formation. (*Id.* at ¶¶143, 147, 157, 328). Along with Defendants Cantwell, Mosley, Spencer, Ray, and Invictus, Defendant Kessler "directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens" at the rally. (*Id.* at ¶329). The complaint identifies Defendant Kessler as leading the charge towards Plaintiffs Magill, Doe, and Romero at the Thomas Jefferson statue. (*Id.* at ¶164). This charge culminated with the circling of the counter-protesters (*id.* at ¶166), Defendant Cantwell and others spraying pepper spray at the counter-protesters (*id.* at ¶172), and the marchers throwing their burning torches at the counter-protesters. (*Id.* at ¶169). Throughout this time, the marchers were performing Nazi salutes, chanting "Blood and Soil," "Jews will not replace us," and making monkey noises at black counter-protesters. (*Id.* at ¶162, 165). Plaintiffs have plausibly alleged

Kessler came to an agreement with these co-Defendants to engage in racially motivated violence against the counter-protesters at the torchlight march.

Then, the next day at the rally, various co-Defendant organizations fought against counter-protesters. (*Id.* at ¶212). While they did this, Defendant Identity Evropa "sent a detachment of fighters to assist [Defendant League of the South] and to relay intelligence to Jason Kessler and other organizers." (*Id.*). This paragraph plausibly alleges Defendant Kessler was overseeing the racial violence at the rally. Finally, after hearing about Defendant Fields's later attack, Kessler called Heather Heyer, the victim who died, a "communist" and said "Communists have killed 94 million. Looks like it was payback time." (*Id.* at ¶267). In light of his other conduct, this plausibly alleges ratification of Defendant Fields's conduct.

The complaint plausibly alleges that Defendant Kessler entered into agreements with these other Defendants for the purpose of assaulting and intimidating individuals who were counter-protesting Defendants' message of white supremacy. As discussed below, many of these actions are completely divorced from any First Amendment protection. (*See, e.g., id.* at ¶164 (the charge resulting in violence around the Jefferson statue); *id.* at ¶212 (overseeing the violence at the Saturday rally)).

### ii.     Richard Spencer

Defendant Spencer was also prominently involved in the organization of the events. (*See* dkt. 175 at ¶¶ 21, 28, 29, 40, 42, 49, 52, 63, 64, 70, 85, 87, 92, 108, 120, 141, 143, 153, 164, 166, 175, 184, 187, 229, 230, 260, 273, 297, 300, 305, 306, 311, 315, 327–29). Alongside Defendant Kessler, "Spencer invited white supremacist groups to visit and hold events around the statue with the intent of intimidating nonwhite and Jewish individuals and their allies." (*Id.* at ¶49). Spencer coordinated with Defendants Damigo and Identity Evropa, who "took the lead in

23

organizing white supremacist participation among people from outside Charlottesville . . . ." (*Id.* at ¶¶28, 70). In the lead up to the rally, Spencer met Evan McLaren, a purported Defendant Identity Evropa member, in person in Washington, D.C. for further organization and direction of the rally. (*Id.* at ¶64). During this time of planning, Spencer made statements that plausibly demonstrate an agreement to engage in violence. An article posted on his website told his followers that "it's time to dominate the streets." (*Id.* at ¶87). A Discord user relayed Spencer's desire that rally attendees "[b]ring as much gear and weaponry as you can within the confines of the law." (*Id.* at ¶108).

Spencer was also a planner of Friday's torchlight march. (*Id.* at ¶¶21, 143, 153, 328). Along with Defendants Cantwell, Mosley, Kessler, Ray, and Invictus, Defendant Spencer "directed and incited physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens" at the rally. (*Id.* at ¶329). As with Defendant Kessler, Spencer is specifically alleged to have led the charge towards Plaintiffs Magill, Doe, and Romero at the Thomas Jefferson statue. (*Id.* at ¶164). Marchers climbed to the top of the statue, waved their torches, and yelled "Hail Spencer! Hail victory!" (*Id.* at ¶175). Afterwards, Defendant Spencer confirmed that Defendants had surrounded the counter-protestors at the statue. (*Id.* at ¶166). After the event, he addressed the crowd and thanked them for "risking their lives" for their future. (*Id.* at ¶175).

Defendant Spencer was also involved with and attended the Saturday rally. (*Id.* at ¶187). He continued to actively promote the rally through social media. (*Id.* at ¶¶21, 184). And then, in the aftermath of the rally, his website posted a statement that announced "The Alt-Right is finished debating, negotiating, surrendering. We're ready to close ranks and fight for what is ours. . . . [W]e stand poised to conquer the continent." (*Id.* at ¶305).

24

Allegations of this degree of planning, followed by these coordinated actions (specifically at the Friday night march), plausibly allege that Defendant Spencer joined a conspiracy to engage in the racially motivated violence that occurred on August 11th and 12th.  As with Spencer, much of this conduct was not protected by the First Amendment.  (*See, e.g., id.* at ¶164 (the charge resulting in violence around the Jefferson statue)).  Other statements might be protected speech taken by themselves, but in light of Spencer's other conduct they can plausibly "be taken as evidence that [he] gave other specific instructions to carry out violent acts or threats."  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982); *see, e.g.,* dkt. 175 at ¶175 (thanking marchers who charged the statue "for risking their lives"); *id.* at ¶305 ("The Alt-Right is finished debating, negotiating, surrendering.  We're ready to close ranks and fight for what is ours.").

### iii.     Christopher Cantwell

While Defendant Cantwell may have been lower in the pecking order than either Kessler or Spencer, he is more closely tied to acts of overt violence in furtherance of the conspiracy than either of them.  (*See* dkt. 175 at ¶¶ 22, 63, 65, 66, 74, 107, 127, 143, 151, 157, 159, 160, 172, 187, 226, 227, 273, 277, 303, 304, 309, 310, 316, 317, 322, 323, 326–330).  He was an active participant on Discord in the months leading up to the event.  (*Id.* at ¶¶74, 322).  He used his various platforms to "advise[] rallygoers on bringing weapons."  (*Id.* at ¶323).  In the days before the rally, he met with Defendants Kessler, Ray, Mosley, and purported co-conspirator David Duke "to plan and direct the unlawful acts of violence . . . ."  (*Id.* at ¶¶65, 66, 316, 317).  On the morning of the 11th, he told a reporter that he was "trying to make [himself] more capable of violence."  (*Id.* at ¶151).

Then, at the Friday night torchlight march, Cantwell joined Defendants Spencer, Mosley, Kessler, Ray, and Invictus, Defendant Spencer in "direct[ing] and incit[ing] physical assaults and violence, the use of open flames, and the intimidation of minority residents and those who advocate for equal rights for minority citizens." (*Id.* at ¶329). "Defendants Cantwell, Kessler, Ray, and other co-conspirators were issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as 'security.'" (*Id.* at ¶157). "Organizers, including Defendant Cantwell, wore earpieces, carried radios, and shouted specific orders at the marchers. They shouted to keep pace, avoid gaps, stay in line 'two-by-two,' and march alongside a 'security guard.'" (*Id.* at ¶159). Defendant Cantwell himself marched with guards "who were selected for their willingness to 'get physical' with counter-protestors." (*Id.* at ¶160).

As they approached counter-protesters, Defendant Cantwell personally "attacked the [counter-]protestors with mace." (*Id.* at ¶172). A photograph included in the complaint shows Cantwell in the act of spraying counter-protestors. (*Id.*). He was later charged "with two felony counts of illegal use of tear gas and one felony count of malicious body injury by means of a caustic substance. He was indicted on December 4 on a felony charge of illegal use of tear gas." (*Id.* at ¶22). This conduct, of course, is not protected by the First Amendment. Other co-Defendants shared this picture, congratulating Cantwell on his violence. (*Id.* at ¶172).

Defendant Cantwell came to the Saturday rally heavily armed, bringing three pistols, two semi-automatic machine guns, and a knife. (*Id.* at ¶303). Then as events spiraled out of control, the Daily Stormer informed its followers to assemble "behind" Defendants Cantwell and Ray. (*Id.* at ¶227). In the aftermath, he told a reporter that he thought "a lot more people are going to die before we're done here, frankly." (*Id.* at ¶303). Reflecting on co-Defendant Fields's attack,

he said "[N]one of our people killed anybody unjustly . . . . [O]ur rivals are just a bunch of stupid animals who don't pay attention that couldn't just get out of the way of the car." (*Id.* at ¶273). He continued, saying "[t]hese people want violence and the right is just meeting market demand." (*Id.*).

In light of the specific statements made by Cantwell, the picture of him assaulting counter-protesters with pepper spray, and his joint leadership of various portions of the events with other Defendants (*e.g.*, the Friday night march, the Daily Stormer's encouragement for its followers to get "behind" him), Plaintiffs have plausibly alleged that Defendant Cantwell joined the conspiracy to engage in the racially motivated violence at the "Unite the Right" events.

### iv. Vanguard America

Plaintiffs have alleged that Defendant Vanguard America's fingerprints were all over last August's events. (Dkt. 175 at ¶¶ 24, 34, 50, 53, 63, 67, 77, 81, 91, 93, 96, 114–17, 121, 153, 167, 185, 187, 191, 196–98, 218, 228, 266, 270, 276, 319, 322, 332). Like other organizational Defendants, Vanguard America had a private channel on Discord called "Southern Front." (*Id.* at ¶77). They used this channel to coordinate attendance, with an organizer telling other members "This event is a **BIG DEAL** and offers a chance to link up Vanguard Guys from across the nation." (*Id.* at ¶¶81, 114). Specifically, members were instructed to wear "matching khaki pants and white polos," which members liked because "it's a good fighting uniform." (*Id.* at ¶115). Some chapters planned to bring shields with matching logos. (*Id.* at ¶121). Vanguard America made twenty extra shields for attendees who were unprepared. (*Id.* at ¶191).

Members made their violent plans explicit. "One member of Defendant Vanguard America explained on the Southern Front server after the event that Vanguard America had coordinated with Defendant National Socialist Movement because the Charlottesville event was

27

about violence." (*Id.* at ¶117). While Vanguard America did not normally associate with National Socialist Movement, they needed to in Charlottesville because "NSM fought so hard" and Vanguard America "need[ed] them in a fight." (*Id.*). Members also discussed whether to bring firearms, collapsible batons, and various types of knives. (*Id.* at ¶115). A Vanguard America member also posted "a violent drawing of Defendant Heimbach wearing a shirt bearing Nazi and Defendant TWP symbols and the words 'nigger killer' above a tally of 'communists killed,' smiling in front of decapitated black men wearing logos associated with anti-fascist movements." (*Id.* at ¶116). While this could potentially being taken as very dark hyperbole in some instances, in the light of the later events it plausibly alleges a plan for violence.

Defendant Vanguard America members were present at the Friday night event, marching in uniform. (*Id.* at ¶153). Once they had surrounded counter-protesters at the Thomas Jefferson statue, online members encouraged those members present "to physically remove [the counter-protestors]." (*Id.* at ¶167). The violence described above ensued.

Defendant Vanguard America also led the violent events at the Saturday rally. Its members met with Defendants Nationalist Front, League of the South, National Socialist Movement, and Traditionalist Worker's Party to coordinate the march into the park in formation. (*Id.* at ¶196). "Defendant Vanguard America marched to the Park first." (*Id.* at ¶197). They chanted "Blood and Soil!" and carried matching shields and flags. (*Id.*). Defendant Fields, wearing the pre-approved uniform, marched with Defendant Vanguard America. (*Id.*). Members also carried rods and other weapons. (*Id.* at ¶34). Other groups followed. (*Id.* at ¶198). Members on Discord had said they would "remove whoever is in [their] way" when they got to the park. (*Id.* at ¶191). Consistent with this plan, members used their shields to break through counter-protestors and move into the park. (*Id.* at ¶209). Once inside the park, online

28

members continued telling members physically there to "[j]ust incite a riot already." (*Id.* at ¶218).

At some point, Defendant Fields broke off from the rest of the group and allegedly committed his attack. He was "wearing the uniform white polo and khakis." (*Id.* at ¶332). After his attack, Defendant Vanguard America members congratulated him and celebrated the attack on Discord, stating, "We fucked up many commies . . . . We hospitalized dozens . . . . Now you make the next rally and fight for your people." (*Id.* at ¶¶266, 270).

In light of the coordinated marching and shield tactics, the various communications on Discord, and their members' continued admissions of violence, Plaintiffs have plausibly alleged that Defendant Vanguard America was part of the conspiracy to engage in racially motivated violence. Many of these allegations describe conduct that either does not implicate the First Amendment, (*id.* at ¶191 (alleging "Vanguard is fabricating 20 additional shields" for the fighting at the rally)), or plausibly serves as evidence of other specific violent acts. *Claiborne Hardware Co.*, 458 U.S. at 927; dkt. 175 at ¶270 ("We fucked up many commies . . . . We hospitalized dozens . . . .").

### v.     Robert "Azzmador" Ray

Defendant Ray is a writer at the Daily Stormer, where he published various anti-Semitic and white supremacist content in support of the rally. (Dkt. 175 at ¶¶ 25, 27). He has held himself out as a representative of the Daily Stormer. (*Id.* at ¶27). The complaint alleges he went beyond this role as a publisher of content to become an active conspirator and participant in the violence at the events. (*Id.* at ¶¶ 25, 27, 62, 63, 66, 74, 84, 88, 92, 93, 110, 116, 118, 143, 150, 157, 168, 169, 186, 187, 202, 217, 226, 227, 317, 318, 323, 325, 326, 328, 329).

29

Defendant Ray contributed to the planning through the use of Discord. (*Id.* at ¶74). Ray also used the Daily Stormer's website to coordinate other meetings for attendees. (*Id.* at ¶84). Some of these meetings were under the auspices of the Daily Stormer's "book clubs," which Defendant Ray clarified do not actually have anything to do with books and instead were used to organize the events. (*See id.* at ¶93 ("You don't think the [Daily Stormer book clubs] have anything to do with books do you? . . . Think boots, not books."). In the days leading up to the rally, Defendant Ray attended in-person meeting with Defendants Cantwell, Mosley, and purported co-conspirator David Duke. (*Id.* at ¶66).

Throughout this time, Defendant Ray used violent language and demonstrated signs of planning for violence. He told a reporter, "We are stepping off the Internet in a big way . . . . We have been organizing on the Internet. And so now they are coming out. We have greatly outnumbered the anti-white, anti-American filth. At some point we will have enough power that we will clear them from the streets forever . . . you ain't seen nothing yet." (*Id.* at ¶88). He wrote that "this rally will put the fear of god into the hearts and minds of our enemies." (*Id.* at ¶92). On Discord, he advised that his followers would "be ready with lots of nifty equipment." (*Id.* at ¶110). He directed his followers to bring tiki torches (for the Friday night march), pepper spray, flag poles, flags, and shields. (*Id.* at ¶118).

This planning came to life on Friday the 11th. Along with Defendants Cantwell and Kessler, Defendant Ray was "issuing orders to the other white supremacists and neo-Nazis, telling them to get in specific formations and assigning people either to march with a torch or on the side as 'security.'" (*Id.* at ¶157). Once they had surrounded the counter-protesters at the statue and torches were being thrown at counter-protesters, he shouted "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.* at ¶169). Within this context, this was

a "true threat" not entitled to First Amendment protection.  *See Virginia v. Black*, 538 U.S. 343, 359 (2003).  The marchers "began to kick and punch the protesters around the statue, using their torches as weapons, and to beat individuals onto the ground."  (Dkt. 175 at ¶168).  Defendant Ray claimed the marchers "went through [the counter-protestors] like shit through a goose!" (*Id.*).

Defendant Ray also attended the rally on the 12th.  He carried a banner that said "Gas the kikes, race war now!"  (*Id.* at ¶202).  He made various anti-Muslim statements as well, calling a woman a "sharia whore."  (*Id.*).  The Daily Stormer also maintained a livefeed of events on its website, where users exhorted further violence.  (*Id.* at ¶217 ("We have an army!  This is the beginning of a war!")).

Defendant Ray's alleged actions, and most specifically his leadership and statements at the Friday night rally, demonstrate that Plaintiffs have plausibly alleged that he was an active member of the conspiracy to commit racial violence.

### vi.    Nathan Damigo and Identity Evropa

Defendant Nathan Damigo attended the events with members of the white supremacist organization he founded, Defendant Identity Evropa.  (Dkt. 175 at ¶¶ 28–30, 50, 52, 63, 64, 70, 77, 92, 187, 212, 276, 300–02, 308, 311, 320, 322).  Defendant Spencer claims that Defendants Damigo and Identity Evropa coordinated attendance from outside Charlottesville.  (*Id.* at ¶¶70, 320).  A purported Identity Evropa member, Evan McClaren, met with Defendant Spencer to coordinate and organize the rally in Washington, D.C.  (*Id.* at ¶64).  Defendant Identity Evropa also had its own Discord channel, which it used to communicate with its members about the events.  (*Id.* at ¶¶77, 322).  Defendant Damigo also attended a previous rally held in Berkeley, California.  (*Id.* at ¶28).  Damigo referred to Berkeley as a "test run" for Charlottesville.  (*Id.*).

31

At that rally, Damigo was arrested for assaulting a counter-protestor, demonstrating his violent intentions for the main event. (*Id.*).

Defendants Damigo and Identity Evropa were key participants in the violence on the 12th. In an account of the day called "Catcher in the Reich: My Account of My Experience in Charlottesville," co-Defendant Parrott claimed that "most of the Identity Evropa men were occupied on other fronts" during the fighting, but that Defendant Identity Evropa "sent a detachment of fighters to assist us and to relay intelligence to Jason Kessler and other organizers. They offered more fighters, but we had our positions amply covered." (*Id.* at ¶212). These allegations of organized paramilitary fighting plausibly allege that Defendants Damigo and Identity Evropa were part of the conspiracy to commit racial violence at these events. Defendant Damigo's prior violence at the "test run" for the Charlottesville events further bolsters the allegations of his personal involvement in a plan to commit racial violence at these events. The First Amendment does not shield Defendants from these allegations of violence. *See Claiborne Hardware Co.*, 458 U.S. at 916 ("The First Amendment does not protect violence.").

**vii.    Eli Mosley**

Defendant Mosley is closely related to Defendants Damigo and Identity Evropa, taking over leadership of Identity Evropa in late August 2017. (Dkt. 175 at ¶¶29, 30). However, Defendant Mosley had a more central role in the organization of the events, and particularly in the organization of violence at them. (Dkt. 175 at ¶¶ 4, 20, 29, 30, 63, 66, 73, 75, 78, 89, 97, 100, 129, 137, 141, 143, 147, 148, 152, 172, 187, 189, 192, 231, 300, 311, 317, 321, 322, 324, 326, 328, 329). Defendant Mosley referred to himself as the "command soldier major of the 'alt-right'" and told attendees that he was running the rally "as a military operation." (*Id.* at ¶¶29, 192). He also declared that Defendants would not be replaced "without a fight." (*Id.* at ¶¶4, 89).

32

Defendant Mosley, along with Kessler, "moderated, reviewed, directed, and managed" Discord.  (*Id.* at ¶¶ 73, 322).  Mosley and other leaders "used Discord for regular 'leadership' meetings through which they shared information and plans."  (*Id.* at ¶75).  Defendant Mosley used this platform to issue "General Orders" for "Operation Unite the Right Charlottesville 2.0." (*Id.*).  These orders described individuals opposed to Defendants' racist ideologies as "hostiles." (*Id.*).  A "video for basic formation, roles, and commands" was also promised on Discord, and a "Shield Tactics Primer" and accompanying video was then posted.  (*Id.* at ¶192).  The video illustrated shield fighting techniques.  (*Id.*).  Distribution of these sorts of instruction manuals to commit crimes is not protected by the First Amendment.  *See Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 265 (4th Cir. 1997) (holding publisher of a "hit man" book was not immune from liability under the First Amendment).

In the build up to the events, Defendant Mosley attended the in-person meeting with Defendants Ray, Cantwell, and purported co-conspirator David Duke.  (Dkt. 175 at ¶¶66, 317). Mosley then helped lead the Friday night march, previously having instructed attendees to buy torches.  (*Id.* at ¶¶143, 147, 328).  He ordered the marchers "to arrive at Nameless Field, a large area behind UVA's Memorial Gymnasium, at 9:30p.m., so that they could march once darkness fell at 9:47 p.m."  (*Id.* at ¶148).  He used Discord to tell marchers when "to start staging."  (*Id.* at ¶152).  He would later approvingly tweet the picture of Cantwell spraying pepper spray in a counter-protester's eyes, saying "He protect / He at[t]ack / But most importantly he got your back."  (*Id.* at ¶172).  This plausibly alleges Defendant Mosley ratified Cantwell's assault.

Defendant Mosley was also active in organizing events on the 12th.  He exhorted attendees to arrive before the park opened and create a "a white bloc barrier or square around the entire statue."  (*Id.* at ¶189).  Once an unlawful assembly was declared and the attendees began

33

leaving the park, "Defendant Mosley sought people with guns." (*Id.* at ¶231). He said, "I need

shooters" because "[w]e're gonna send 200 people with long rifles back to that statue." (*Id.*).

In light of the Defendant Mosley's self-proclaimed role as "command soldier major of

the alt-right," his use of Discord to share fighting tactics, and his alleged organization of

attendees at the Friday night march, Plaintiffs have adequately alleged that he was part of a

conspiracy to commit racial violence.

### viii. Matthew Heimbach, Matthew Parrott, and Traditionalist Worker Party

Defendants Matthew Heimbach and Matthew Parrott are leaders of Defendant

Traditionalist Worker Party, an anti-Semitic organization with around 500 members. (Dkt. 175

at ¶¶31–33). These Defendants, alongside the Defendants associated with Defendant League of

the South, allegedly engaged in many of the most specific acts of violence in furtherance of the

conspiracy. (Dkt. 175 at ¶¶ 31–33, 37, 50, 63, 67, 74, 77, 90, 116, 187, 188, 196, 200, 212, 214,

228, 268, 271, 319, 322, 327). Like other organizational Defendants, Defendant Traditionalist

Worker Party used a private Discord channel for planning with its members. (*Id.* at ¶77).

Defendants Heimbach and Parrott participated on Discord. (*Id.* at ¶74). In addition to planning,

and as mentioned above, a member of co-Defendant Vanguard America used Discord to

distribute a drawing of Defendant Heimbach with "kill tallies" of communists, the words "nigger

killer," and drawing of decapitated black men. (*Id.* at ¶116).

On the morning of the 12th, members of Defendant Traditionalist Worker Party met with

members from Defendants Nationalist Front, League of the South, and National Socialist

Movement "at a pre-set location in order to march to Emancipation Park in formation." (*Id.* at

¶196). Defendants Parrott, Heimbach, and other  Traditionalist Worker Party members then

marched behind Defendant League of the South. (*Id.* at ¶200). Defendants in these formations

34

"charged through the peaceful clergy when they arrived at the park . . . and Plaintiff Wispelwey was knocked into a bush." (*Id.* at ¶208). Then, in Parrott's words, members worked with other Defendants "to help create two shield walls" for "the fight." (*Id.* at ¶212). This apparently part of an "original plan to define and secure the event perimeter." (*Id.* at ¶214). Defendants Parrott and Traditionalist Worker Party then coordinated the placement of "detachment[s] of fighters" with other Defendants to "amply cover" their positions. (*Id.* at ¶212). Defendant Parrott described how, "[w]ith a full-throated rebel yell," co-Defendant League of the South member Michael Tubbs "towered over and pushed through the antifa like a Tyrannosaurus among raptors as League fighters with shields put their training to work." (*Id.*). Once the gathering was declared an unlawful assembly, Defendant Parrott was arrested for failure to disperse. (*Id.* at ¶228). A co-Defendant later thanked Defendant Traditionalist Worker Party for their work, referring to them as "true warriors." (*Id.* at ¶271).

Plaintiff's recounting of Defendant Parrott's own account of the events, as well as the other allegations of violence, plausibly allege that these three Defendants joined the conspiracy to commit racial violence. As with other Defendants, the First Amendment does not prevent the imposition of liability for the acts of violence alleged here. (*See id.* at ¶212 (summarizing Defendant Parrott's account of the fighting)).

### ix.    Michael Hill, Michael Tubbs, and League of the South

As with the three just-discussed Defendants, Defendants Michael Hill, Michael Tubbs, and League of the South were allegedly in the heart of the violence that occurred on Saturday the 12th. (Dkt. 175 at ¶¶ 34–36, 39, 50, 63, 67, 77, 94, 99, 187, 188, 196, 198–200, 212–14, 260, 318, 319, 322, 327). Defendant Michael Hill is the co-founder and President of Defendant League of the South. (*Id.* at ¶34). The white supremacist organization includes "an armed,

paramilitary unit" called "the Indomitables" that has been "tasked with advancing southern secession by any means necessary." (*Id.*). Defendant Michael Tubbs is the "Chief of Staff" of Defendant League of the South. (*Id.* at ¶35).

Defendant League of the South used Discord and Facebook to communicate with its members. (*Id.* at ¶¶77, 322). In the lead up to the events, Defendant Hill posted in the Facebook group, saying he wanted "no fewer than 150 League warriors, dressed and ready for action, in Charlottesville, Virginia, on 12 August." (*Id.* at ¶36). One member explained that he planned to attend the rally because "I intend to stand for the South and die for it if need be." (*Id.*).

They coordinated with the other Defendants. Defendant Kessler "promised that there would be hundreds of members of [Traditionalist Worker Party] and League of the South at the park as early as 8:00 a.m." on the 12th. (*Id.* at ¶188). Before going to the park, members met with co-Defendants "at a pre-set location in order to march to Emancipation Park in formation." (*Id.* at ¶196). Members then followed Defendant Hill, marching "with coordinated shields and flags," and carrying "rods and other weapons." (*Id.* at ¶198). Either as they approached the park, or once they were already within it, Defendant Tubbs ordered League of the South members "to attack by yelling 'charge!'" (*Id.* at ¶35). "After receiving this command, the group streamed past him to attack counter-protestors." *Id.*; *compare with Noto v. United States*, 367 U.S. 290, 297–98 (1961) ("[M]ere abstract teaching . . . is not the same as preparing a group for violent action and steeling it to such action. There must be some substantial direct or circumstantial evidence of a call to violence now or in the future which is both sufficiently strong and sufficiently pervasive to lend color to the otherwise ambiguous theoretical material . . . .").

And as recounted above, Defendant Parrott's account of the fighting explained how Defendant League of the South used their shields in the fighting. (*Id.* at ¶212). Defendant Tubbs

36

was the individual pushing "through the antifa like a Tyrannosaurus among raptors." (*Id.*). Defendant Parrott's account also explained that "League fighters with shields put their training to work." (*Id.*). Elsewhere, Defendant Hill claimed that "Mr. Tubbs was everywhere the chaos was." (*Id.* at ¶213). As the day wound down, "Defendant Hill tweeted 'The League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men. God be praised!'" (*Id.* at ¶260).

These allegations, specifically the acknowledgment by co-Defendant Parrott that Defendant League members were "putting their training to work," state a claim that these three Defendants entered into a conspiracy to commit racial violence.

### x.    Jeff Schoep, National Socialist Movement, and Nationalist Front

Defendant Schoep is a leader of Defendant National Socialist Movement, "the largest neo-Nazi coalition in the United States." (Dkt. 175 at ¶37). Defendant National Socialist Movement "is paramilitary in structure; its members claim to be lieutenants, sergeants, or other military ranks." (*Id*. at ¶38). Schoep is the organization's "Commander." (*Id.*). Schoep also formed Defendant Nationalist Front, which is an umbrella organization for groups such as Defendant Traditionalist Worker Party, the Aryan Terror Brigade, and regional factions of the Ku Klux Klan. (*Id.* at ¶37). Co-Defendants Heimbach and Hill also serve as leaders of Defendant Nationalist Front. (*Id.* at ¶39). Defendants Schoep, National Socialist Movement, Nationalist Front, and the members of their umbrella structure are featured throughout the complaint. (Dkt. 175 at ¶¶ 37, 39, 44, 63, 67, 117, 187, 188, 196, 201, 212, 214, 228, 231, 271, 319).

Other Defendants viewed Defendant National Socialist Movement as being more "hard core" than some of the other groups. A Defendant Vanguard America member explained

National Socialist Movement was needed in Charlottesville because "NSM fought so hard regardless of their optics. Do we need them at normie events? No. We need them in a fight? Yes." (*Id.* at ¶117). Likewise, another Discord described National Socialist Movement as "nuts . . . in a good way." (*Id.* at ¶188). Members from Defendant National Socialist Movement met with other Defendants "at a pre-set location in order to march to Emancipation Park in formation." (*Id.* at ¶196). Defendant Schoep, alongside Defendants Hill, Heimbach, and Parrott, led these Defendants in a "charge[] through [counter-]protesters, pushing and shoving them with their shields and rods." (*Id.* at ¶214). This was part of "the original plan to define and secure the event perimeter." (*Id.*). Defendants National Socialist Movement and Nationalist Front were also engaged in the fighting summarized by Defendant Parrott's account. (*Id.* at ¶212).

After the rally was declared an unlawful assembly, "Defendant Schoep also marched to McIntire Park, attacking counter-protestors along the way." (*Id.* at ¶228). He explained how he and others following him "went right through [counter-protestors] like warriors." (*Id.*). Then, according to Defendant National Socialist Movement's twitter account, Defendant Schoep "led a group of 40 back the 1.3 miles from [McIntire] park back to Lee Park, through Antifa and police interference!" (*Id.* at ¶231). Members crooned their admiration: "So much respect for my Commander Jeff Schoep. I will go into battle with you anytime Sir . . . ." (*Id.*). After everything had settled down, Defendant Schoep tweeted that "It was an Honor to stand with U all in C'Ville this weekend. [National Socialist Movement], [Nationalist Front], [Traditionalist Worker Party], [League of the South], [Vanguard America], [East Coast Knights], and the rest, true warriors!" (*Id.* at ¶¶37, 271)

As with the other Defendants discussed above, the Plaintiffs have plausibly alleged that these three Defendants were engaged in the conspiracy to commit racial violence against

counter-protestors. In particular, the Court returns to Defendant Parrott's account of these Defendants' role in the violence, the meeting and then organized fighting to enter the park, and Defendant Schoep's embrace of the other Defendants in his tweet.

      **xi.    Michael Peinovich**

The only moving Defendant who Plaintiffs have failed to plausibly allege was part of the conspiracy is Defendant Michael Peinovich. Through their briefing and argument, Plaintiffs point to fourteen paragraphs that mention Peinovich. (Dkt. 175 at ¶¶ 42, 50, 52, 63, 96, 129, 141, 187, 207, 229, 230, 310, 326, 327). Two of those paragraphs contain merely conclusory language. (*See id.* at ¶63 ("[A list of all Defendants including Peinovich] all agreed and coordinated with and among each other to plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville."); *id.* at ¶187(similar)). Other than these two conclusory paragraphs, there are no allegations that he participated in any violent acts.

The others do not plausibly allege that Defendant Peinovich joined the alleged conspiracy. Two paragraphs note he hosts a racist podcast, was featured on a poster for the rally, and spoke to followers after the events. (*Id.* at ¶¶42, 327). The podcast, without more, is protected speech. Another paragraph alleges that on his podcast, an unnamed individual asked "Now come on, beating up the wrong negro . . . is that even a possibility? Beat up the wrong nigger . . . ." (*Id.* at ¶96). Without more context about, for example, when and who said this and how Defendant Peinovich responded, this is insufficient to demonstrate Peinovich had entered an agreement to engage in racial violence at the events. The promotional poster at most demonstrates an agreement to promote the rally, an event which many people attended for divergent reasons. His promotion of the event is insufficient to plausibly allege an agreement to commit violence. Finally, the mere fact he addressed followers is innocuous. Although it is

ambiguous whether this was part of the same address, the complaint elsewhere alleges "Peinovich called the counter-protestors 'savages.'" (*Id.* at ¶230). This sort of name calling is far short of plausibly pleading an agreement to commit racial violence and, even within this context, is protected speech. *See, e.g., Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) ("Offensive statements made generally to a crowd are not excluded from First Amendment protection; the insult or offense must be directed specifically at an individual.").

Turning to his actions at Emancipation Park, while Plaintiffs allege Defendant Peinovich arrived at the park in a passenger van, and was surrounded by a "security team," there are no allegations he was involved in violence. (*Id.* at ¶207). Likewise, the fact he reassembled with followers in McIntire Park, without an allegation of an agreement to commit violence, is insufficient. (*Id.* at ¶229).

Two other paragraphs concern only his appearances at a previous rally with some co-Defendants. (*Id.* at ¶¶50, 52). But there are no allegations these rallies were unlawful; Defendant Peinovich cannot be held liable simply for his associations. Three other paragraphs allege that Defendant Peinovich set up a legal fund before the rally and helped Defendant Cantwell fundraise from prison after the events. (*Id.* at ¶¶129, 310, 326). This sort of fundraising is too far removed from the other Defendants' violence to plausibly connect Defendant Peinovich to a conspiracy to commit violence.

Finally, Plaintiffs allege Defendant Peinovich tweeted, "Do these white business owners and shitlibs in CVille think that their virtue signaling mean they will be spared somehow? Lol." (*Id.* at ¶141). Peinovich was responding to signs put up by various organizations in Charlottesville that "voiced support for equality and diversity." (*Id.* at ¶140). Some of these businesses later received threatening mail. (*Id.* at ¶142). His tweet is still insufficient to

demonstrate a conspiracy to commit violence that injured these Plaintiffs. Even if these businesses were injured, a fact not alleged here, they are not parties to this lawsuit. This tweet does not plausibly allege an agreement to engage in racial violence *at these events*.

There are no allegations Defendant Peinovich engaged in violence. There are no allegations that he even used Discord. And in light of this discussion, there are no other plausible allegations that he joined the conspiracy to commit racial violence. Accordingly, the Court holds Plaintiffs' complaint fails to plausibly allege that Defendant Peinovich violated Section 1985(3), and so he will be dismissed without prejudice.

## D.    Whether Plaintiffs' injuries resulted from overt acts committed in furtherance of the conspiracy

Plaintiffs have plausibly alleged that Defendants, other than Peinovich, joined a conspiracy to engage in racially motivated violence at the "Unite the Right" events. However, in order to hold Defendants liable, Plaintiffs must also plausibly allege they suffered injuries caused by Defendants' overt acts taken in furtherance of the conspiracy (the fourth and fifth elements). *A Soc'y Without A Name*, 655 F.3d at 346. For almost all Plaintiffs, this is not a problem.

Each Plaintiff need not be able to point to an injury incurred from each Defendant. Instead, because Plaintiffs have adequately pled that all Defendants (other than Peinovich) were part of the conspiracy, Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators. *See, e.g., Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946) ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement."); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003) ("[U]nder conspiracy law, he is liable for

41

the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him."); *Willis v. Blevins*, 957 F. Supp. 2d 690, 700 (E.D. Va. 2013) (applying the reasonably foreseeable standard in a Section 1985(3) case).

### i.      Injuries incurred at the torchlight march

Plaintiffs Magill, Doe, and Romero allege they were pepper sprayed and otherwise assaulted at the base of the Thomas Jefferson statue on the night of August 11th.  (Dkt. 175 at ¶¶11, 13, 18, 166, 169, 173, 174, 293).  Injuries associated with these assaults were reasonably foreseeable consequences of the Defendants' conspiracy: Defendant Cantwell sprayed pepper spray at counter-protestors at the foot of the statue (*id.* at ¶22), Defendants Spencer and Cantwell led the charge of marchers towards the statue (*id.* at ¶¶164, 166), and Defendant Ray yelled "The heat here is nothing compared to what you're going to get in the ovens!" while torches were being thrown at them.  (*Id.* at ¶169).  These Plaintiffs have adequately pled their Section 1985(3) claims.

### ii.     Injuries incurred from Defendant Fields's attack

Plaintiffs Romero, Martin, Blair, Alvarado, Sines, and Muñiz were all injured by Defendant Fields's car attack.  (*Id.* at ¶¶12, 15–19).  Other Defendants may be held liable for these injuries if it was "reasonably foreseeable" to them that a co-conspirator would intentionally drive his car into a crowd of counter-protestors.  The Court holds that Plaintiffs have adequately pled that Defendant Fields's attack was reasonably foreseeable for three reasons.

First, the exact possibility of running over counter-protestors was explicitly mentioned on the invite-only Discord platform before the events.  The complaint alleges that a "run them over" catchphrase was popularized on the Fox Nation website, the Daily Caller website, and by Defendants.  (Dkt. 175 at ¶236).  For example, Defendant Heimbach had previously encouraged

42

a police car to run over protesters, saying "Don't stop, officer" and "Fucking step on the gas!" (*Id.*). A Discord user posted an image of a bus retrofitted with chainsaws and running over pedestrians. (*Id.* at ¶237). Another frequent Discord user responded, saying "I know NC law is on the books that driving over protesters blocking roadway isn't an offense . . . Sure would be nice." (*Id.* at ¶238). The user later asked whether it was "legal to run over protestors blocking roadways?" (*Id.* at ¶239). He clarified that this was not some sort of sick joke: "I'm NOT just shitposting. I would like clarification. I know it's legal in [North Carolina] and a few other states. I'm legitimately curious for the answer." (*Id.*). Kessler was part of a conversation where a different Discord user talked about how counter-protestors had previously flooded streets, and regretted that it was "[t]oo bad the civilians didn't just make new speed bumps for some of these scum." (*Id.* at ¶241). These posts were all on the private, invite-only, moderated platform that Defendants used.

Second, the Defendants planned to bring deadly weaponry to the event. (*See, e.g.,* dkt. 175 at ¶303 ("After the Unite the Right 'rally,' Defendant Cantwell explained, 'I came pretty well prepared for this thing today,' while pulling out three pistols, two semi-automatic machine guns, and a knife.")). Allegations concerning this level of weaponry demonstrate that it was eminently foreseeable to the Defendants that the rally could turn deadly. The fact that a counter-protestor was killed by a vehicle, instead of by the "semi-automatic machine guns" Defendants brought, provides a distinction that makes no difference to this analysis.

Third, multiple Defendants ratified Defendant Fields's attack after the fact. (Dkt. 175 at ¶¶263–67, 272–73). For example, Defendant Loyal White Knights said: "Nothing makes us more proud at the KKK than we see white patriots such as James Fields, Jr, age 20, taking his car and running over nine communist anti-fascist, killing one nigger-lover named Heather Heyer.

James Fields hail victory." (Dkt. 175 at ¶272). Defendant Kessler tweeted "Communists have killed 94 million. Looks like it was payback time." (Dkt. 175 at ¶267). Others made similar comments. These ratifications plausibly demonstrate that Defendant Fields's actions were consistent with the conspiracy's avowed goals.

In light of the discussion of these sorts of attacks, the potentially deadly nature of the planned violence, and the various ratifications of Defendant Fields's attack, the Court finds Plaintiffs Romero, Martin, Blair, Alvarado, Sines, and Muñiz have adequately pled Defendant Fields's attack was reasonably foreseeable to his co-conspirator Defendants. Accordingly, Plaintiffs have plausibly alleged that these co-conspirator Defendants may be held liable for the overt act Fields's took in furtherance of the conspiracy. *See United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003). Of course, factual development may undermine this conclusion.

### iii.    Plaintiffs Wispelwey and Pearce

That leaves only two remaining Plaintiffs. Plaintiff Wispelwey was "knocked into a bush" when rally attendees charged through peaceful clergy, "[c]onsistent with their elaborate planning and lessons in battlefield tactics." (*Id.* at ¶208). While Plaintiff Wispelwey does not allege which specific Defendant knocked him into a bush, the preceding paragraphs of the complaint extensively allege that specific Defendants, including Vanguard America and League of the South, organized in military formations outside Emancipation Park. (*Id.* at ¶¶195–98). Defendant Parrott specifically alleges that Defendant League of the South entered the park by breaking "through the wall of degenerates and [an otherwise unidentified individual named "TradWorker"] managed to enter the [Emancipation] Park venue itself while they were largely still reeling." (*Id.* at ¶212). Plaintiffs also allege Defendants "use[d] shields, flags, or fists to break through the blockade of counter-protestors" in order to enter the park. (*Id.* at ¶209). In

44

light of the specificity of these allegations of how Defendants entered the park, and Plaintiff Wispelwey's allegation that he was knocked over by someone who was acting consistently with these "battlefield tactics," he has plausibly alleged his injuries were caused by overt actions of the Defendants.

On the other hand, while the Court in no way minimizes the injuries Plaintiff Pearce suffered, she has not sufficiently alleged her injuries were caused by overt acts committed in connection with Defendants' conspiracy. Pearce is mentioned in nine paragraphs. (*Id.* at ¶¶14, 138, 202, 219–22, 258, 295). Some of these paragraphs only allege injury in a conclusory fashion. (*See, e.g., id.* at ¶14 ("On the basis of her religion, Pearce was threatened, harassed, intimidated, and physically assaulted."). Others mention fear of injury that was not associated with a specific overt act of any Defendant. (*See, e.g., id.* at ¶¶138, 219, 295). There is no allegation she was exposed to certain anti-Semitic banners allegedly carried by a Defendant. (*See id.* at ¶202). And the most targeted injuries and insults were made by anonymous "co-conspirators," who Plaintiffs have failed to plausibly allege were part of Defendants' conspiracy. (*See id.* at ¶¶220, 221). While the Court finds Plaintiff Pearce has insufficiently alleged her injuries were caused by overt acts made in connection with the conspiracy, she may seek leave to amend with more specific factual allegations if she is able to provide them.

Accordingly, each of the Plaintiffs except Pearce has alleged they suffered injuries that were caused by an overt act in furtherance of the moving Defendants' conspiracy.

## E.     Count I conclusion

The Court concludes Plaintiffs have, for the most part, adequately alleged that Defendants formed a conspiracy to hurt black and Jewish individuals, and their supporters, because of their race at the August 11th and 12th events. The alleged violence is greater than

45

that alleged in *Griffin*, and likewise "lies so close to the core of the coverage intended by Congress [in enacting Section 1985(3)] that it is hard to conceive of wholly private conduct that would come within the statute if this does not." 403 U.S. at 103. There are two caveats to that general conclusion. First, Plaintiff Pearce's Section 1985(3) claims against the moving Defendants will be dismissed because she has not adequately connected her injuries to these Defendants. Second, the Section 1985(3) claims against Defendant Peinovich will be dismissed because Plaintiffs have not adequately alleged he joined the conspiracy. Finally, while the Court has pointed out conduct and statements that were not protected by Defendants' First Amendment defense along the way, that defense is addressed more fulsomely at the end of this opinion.

## IV.  COUNT II: 42 U.S.C. § 1986

In Count Two, Plaintiffs allege all Defendants violated 42 U.S.C. § 1986, which provides:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . .

"A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985); *id.* ("Having affirmed the dismissal of plaintiff's § 1985 claim, we also affirm the dismissal of his § 1986 claim."). The Defendants merely argue that the Section 1986 claim must fail because the Section 1985(3) claim must fail. But as just discussed, those claims survive, and so this argument must be discarded for the majority of the Defendants. With respect to Defendant Peinovich, just as Plaintiffs have failed to plausibly allege that he was part of the underlying conspiracy, they have also failed to allege that he (1) was aware of a conspiracy to commit violence or (2) had "power to prevent or aid in preventing the commission of the same." 42 U.S.C. § 1986. Accordingly, as with the Section

46

1985(3) claim, the Section 1986 claim against him will be dismissed. Finally, because Plaintiff Pearce has insufficiently pled that she was injured by these Defendants, her Section 1986 claim fails for the same reasons discussed in the Section 1985(3) context.

## V. COUNT III: CIVIL CONSPIRACY

In Count III, Plaintiffs allege a common law conspiracy under Virginia law. The complaint alleges all Defendants conspired together to commit various state law torts and crimes against all the Plaintiffs.[4] Although a different claim, the above Defendant-by-Defendant Section 1985(3) analysis also governs the analysis here. This is because Plaintiffs have alleged Defendants committed various assaults, batteries, and violations of Virginia's hate crime statute in furtherance of the above conspiracy to commit racial violence.

"A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc. v. Bellsouth Servs.*, Inc., 249 Va. 39, 48 (1995); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 320 (4th Cir. 2012) (quoting *Commercial Bus. Sys.*).[5] "[T]he plaintiff must first allege that the defendants combined together to effect a preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy." *Bay Tobacco, LLC v. Bell Quality Tobacco Products, LLC*, 261 F.Supp.2d 483, 499 (E.D.Va. 2003) (internal citations and quotation marks omitted). Here, the just-described

---

[4]      While Plaintiffs maintain there were some eighteen different laws violated in furtherance of the conspiracy, only four are discussed in Plaintiffs' opposition to the motion to dismiss. (Dkt. 231 at ECF44–48). The Court expects this list to be winnowed as the parties develop the facts.

[5]      Defendants argue that under *Vansant & Gusler, Inc. v. Washington*, 245 Va. 356 (1993), there is no general civil cause of action for criminal violations. While that is true as general matter, it neither undermines nor addresses the above case law describing counts of common law conspiracy based on criminal violations. The Court also notes tort liability would exist for the same alleged assaults and battery.

47

conspiracy to commit racial violence at the "Unite the Right" events provides such a conspiracy. As demonstrated in the Defendant-by-Defendant analysis, Plaintiffs have plausibly alleged that Defendants (other than Defendant Peinovich) conspired to assault counter-protesters out of racial animus.

A claim of civil conspiracy also "requires proof that the underlying tort was committed" by a co-conspirator in furtherance of that conspiracy. *Almy v. Grisham*, 273 Va. 68, 80 (2007); *Terry v. SunTrust Banks, Inc.*, 493 F. App'x 345, 357 (4th Cir. 2012) ("The 'unlawful act' element requires that a member of the alleged conspiracy have 'committed' an 'underlying tort.'"). Additionally, the plaintiff must suffer an injury from the tort: "The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means." *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 28 (1993).

As discussed above when addressing the fourth and fifth elements of the Section 1985(3) claim, Plaintiffs (other than Pearce) have adequately pled specific alleged violations of state tort and statutory law. More specifically, the alleged injuries to Plaintiffs' persons at the Friday night march, Saturday rally, and car attack would all violate Virginia's hate crime statute (discussed more robustly under the following count) and constitute assaults and batteries. *See* Va. Code Ann. § 8.01-42.1(A) ("An action for . . . civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment or (ii) violence directed against his person . . . where such acts are motivated by racial, religious, or ethnic animosity."); *Koffman v. Garnett*, 265 Va. 12, 16 (2003) ("The tort of battery is an unwanted touching which is neither consented to, excused, nor justified."); *id.* ("The tort of assault consists of an act intended to cause either

48

harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery."). Plaintiffs (other than Pearce) have also pled that their injuries were caused by these unlawful acts of Defendants.

As with Count I, the Court concludes Plaintiffs have, for the most part, adequately alleged that Defendants formed a conspiracy to attack black and Jewish counter-protesters, and their supporters, because of racial animus. Those allegations, reviewed in detail above, can support the civil conspiracy claims. The two caveats to that general conclusion remain. First, Plaintiff Pearce's common law conspiracy claims against the moving Defendants will be dismissed. Second, the common law claims against Defendant Peinovich will also be dismissed.

## VI. COUNT V: VIOLATION OF VIRGINIA CODE § 8.01-42.1

In Count Five, Plaintiffs Wispelwey, Magill, Muñiz, Doe, Sines, Blair, Martin, Alvarado, and Romero allege Defendants Fields, Mosley, Spencer, Kessler, Ray, Cantwell, and Invictus violated Virginia's hate crime statute.

Plaintiffs state a claim against any Defendant who engaged in "intimidation or harassment or . . . violence directed against his person . . . where such acts are motivated by racial, religious, or ethnic animosity." Va. Code Ann. § 8.01-42.1(A). Very few courts have provided elaboration of the statute. Cases have found the statute satisfied when defendants "used racial slurs and physically attacked [the plaintiffs] because of their race," *Frazier v. Cooke*, No. 4:17-CV-54, 2017 WL 5560864, at *7 (E.D. Va. Nov. 17, 2017); when a defendant's employee "harassed plaintiff based on racial animus because he apprehended her, used a racial slur, and later implied that African–Americans came into [the store] to steal," *Berry v. Target Corp.*, 214 F. Supp. 3d 530, 535 (E.D. Va. 2016); and when a skating rink, which was under a consent

decree for denying equal access to public accommodations, singled the plaintiff out for discriminatory treatment and called the police on him, *Johnson v. Hugo's Skateway*, 949 F.2d 1338 (4th Cir. 1991), *on reh'g*, 974 F.2d 1408 (4th Cir. 1992).

Each of the Plaintiffs bringing this claim (Wispelwey, Magill, Muñiz, Doe, Sines, Blair, Martin, Alvarado, and Romero) must demonstrate each of the moving Defendants (Mosley, Spencer, Kessler, Ray, and Cantwell) violated the statute. To start, Plaintiffs Muñiz, Blair, Martin, and Alvarado do not allege they ever interacted with these Defendants; they allegedly incurred injuries from Defendant Fields's attack. In response to the motions to dismiss, these Plaintiffs do not attempt to identify any allegations that the moving Defendants violated this statute. These Plaintiffs' claims against the moving Defendants will be dismissed.

That leaves Plaintiffs Wispelwey, Magill, Doe, Sines, and Romero. Plaintiff Sines claims against the moving Defendants will also be dismissed. In response to the motion to dismiss, she points to two paragraphs. In the first of these, she alleges that she "heard the marchers chanting slogans chosen for their intimidating and racially harassing effect." (Dkt. 175 at ¶161). But this allegation neither alleges the chants were "directed against [her] person," Va. Code Ann. § 8.01-42.1(A), nor alleges that one of these specific Defendants was chanting. In the second, she alleges she "witnessed co-conspirators throwing fuel and tiki torches at the peaceful protestors around the statue." (Dkt. 175 at ¶170). The same problems apply. Plaintiff neither alleges that these specific Defendants were the ones throwing fuel and torches, nor does she allege that this conduct was directed at her. Her claims under this statute against the moving Defendants will be dismissed.

Likewise, Plaintiff Wispelwey's claims against the moving Defendants cannot survive. In response to the motion to dismiss, he identifies five relevant paragraphs. (*Id.* at ¶¶178–82).

These paragraphs describe the church service that occurred across from the Rotunda, where Wispelwey and others could see the mob and their torches. (*Id.*). But the only Defendant mentioned by name in these paragraphs is Defendant Invictus, who is not moving to dismiss. As to the other Defendants, these paragraphs fail to plausibly allege that this conduct was directed against Plaintiff Wispelwey or that these Defendants were specifically involved.

Plaintiffs Magill, Doe, and Romero were each surrounded by the marchers at the base of the Thomas Jefferson statue. (*Id.* at ¶¶164–69). They have plausibly alleged violations of the hate crime statute by Mosley, Spencer, Kessler, Ray, and Cantwell, and so the motion to dismiss these claims against these Defendants will be denied. Plaintiffs allege the torchlight march was designed to intimidate racial minorities by replicating the Ku Klux Klan's and Nazi's use of torches. (*Id.* at ¶150). Plaintiffs allege that the torch-wielding mob, including each of these Defendants, "charged toward a small group . . . including Plaintiffs John Doe and Romero, who had locked arms around the statue of Thomas Jefferson." (*Id.* at ¶¶143, 164, 169, 172). Magill later joined Doe and Romero at the statue. (*Id.* at ¶169). These Plaintiffs were surrounded by Defendants and other marchers. (*Id.* at ¶166). Marchers then "began to kick and punch the protesters around the statue, using their torches as weapons, and to beat the individuals onto the ground." (*Id.* at ¶168). Marchers also threw fluid, which Plaintiffs feared was fuel, onto them. (*Id.* at ¶169). Marchers then threw their torches in the air at Plaintiffs and other counter-protesters. (*Id.*). Defendant Ray said, "The heat here is nothing compared to what you're going to get in the ovens!" (*Id.*).

Even if some of the torchlight march could be characterized as expressive conduct, the combination of the torches and this violence was not protected by the First Amendment, and these moving Defendants can be held liable under Virginia's hate crime statute. "[T]he First

Amendment . . . permits a State to ban a 'true threat.'" *Virginia v. Black*, 538 U.S. 343, 359 (2003). "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* at 360. Just as the Supreme Court has recognized that cross burnings are often intimidating, the torchlight march and the violence directed at Plaintiffs and other counter-protesters at the foot of the Thomas Jefferson statue, was likewise intimidating "in the constitutionally proscribable sense of the word." *Id.* Plaintiffs Magill, Doe, and Romero have plausibly alleged that Defendants Mosley, Spencer, Kessler, Ray, and Cantwell engaged in "intimidation or harassment or . . . violence directed against [their] person[s] . . . where such acts are motivated by racial, religious, or ethnic animosity." Va. Code Ann. § 8.01-42.1(A). Accordingly, their claims will survive.

## VII.   REMAINING DEFENSES AND ISSUES

While Defendants' specific arguments have been addressed throughout, the Court now turns to two remaining defenses that were framed at a higher level of abstraction concerning the First and Second Amendments. The Court finds that neither requires dismissal at this stage, although concerns about the possibility of chilling First Amendment speech do inform the entirety of this opinion. Finally, the Court also addresses two other general issues: judicial notice and Virginia law governing unincorporated associations.

### A.   The First Amendment

Defendants argue their conduct was generally protected by the First Amendment. Of course, *peaceful* picketing, *see Thornhill v. State of Alabama*, 310 U.S. 88 (1940), and *peaceful* marching, *see Edwards v. South Carolina*, 372 U.S. 229 (1963), are the sorts of expressive activities that are protected by the First Amendment. And some of the Defendants' behavior

52

certainly was protected by the First Amendment. After all, the genesis of the Defendants' interest in Charlottesville was the renaming of the park. Picketing and marching protesting that decision, even if motivated by racist ideology, *see Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), would be protected speech. *See generally Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 295 (1981) ("The Court has long viewed the First Amendment as protecting a marketplace for the clash of different views and conflicting ideas."). These are the First Amendment values that led Judge Conrad to grant a preliminary injunction enjoining Charlottesville from revoking Defendant Kessler's permit last August. *See Kessler v. City of Charlottesville, Virginia*, No. 3:17CV00056, 2017 WL 3474071, at *3 (W.D. Va. Aug. 11, 2017).[6]

But "[t]he First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). And so "if [the Defendants] have formed or are engaged in a conspiracy against the public peace and order" and thereby "transcend the bounds of the freedom of speech which the Constitution protects," any law holding them liable for such conspiracy does not violate the First Amendment. *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937); *Brown v. Hartlage*, 456 U.S. 45, 55 (1982) ("Although agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment.");

---

[6]     Defendant Kessler applied for and was originally granted a permit for the Saturday rally. *See Kessler v. City of Charlottesville, Virginia*, 2017 WL 3474071, at *1 (providing further background). However, "[o]n August 7, 2017, less than a week before the long-planned demonstration at the Park, the defendants notified Kessler by letter that they were 'revok[ing]' the permit." *Id.* Defendant Kessler filed a motion for a preliminary injunction, which Judge Conrad granted. Judge Conrad granted the motion, finding Kessler was likely to succeed on the merits, because "the evidence cited by Kessler supports the conclusion that the City's decision constitutes a content-based restriction of speech" and the City did not come forward with evidence that supported its proffered reason for the revocation. *Id.* at *2.

53

*United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech."). Just as those conspiracies can violate the criminal law, the First Amendment does not prohibit "tort liability for . . . losses that are caused by violence and by threats of violence." *Claiborne Hardware Co.*, 458 U.S. at 916. As described above, Plaintiffs plausibly allege that the Defendants formed just such a conspiracy to commit violence, and so the First Amendment does not protect Defendants.

To be clear, if Plaintiffs alleged Defendants only engaged in "abstract" advocacy of violence, those statements would be protected. *See Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 243 (4th Cir. 1997) ("[A]bstract advocacy of lawlessness is protected speech under the First Amendment."); *Claiborne Hardware Co.*, 458 U.S. at 927 ("[M]ere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment."); *Brandenburg*, 395 U.S. at 447 ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). The complaint, though, is replete with specific allegations that extend beyond mere "abstract" advocacy. The allegations of physical assault are "not by any stretch of the imagination expressive conduct protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993). And even many of those allegations that do concern expressive conduct, which the Court included in its above analysis, fall into three main categories of speech that extend beyond the First Amendment's protections for advocacy.

First, as the Supreme Court recognized in *Claiborne Hardware*, "a finding that [a Defendant] authorized, directed, or ratified specific tortious activity would justify holding him

responsible for the consequences of that activity." 458 U.S. at 927. The allegations that Defendants directed a charge towards Plaintiffs while they were around the Jefferson statue (dkt. 175 at ¶164), sprayed them with pepper spray (*id.* at ¶172), ratified the other assaults (*id.* at ¶¶166, 169, 172), organized and oversaw violence in the park (*id.* at ¶212), and ratified Defendant Fields's attack all fall within this category. (*Id.* at ¶267).

"Second, a finding that [a Defendant's public statements] were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period." *Claiborne Hardware*, 458 U.S. at 927. Falling within this category are the allegations that Defendants encouraged the throwing of torches at counter-protesters (dkt. 175 at ¶169), and ordered others to "charge!" (*id.* at ¶35). *See also Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) ("The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.").

"Third, [otherwise protected speech] might be taken as evidence that [a Defendant] gave other specific instructions to carry out violent acts or threats." *Claiborne Hardware*, 458 U.S. at 927. Multiple allegations fall into this category, including allegations Defendants distributed shield fighting tactics (dkt. 175 at ¶192), instructed members to wear "good fighting uniforms" (*id.* at ¶ 115), and recommended attendees "bring picket sign posts, shields, and other self-defense implements which can be turned from a free speech tool to a self-defense weapon should things turn ugly." (*Id.* at ¶112). Taken by themselves, these statements may be protected. But

taken in light of the other allegations, they can serve as evidence of an agreement to commit violence.

While Defendants are incorrect in suggesting that the First Amendment immunizes them entirely, it does require a careful parsing of the allegations.  When conspiracy or other unprotected speech "occurs in the context of constitutionally protected activity, . . . 'precision of regulation' is demanded." *Claiborne Hardware Co.*, 458 U.S. at 916 (quoting *N. A. A. C. P. v. Button*, 371 U.S. 415, 438 (1963)); *id.* at 908 ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.").  "Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17.

One of the primary effects of these restraints is that Plaintiffs may recover "[o]nly those losses proximately caused by unlawful conduct[.]" *Claiborne Hardware Co.*, 458 U.S. at 918. This requires tracing the "specific parties [who] agreed to use unlawful means" and "identify[ing] the impact of such unlawful conduct." *Id.* at 933–34.  These requirements substantially overlap with the pleading requirements framed above.  *See A Soc'y Without A Name*, 655 F.3d at 347 (holding Section 1985(3) allegations were insufficient when the plaintiff "fail[ed] to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made").  And so, as described there, the Court has required Plaintiffs to plausibly allege that their various injuries resulted from agreements made by specific Defendants; they cannot allege that all the rally attendees who disagree with them were part of

56

one overarching conspiracy.  The Court has imposed this heightened standard to the pleadings in order to satisfy the "precision of regulation" demanded by the First Amendment.  *Claiborne Hardware Co.*, 458 U.S. at 916.  However, Defendants' more general argument that it is immunized from liability by the First Amendment fails.[7]

## B.  The Second Amendment

Many of the above allegations note that Defendants brought weapons (*e.g.*, assault rifles, shields, poles, and pepper spray) to the Friday and Saturday events.  Defendants briefly argue that the Second Amendment protected their rights to bring these weapons to the rally.  But Plaintiffs' theory here is not that Defendants incurred liability by *bringing* these weapons, but by *using* them.  (Dkt. 231 at ECF 52).  As Plaintiffs correctly point out, the Second Amendment "right of the people to keep and bear Arms" no more insulates Defendants from civil liability for the use of their weapons in an assault than it insulates a criminal defendant from liability because he committed his crime with a weapon.  "Like most rights, the right secured by the Second Amendment is not unlimited."  *D.C. v. Heller*, 554 U.S. 570, 626 (2008).

---

[7]     Two remaining First Amendment arguments can be dismissed quickly.  First, a few Defendants argue that this Court's August 2017 order enjoining Charlottesville from revoking the attendee's permit establishes the legality of the rally as a matter of *res judicata*.  But that *ex ante* determination, that included none of these Plaintiffs, about whether Charlottesville violated the First Amendment is completely different than this *ex post* consideration of whether Defendants violated specific laws.  As just discussed, Defendants and other rally attendees did have legitimate First Amendment rights at the rally, but the problem is that Plaintiffs allege Defendants exceeded the bounds of those rights by conspiring to commit violence.

    Second, the same Defendants argue that the torchlight march was an expressive activity that is no different than flag burning.  *See, e.g., Texas v. Johnson*, 491 U.S. 397 (1989).  While this may or may not be correct, *see, e.g., Virginia v. Black*, 538 U.S. 343 (2003) (cross burning is not necessarily protected by the First Amendment because true threats are not protected speech), Plaintiffs' allegations are based not just on the torches themselves, but on the associated violence that occurred during the march.  As just discussed, that violence is not protected by the First Amendment.

Likewise, Defendants point to no authority preventing the Court from considering Defendants' decisions to bring substantial amounts of weapons to the rally as evidence of a plan to engage in violence. (*See, e.g.,* dkt. 175 at ¶303 ("After the Unite the Right 'rally,' Defendant Cantwell explained, 'I came pretty well prepared for this thing today,' while pulling out three pistols, two semi-automatic machine guns, and a knife. Of the next 'alt-right protest,' he said, 'it's going to be tough to top but we're up to the challenge . . . I think a lot more people are going to die before we're done here, frankly.'")). While the reasonableness of this inference may vary based on specific allegations (*e.g.*, an individual lawfully carrying a licensed gun does not reasonably give rise to this inference), some of Plaintiffs' allegations concerning weapons do support an inference that Defendants planned to engage in racially motivated violence at the rally. (*See, e.g., id.* at ¶191 ("Vanguard is fabricating 20 additional shields. We should have a good amount between organizations."); *id.* at ¶192 (describing a "Shield Tactics Primer" and "a video illustrating shield fighting techniques" posted on Discord); *id.* at ¶212 (describing how Defendants used shields in "the fight")). Defendants cite no cases to the contrary, choosing instead to invoke *Heller* and *McDonald* as talismans. Defendants' Second Amendment arguments fall flat.

**C. Judicial notice**

Defendants also ask the Court to take judicial notice of various documents and videos, ranging from the Heaphy Report (a report Charlottesville commissioned in the wake of the rally) to YouTube videos of speeches Defendants' made at the rally. *See generally* Fed. R. Evid. 201. First, Defendants wish to demonstrate that the City of Charlottesville and various counter-protesters were also responsible for the violence. While the Court has reviewed the Heaphy Report, other potential causes of violence mentioned by it do not undermine Plaintiffs'

allegations about these Defendants' conspiracy to commit violence. Even assuming it is proper to take judicial notice of the whole report, *see* Fed. R. Evid. 201(b) ("The court may judicially notice a *fact* . . . ."), its only relevance here is to provide general background to the allegations.

Second, Defendants also wish to provide context for various quotes and statements that they made through videos and transcripts of their speeches and statements. Here, the Court declines to take judicial notice of these documents because doing so would lead the Court into some of the fundamental factual disputes of the case, disputes that are appropriate for discussion later in the litigation. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015) ("We are mindful that judicial notice must not 'be used as an expedient for courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of litigants to present evidence on disputed matters.'"). More specifically, because "[t]he parties clearly and reasonably disagree about the meaning to be ascribed to these [statements]," it is appropriate for the Court to "decline to judicially notice them." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009).

**D.**      **Unincorporated associations under Va. Code § 8.01-15**

Multiple Defendants are sued as "unincorporated associations" under Virginia law. Virginia Code § 8.01-15 "provides that unincorporated associations may sue or be sued in their own name, but does not otherwise alter the legal definitions of such groups." *Bedford Genealogical Soc., Inc. v. Bedford Museum & Genealogical Library*, No. CIV.A. 6:09-CV-00060, 2010 WL 2038843, at *3 n.4 (W.D. Va. May 21, 2010). And so, looking to the common law governing unincorporated associations, "[a]n unincorporated association is a collection of individuals gathered for a common purpose and 'is not a legal entity separate from the persons who compose it.'" *Id.* (quoting Black's Law Dictionary, association (8th ed. 2004)). "Such an

association suggests an organized group made up of persons who become members of the association voluntarily, but subject to certain rules or by-laws; the members are customarily subject to discipline for violations or non-compliance with the rules of the association." *Yonce v. Miners Mem'l Hosp. Ass'n*, 161 F. Supp. 178, 186 (W.D. Va. 1958). The word has been used to refer to "associations such as trade unions, fraternal organizations, business organizations, and the like." *Id.* Another court has listed the following unincorporated associations: "a hospital association, real estate investment trust, racing commission, landowner association, and a labor organization." *Muniz v. Fairfax Cty. Police Dep't*, No. 1:05CV466 (JCC), 2005 WL 1838326, at *2 n.2 (E.D. Va. Aug. 2, 2005). Generally, associations have the abilities "to prescribe the conditions or qualifications of their membership or their duties, to enlarge or reduce their membership, to enlarge or decrease the scope of their activities, [and] to dissolve the association . . . ." *Yonce*, 161 F. Supp. at 186.

　　　　Only one organizational Defendant addresses whether it qualifies as an "unincorporated associations," and it does so by introducing an affidavit that is not properly before the Court at this stage.[8] However, the Court will eventually need to consider the question in order to

---

[8]　　　　Defendant Nationalist Front briefly raised this issue in a motion to dismiss filed in response to the original complaint. (Dkt. 105 at 1–2; dkt. 207). Defendant Schoep, the founder of Defendant Nationalist Front, filed an affidavit in support of the motion to dismiss. (Dkt. 105-1). The affidavit states that Nationalist Front "has no existence other than [its] website." (*Id.* at ¶9). This is directly contradicted by Plaintiffs' allegations that Defendants Schoep and Heimbach "co-chair" the organization (dkt. 175 at ¶31), that Defendant Hill also assists in its leadership (*id.* at ¶39), that it was designed to be "the thread that would unite white supremacist and white nationalist circles" (*id.* at ¶39), and that its members were present and acted as "warriors" at the Saturday rally (*id.* at ¶¶37, 196, 212). Considering this affidavit and resolving whether Defendant Nationalist was merely a website or instead a platform for Defendants to coordinate their conduct at the rally would require the Court to treat this as a motion for summary judgment. Fed. R. Civ. P. 12(d). Furthermore, Defendant Nationalist Front does not respond to Plaintiffs' argument that consideration of the affidavit would be inappropriate without allowing Plaintiffs time for discovery. The Court holds consideration of the affidavit would be inappropriate at this stage, and so the affidavit will be excluded. *See Occupy Columbia v. Haley*,

60

determine what alleged actions and statements of individuals are attributable to the purported

unincorporated associations.  *See* 7 *Corpus Juris Secundum* Associations § 75 (2018 Westlaw)

("An unincorporated association, formed to accomplish a common purpose, is bound to use the

same care to avoid injury to others as natural persons, and it may be liable in tort for the

wrongful acts of its members *when acting collectively in the prosecution of the business for*

*which it is organized. . . .*  An association may not be held liable for torts of a member when it

has no control over his or her acts."  (emphasis added)).[9]  But because this issue is not properly

before the Court at this stage and requires further factual development, the Court does not

consider these issues at this stage of the litigation.

---

738 F.3d 107, 117 (4th Cir. 2013) (affirming district court's refusal to consider affidavits at the
motion to dismiss stage).  The parties may seek leave to brief this issue on an expedited basis.

[9]       Difficult questions are also raised by the alleged ratification of certain actions (*e.g.*,
Defendant Fields's car attack) by various organizational Defendants.  *See N.A.A.C.P. v.
Claiborne Hardware Co.*, 458 U.S. 886, 931 (1982) ("To impose liability without a finding that
the NAACP authorized—either actually or apparently—or ratified unlawful conduct would
impermissibly burden the rights of political association that are protected by the First
Amendment."); *see also* 7 *Corpus Juris Secundum* Associations § 75 (2018 Westlaw) ("In the
absence of authorization or ratification by all of its members, an association can only be held
liable for the unintentional act of an agent or employee, and cannot be held to account for the
intentional act of an agent which results in a trespass."); *id.* at § 71 ("An unincorporated
association can ratify the conduct of one of its members and an unincorporated association's
ratification of an unauthorized act of one of its members has retroactive effect.").
        Another thorny issue is whether actions of these organizations can create liability for
their individual members.  *See Feldman v. N. British & Mercantile Ins. Co.*, 137 F.2d 266, 268
(4th Cir. 1943) ("It is generally held that an unincorporated voluntary association, formed to
accomplish a common purpose, is bound to use the same care to avoid injury to others as natural
persons, but mere membership in the body or contribution of dues or money to effectuate the
common purpose does not make all the members liable for unlawful acts of the association done
without their participation and without their knowledge or approval.") (applying South Carolina
law); *see also Bedford Genealogical Soc., Inc. v. Bedford Museum & Genealogical Library*, No.
CIV.A. 6:09-CV-00060, 2010 WL 2038843, at *3 (W.D. Va. May 21, 2010) ("The unilateral
acts of certain Society members—without notice to or the knowledge or consent of the entire
membership—in forming a corporation of the same name did not transfer the assets or members
of the unincorporated association to the corporation.").

61

## VIII. Conclusion

> In litigation of this kind the stakes are high. Concerted action is a powerful
> weapon. History teaches that special dangers are associated with conspiratorial
> activity. And yet one of the foundations of our society is the right of individuals
> to combine with other persons in pursuit of a common goal by lawful means.

*Claiborne Hardware Co.*, 458 U.S. at 932–33. While the Court acknowledges the weighty First

Amendment interests implicated by the "Unite the Right" events, Plaintiffs here have plausibly

alleged conduct that lies "close to the core of the coverage intended by Congress" when it passed

the Ku Klux Klan Act to address violence against racial minorities. *Griffin*, 403 U.S. at 103;

*Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 368, 394. Accordingly, the Court will largely

deny the motion to dismiss. Defendant Peinovich will be dismissed from the case. Plaintiff

Pearce's claims against the moving Defendants will be dismissed, although the Court does not

address her claims against the non-moving Defendants. And the claims under the Virginia hate

crime statute survive only for those Plaintiffs who were injured at the torchlight march.[10]

An appropriate order will issue. The Clerk of Court is requested to send a copy of this

Opinion and the accompanying Order to the parties.

Entered this  9th  day of July, 2018.

*Norman K. Moon*

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[10]    Counts Four, Five, and Six are only alleged against Defendant Fields, and are tied to his
car attack. He has not moved to dismiss, and so these claims are not addressed here.

62

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA


ELIZABETH SINES ET AL.　　　　　:　　　Case No.  3:17-CV-72

　　　　**Plaintiff**　　　　　　　:　　　Judge MOON


　　　　　　　　　　　　　　　　　:

　　-v-

JASON KESSLER ET AL.　　　　　　:

　　　　　　　　　　　　　　　　　:

　　　　**Defendants**

_____

**ANSWER TO PLAINTIFFS FIRST AMENDED COMPLAINT**
_____


　　　Defendants Jason Kessler, Christopher Cantwell, Robert Ray, Nathan Damigo, Matthew Heimbach, Matthew Parrott, Jeff Schoep, Vanguard America, Identity Evropa, Traditionalist Worker Party, National Socialist Movement, and Nationalist Front ("Answering Defendants") state their Answer to Plaintiff's First Amended Complaint as follows:


　　　1.　Denied.[1]

_____

[1] To the extent Nationalist Front ("NF") took any action at all in Charlottesville it was taken by NF member organizations. In this Answer those would be TWP, NSM, and Vanguard. If any of those organizations

1

2. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

3. Answering Defendants deny the allegations in the first sentence of this paragraph; are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph, and on that basis, deny those allegations except that it is denied any Answering Defendant is a "Klansmen"; are without knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of this paragraph, and on that basis, deny those allegations; admit that Cantwell brought firearms and mace, that Vanguard, NSM, Heimbach, Parrott, and Schoep, brought shields and flagpoles, that Identity Evropa, and Damigo, brought signs and flagpoles, and that Ray brought mace, deny any other allegation in the fifth sentence of this paragraph; are without knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence of this paragraph, and on that basis, deny those allegations, except that Kessler, Cantwell, and Ray admit that persons chanted the listed phrases or something similar on August 11, 2017; and deny the remaining allegations in this paragraph.

4. Answering Defendants admit the allegations in the first sentence of this paragraph is accurate but deny they are in any way legally responsible for said

makes an admission to an allegation herein it is also admitted by NF. If none of them make an admission it is also denied by NF. In addition, where a particular Answering Defendant makes an admission or denial it is admitted or denied by all based solely on the knowledge of that particular answering defendant and to the limits of said defendants knowledge. Further, the phrase "or ratifying" should be included in each factual denial whether or not fully typed in as it was occasionally omitted due to a word processing error.

2

violence occurring; deny the second sentence of this paragraph; admit the listed quotes in the remainder of the paragraph are accurate or that something similar was posted to the internet, but deny the remaining allegations in this paragraph.

5. Denied.

6. Denied.

7. Denied.

8. Admitted.

9. Admitted.

10. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

11. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

12. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

13. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

14. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

3

15. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

16. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

17. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

18. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

19. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

20. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except Jason Kessler admits he uses or has used the internet handles listed, was an organizer for Unite the Right, founded Unity and Security for America, contributed to VDare and Daily Caller, was featured on a promotional poster, got in a fight with a man in January 2017 and subsequently pled guilty to a misdemeanor charge resulting therefrom, and was charged with perjury, and has collected petition signatures as alleged.

4

21. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

22. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except Christopher Cantwell admits he resides in New Hampshire, hosts "Radical Agenda" and it's associated social media, has made the statements listed or something similar, and was charged with felonies as alleged or something similar.

23. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that they admit Mr. Fields has been indicted.

24. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except Vanguard America admits the general description given of it in this paragraph is passably accurate, denies that James Fields is or ever has been a member; and admits that Fields wore a Vanguard uniform and carried a Vanguard shield on August 12.

25. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they admit Anglin is the publisher of the

5

Daily Stormer and that said publication posted the poster alleged or something similar.

26. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they admit the fundraising post alleged or something similar was posted.

27. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except Robert Ray admits he is a resident of Texas, occasionally writes for Daily Stormer, has occasionally represented Daily Stormer and did so in relation to Unite the Right, is involved with Daily Stormer DFW book clubs both in Dallas and generally, encouraged persons to attend the relevant events on Daily Stormer, attended the rally on both August 11 and 12, denies as factually inaccurate allegations of extremism or wrongful violence, and admits attending certain meetings but denies any wrongful conduct plans to do same.

28. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except Nathan Damigo admits he was resident of California, was a member of Identity Evropa, punched the woman called "Moldylocks" in April 2017 in Berkeley and made the statement attributed to him or something similar. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations about

6

what Richard Spencer did or didn't say, and on that basis, deny those allegations.

29. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they admit Mosley was a planner of Unite the Right.

30. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except Identity Evropa admits the general description given of it in this paragraph is passably accurate with the exception of the allegation and implication of any supremacism.

31. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations deny except Matthew Heimbach admits he was a leader of TWP and Traditionalist Youth Network, is familiar with Jeff Schoep and Nationalist Front, made the Hitler statement or something similar, and led TWP on August 12.

32. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Matthew Parrott admits the paragraph is accurate but adverts that his status in the TWP described in this paragraph is no longer accurate.

33. Admitted except that Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Virginia Code in this paragraph, and on that basis, and deny those allegations and deny as factually inaccurate the allegation that violence engaged in was wrongful or unlawful in last sentence of this paragraph.

34. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

35. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

36. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they deny as factually inaccurate the allegation of unlawful violence.

37. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jeff Schoep admits this paragraph is accurate.

38. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jeff Schoep and NSM admit that,

8

other than legal conclusions and allegations of violence, the description of NSM in this paragraph is substantially accurate.

39. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, except that Jeff Schoep and Matthew Heimbach admit Nationalist Front was supposed to be a way for disparate pro-white groups to cooperate on individual projects should they choose to do so, and deny as factually inaccurate allegations of wrongful violence or intimidation.

40. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they admit they are aware of the participation Mr. Invictus in the rally.

41. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

42. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they admit they are aware of Mr. Peinovich's online business presence and are aware that at least Spencer addressed the crowd at various times on August 11 and 12.

43. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

9

44. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except they deny as factually inaccurate allegations of conspiracy or wrongful violence.

45. Denied.

46. Denied except that Answering Defendants are aware of the "summer of hate" meme on Daily Stormer.

47. Answering defendants deny the allegations in this paragraph except they admit the Lee statue issue was relevant to the decision to rally in Charlottesville.

48. Answering defendants deny the allegations in this paragraph except they admit the Lee statue issue was relevant to the decision to rally in Charlottesville.

49. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler denies as factually inaccurate the allegations of intimidation in this paragraph.

50. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler, Nathan Damigo, Matthew Heimbach, Identity Evropa, Vanguard America, and TWP admit the description of signs carried and chants verbally made, as distinct from what WW2 era Nazi government policy or philosophy was, is substantially accurate.

51. Denied as factually inaccurate except that Jason Kessler admits the statements attributed to him in quotes are substantially accurate.

52. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Damigo and Kessler admit that the quoted statement was made if not by Spencer than by a different speaker.

53. Answering Defendants deny as factually inaccurate the allegations in this paragraph except they admit they are aware that the Daily Stormer published the language indicated.

54. Answering Defendants deny as factually inaccurate the allegations in this paragraph except they admit they are aware that the May event has been referred to as indicated.

55. Answering Defendants deny as factually inaccurate the allegations in this paragraph except they admit Jason Kessler applied for a permit and that lawful event planning began prior to August 2017.

56. Answering Defendants deny as factually inaccurate the allegations in this paragraph except Jason Kessler admits the "Proud Boys" were invited and the statements in quotes are substantially accurate.

57. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler admits he witnessed the July 2017 and it's description in this paragraph is substantially accurate.

58. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

11

59. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler admits the allegations in this paragraph.

60. Denied as factually inaccurate.

61. Denied as factually inaccurate.

62. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Robert Ray admits the indicated language was published by the daily Stormer.

63. Denied as factually inaccurate except that Answering Defendants admit some lawful event planning did occur.

64. Denied as factually inaccurate.

65. Denied as factually inaccurate.

66. Denied as factually inaccurate.

67. Denied as factually inaccurate.

68. Denied as factually inaccurate.

69. Admitted that the internet is used by Answering Defendants and others to communicate a variety of ideas, denied as factually inaccurate that Answering Defendants used it as specifically alleged in this paragraph.

70. Answering Defendants deny as factually inaccurate the allegation in this paragraph that they used the internet to conspire to commit any wrongful or unlawful acts but admit it was used for lawful event planning. Nathan Damigo

and Identity Evropa deny as factually inaccurate the allegation in the last sentence of this paragraph and deny as factually inaccurate that this was an official Identity Evropa event, however it is admitted that Identity Evropa members participated in lawful political activity on relevant dates.

71. Answering Defendants state that the Discord site and how it works speak for itself.

72. Answering Defendants admit a Charlottesville server was set up on Discord, deny as factually inaccurate the remainder of the allegations in this paragraph, but admit that some lawful event planning did occur on the Discord.

73. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler admits he was a moderator on relevant Discord channel and that it was invite only and he could view and delete posts in his channel.

74. Denied as factually inaccurate.

75. Answer Defendants deny as factually inaccurate the allegations in this paragraph that any unlawful conspiring or activity was perpetrated by them on the Discord but Jason Kessler and Nathan Damigo admit lawful event planning occurred on the Discord.

76. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that they admit there was more than one channel dedicated to lawful planning of the Rally on Discord.

77. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler, Nathan Damigo, and Vanguard America admit that there were private channels on Discord for Rally planning as to specific groups.

78. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler admits the indicated persons all participated in or were referenced on Discord.

79. Denied as factually inaccurate except that Jason Kessler admits lawful promotional material was shared on Discord.

80. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Jason Kessler admits those hashtags were used on Twitter.

81. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations except that Vanguard America admits it had a Discord channel one purpose of which was to communicate with event organizers.

82. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

14

basis, deny those allegations except that they are aware that the listed group had a Discord server.

83. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, but Jason Kessler admits that not all Discord servers have appeared publicly.

84. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, but Robert Ray admits Daily Stormer used it's website for lawful planning activities.

85. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, but admit they are aware of the Charlottesville statement and aver that the statement speaks for itself.

86. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, and aver that the Daily Stormer speaks for itself.

87. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, and aver that altright.com speaks for itself.

88. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, but Robert Ray admits he appears on the referenced video interview and that said video speaks for itself.

89. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts.

90. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, but TWP admits created or distributed the reference poster and avers that the poster speaks for itself.

91. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, but Robert Ray and Vanguard

admit they created or distributed the referenced poster and aver that the poster speaks for itself.

92. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, and aver that the Daily Stormer and altright.com speak for themselves.

93. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, aver that the referenced publications speak for themselves, but Robert Ray admits he posted the language attributed to him or something similar.

94. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts.

95. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, and aver the poster speaks for itself including as to the identity of it's creator and uploader.

96. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, and aver publicly released Discord logs speak for themselves.

97. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, deny as factually inaccurate allegations of conspiracy or the planning of unlawful acts, and aver the publicly available chat logs speak for themselves.

98. Answering Defendants deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph.

99. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph.

100. Answering Defendants admit this document exists and was circulated, deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that the document speaks for itself.

101. Answering Defendants deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the referenced document speaks for itself.

102. Denied as factually inaccurate.

103.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself.

104.     Answering Defendants deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the postings speak for themselves.

105.     Answering Defendants deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the postings speak for themselves.

106.     Answering Defendants deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the postings speak for themselves.

107.     Answering Defendants deny as factually inaccurate the allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the postings speak for themselves.

108.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the postings speaks for themselves.

109. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such postings speaks for themselves.

110. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself.

111. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself.

112. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself but Jason Kessler admits he posted the indicated language or something similar.

113. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself.

114.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself but Vanguard admits Mr. Rousseau was a member at relevant times.

115.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself but Vanguard admits Mr. Rousseau was a member at relevant times.

116.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself, but Vanguard admits Mr. Rousseau was a member at relevant times and Mr. Ray admits he made the indicted post or something similar.

117.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself.

118.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting on Daily Stormer speaks for itself.

119.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph.

120.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such posting speaks for itself.

121.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that

any such posting speaks for itself, but Vanguard admits planning for a particular physical appearance of it's members did occur.

122.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that any such posting speaks for itself, but Jason Kessler admits to posting the referenced language or something similar.

123.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver the referenced poster speaks for itself.

124.     Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that any such internet posting speaks for itself.

125.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that any such posting speaks for itself.

126.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph and aver that the Daily Stormer speaks for itself.

127.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that any such posting or recorded communication speaks for itself.

128.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that any such posting speaks for itself.

129.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that any such posting or podcast speaks for itself.

130.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, and aver that any such posting speaks for itself, but Jason Kessler

admits he discussed a possible parking and shuttle plan with Tyrone but denies that plan was actually used.

131.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy the planning, intending, or committing of unlawful acts in this paragraph.

132.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning of unlawful acts in this paragraph, and aver that any such permits speak for themselves.

133.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

134.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

135.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such posting speaks for itself. Jason Kessler specifically denies the allegations regarding his intent in this paragraph.

136.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such posting speaks for itself.

137.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such voice chat speaks for itself.

138.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts and aver that the claim based on this paragraph has been dismissed.

139.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

26

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts and aver that the claim based on this paragraph has been dismissed.

140.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such store signs speak for themselves.

141.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such posting or store signs speak for themselves.

142.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such letters speak for themselves.

143.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, but Jason Kessler, Robert Ray, and Christopher Cantwell admit they

participated in planning and/or were aware of planning and did attend said torchlight march.

144.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph but Jason Kessler admits the march was not publicized generally but specifically denies proper government authority was not told about and fully briefed on said march. It is further admitted Jason Kessler's rally permit was for August 12.

145.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, but Jason Kessler admits there was lawful coordination on Discord and avers the Discord speaks for itself.

146.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver the Daily Stormer speaks for itself.

147.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

28

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, aver that Discord call recordings speak for themselves, but Jason Kessler admits he made the statements indicated or something similar.

148.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, but Jason Kessler admits the instruction indicated is substantially accurate.

149.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, and aver that Discord postings speak for themselves.

150.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, and aver that Discord or internet posts speak for themselves, but Robert Ray admits he made the explanation attributed to him or something similar.

151.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and state the Vice documentary speaks for itself, but Christopher Cantwell admits he does appear in the referenced video.

152.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver the Discord posts speak for themselves.

153.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

154.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

155.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

156.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

157.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, and Cantwell, Kessler, and Ray deny they issued any unlawful orders to anybody on August 11 during the torchlight march but admit they heard chanting and barking which was impressively noisy.

158.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Jason Kessler specifically denies they took a circuitous route to annoy UVA students or for any other reason and Cantwell and Ray deny they have any knowledge of why any route was taken.

159.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Cantwell, Kessler, and Ray further deny issuing any unlawful

instructions at any time that evening and further deny they carried radios, or wore earpieces.

160.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Cantwell admits he walked generally on the outside of the column.

161.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

162.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph except that Kessler, Cantwell, and Ray admit they heard barking.

163.    Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

164.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

165.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself but admit that Richard Spencer appears in said video.

166.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself and that Discord posts speak for themselves.

167.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

168.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself. Robert Ray admits he made the statement attributed to him or something similar.

169.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself. Robert Ray admits he shouted at counterprotestors and admits he made the statement attributed to him or something similar.

170.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

171.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

172.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video and pictures of this portion of the march and they speak for themselves. Answering defendants further aver that any violence was started by the alleged victims not by the marchers and any Answering Defendant actions thereafter were lawful except that Mr. Cantwell admits he has pled guilty to two misdemeanors in connection with this portion of the march but Mr. Cantwell avers his actions were otherwise lawful.

173.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

174.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

175.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself but admit that Richard Spencer appears in the video.

176.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march and it speaks for itself.

177.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and aver that any such video speaks for itself.

178.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

179.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

180.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

181.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

182.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

183.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

37

Pg. No. 222

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, and aver that the internet post speaks for itself.

184.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that internet posts speak for themselves.

185.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that internet posts speak for themselves.

186.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that internet posts speak for themselves.

187.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph except that it is admitted Unite the Right occurred on August 12, 2017.

188.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this event and that it speaks for itself and that statements on the internet or video speak for themselves. Jason Kessler admits he made the statement attributed to him or something similar.

189.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that internet or video posts speak for themselves.

190.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that Discord posts speak for

themselves. Jason Kessler specifically denies as factually inaccurate the allegation in the last sentence of this paragraph.

191.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that Discord chats speak for themselves.

192.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver that Discord logs speak for themselves.

193.     Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

194.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, and Jason Kessler denies there was any intentional failure to follow a plan by the Charlottesville Police for safety of marchers.

195.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is video of this rally and said video speaks for itself and said video fails to verify the alleged statements of Mr. McAuliffe.

196.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of NSM's pre-set location and the video speaks for itself.

197.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Vanguard America admits some members marched as a group to the park. Vanguard admits a non-member, James Fields, marched with them.

198.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this

41

paragraph except that it is admitted that persons known to Answering Defendants as league of the South members were present on August 12.

199.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

200.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. TWP admits the description of it's members and activities in this paragraph is substantially accurate.

201.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants aver there is publicly available video of this portion of the march that contains the quoted language but further aver that none of them expressed said language and that context given in Plaintiffs complaint is entirely inaccurate based on the video.

202.     This paragraph was dismissed and does not require a response. Answering Defendants are without knowledge or information sufficient to form a belief as

to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

203. The plaintiffs allegation that each and every anonymous internet poster is a conspirator was dismissed and does not require a response. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

204. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

205. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations.

206. Answering Defendants deny that they knowingly worked in concert with persons carrying firearms but admit that such were present. Answering Defendants admit Plaintiff Wispelwey was present and locking arms with his cohorts. Other than as admitted in this paragraph Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and

deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

207.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

208.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants admit that Wispelwey and the others were moved out of the way but aver that this occurred only after a Charlottesville police officer told co-defendant Michael Hill that the police could not do anything about Wispelwey and others blocking the road and so the marchers would have to walk through them. Further, it is denied that any Answering Defendant made the statement to Wispelwey or heard it made.

209.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Answering Defendants further aver that this allegation is not even consistent with statements made by Wispelwey to media.

210.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

211.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Further, it is specifically denied that any Answering defendant spit on or caused to be spit on Plaintiff Romero.

212.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, except Matt Parrott admits he made the statements and published the articles attributed to him.

213.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

214.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph except that Matt Parrott admits he made the statement attributed to him or something similar.

215.    Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

216.    Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

217.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph except that Robert Ray admits the Daily Stormer published the indicated statements or something similar but he denies the plaintiffs allegation regarding deliberate incitement as factually inaccurate.

218.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this

paragraph. Vanguard denies the statement indicated was anything but a joke or that it had or could have had any effect at the park or was even noticed by any Vanguard member at the park.

219.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

220.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

221.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts or of "common tactics" in this paragraph.

222.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

223. Admitted.

224. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, except it is admitted that state of emergency was announced by police officers around 11:28 a.m.

225. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph, except that Robert Ray admits the Daily Stormer published the indicated comment or something similar.

226. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph except it is admitted Jason Kessler directed people to go to McIntire Park, some persons loaded into vans, and that Cantwell and Ray were interviewed. Ray's video interview speaks for itself.

227. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this

48

paragraph. Robert Ray admits Daily Stormer published the indicated text or something similar but it is denied this was an incitement to violence.

228.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph and further deny the statements alleged are admissions of any unlawful conduct except Mr. Parrott admits he did not leave the park immediately upon being told to do so.

229.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

230.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

231.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this

paragraph. Jeff Schoep admits his published statements on this event are accurate.

232.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

233.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

234.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

235.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

236.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

237.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Jason Kessler admits the attached picture is accurate.

238.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Jason Kessler admits the attached picture is accurate.

239.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

240.　　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

241.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Jason Kessler admits the indicated post is accurate.

242.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

243.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

244.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

245.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

246.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

247.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

248.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

249.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

Case 3:17-cv-00072-NKM-JCH   Document 343   Filed 07/23/18   Page 53 of 82   Pageid#: 3047

of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

250.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

251.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

252.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

253.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

254. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

255. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

256. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

257. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

258. Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

259.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

260.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Jason Kessler admits retweeting the Richard Spencer tweet.

261.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph. Robert Ray admits the daily Stormer published the indicated language.

262.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph.

56

263.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, or committing of unlawful acts in this paragraph or it's footnote.

264.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Robert Ray admits the Daily Stormer published this comment.

265.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

266.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

267.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

Case 3:17-cv-00072-NKM-JCH   Document 343   Filed 07/23/18   Page 57 of 82   Pageid#: 3051

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jason Kessler admits he made tweet in question and later withdrew with the alleged explanation or one substantially similar. Robert Ray admits the Daily Stormer published the hacking text alleged.

268.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Matt Heimbach admits making the comments alleged.

269.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Robert Ray admits the Daily Stormer published this comment.

270.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Vanguard America admits their server contained such comments and avers that Mr. Rousseau is no longer a member.

271.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jeff Schoep admits he made the alleged comments.

272.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

273.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Christopher Cantwell admits he made the comments attributed to him.

274.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

275.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

59

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

276.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

277.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

278.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. It is admitted that Heather Heyer, Lt. H. Jay Cullen, and Trooper Pilot Berke M.M. Yates died on August 12.

279.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

280.　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

281.　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

282.　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

283.　Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

284.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

285.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

286.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

287.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

288.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

289.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

290.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

291.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

292.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

293.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

294.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

295.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

296.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jason Kessler admits he has applied for a permit for August 2018.

297.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that

basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

298.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

299.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

300.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

301.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

302.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jason Kessler admits making the indicated comment.

303.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Christopher Cantwell admits he appeared in the Vice video which is the source of the comments attributed to him.

304.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Christopher Cantwell admits he granted an interview to Vice which is the source of the comment attributed to him.

305.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

306.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

307.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jason Kessler admits he applied for the alleged permit but denies anything like the first Unite the Right will occur with or without a permit.

308.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

309.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Mr. Cantwell admits the funding pages that are alleged were active at one time.

310.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Mr. Cantwell admits running his show from Albemarle County Jail.

311.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Mr. Damigo admits raising funds as alleged at one time.

312.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. It is admitted the City of Charlottesville's proposed actions regarding the Robert E. Lee statue were relevant to the decision to rally in Charlottesville.

313.     Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

314.    Answering Defendants deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

315.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Identity Evropa admits McLaren met with Spencer.

316.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

317.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

318.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

319.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

320.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

321.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jason Kessler avers that while Tyrone offered to help and submitted suggestions neither his assistance nor his plan were ultimately used.

322.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Jason Kessler admits moderating and organizing lawful activity. He denies the Discord was used to plot or incite illegality.

70

323.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Mr. Cantwell and Mr. ray admit only that the lawful possession and use of weapons was discussed.

324.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

325.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

326.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Cantwell, Kessler, and Ray admit that some fundraising and other help, all lawful, for rallygoers was attempted.

327.     Admitted.

328.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

329.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Cantwell, Kessler, and Ray specifically deny this allegation in each particular except they admit to being at the torch light rally.

330.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Cantwell denies assaulting any peaceful person but admits he pled guilty to two misdemeanors arising from the march.

331.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

332.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph. Vanguard admits Fields so attended but denies he is or ever was a member.

333.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

334.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

335.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

336.    Answering Defendants incorporate herein all previous admissions and denials.

337.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

338.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

339.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

340.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

341.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

342.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

343.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

344.    Answering Defendants incorporate herein all previous admissions and denials.

345.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

346.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

347.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

348.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

349.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

350.      Answering Defendants incorporate herein all previous admissions and denials.

351.      Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph and all it's subparts.

352.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

353.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

354.    Answering Defendants incorporate herein all previous admissions and denials.

355.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

356.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations

of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

357.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

358.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

359.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

360.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

361.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

362.    Answering Defendants incorporate herein all previous admissions and denials.

363.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

364.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

365.    Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

366.     Answering Defendants incorporate herein all previous admissions and denials.

367.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

368.     Answering Defendants incorporate herein all previous admissions and denials.

369.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

370.     Answering Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and on that basis, deny those allegations, and deny as factually inaccurate any allegations of conspiracy or the planning, intending, committing or ratifying of unlawful acts in this paragraph.

<u>AFFIRMATIVE DEFENSES</u>

371.     Assumption of the Risk: in that Plaintiffs assumed and unreasonably disregarded the risk their actions would result in their own personal injury;

372.     Contributory Negligence: in that Plaintiffs actions were partly or wholly the cause of their claimed injuries;

373.     Duress: In that Defendants claimed actions were taken in self defense while defendants were being unlawfully assaulted or otherwise mistreated.

374.     Illegality: In that Plaintiffs actions were unlawful and Plaintiffs misconduct is itself the proximate cause of their injuries;

375.     Anything not specifically and explicitly admitted as true in this answer is denied.

WHEREFORE, having fully answered the Plaintiffs Amended Complaint, Answering Defendants request the Court dismiss this action with prejudice.

Respectfully Submitted,

s/ **Elmer Woodard**   _____
ELMER WOODARD (VSB 27734)
5661 US Hwy 29
Blairs, Va. 24527
(434) 878-3422
isuecrooks@comcast.net
*Trial Attorney for Defendants*

S/ **James E. Kolenich** (PHV)
KOLENICH LAW OFFICE
9435 Waterstone Blvd. #140
Cincinnati OH 45249
Phone: 513.444.2150
Fax: 513.297.6065
e-mail: Jek318@gmail.com
*Trial Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify the above was served via the Court's ECF system on July 23, 2018 upon:

All parties of record. No party is entitled to or has requested service by other means.

s/ **Elmer Woodard**
_____
E. Woodard (VSB 27734)